## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| BLAKE J. WATTERSON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; | § | |
| | § | |
| | § | |
| STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| UNITED STATES DEPARTMENT OF JUSTICE; | § | |
| | § | |
| | § | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; | § | |
| | § | |
| | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Defendants.* | § | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    This lawsuit challenges the adoption of a federal rule which purports to turn millions of law-abiding citizens into felons by bureaucratic diktat, in direct violation of both the structural limits in the U.S. Constitution and the Second Amendment right to keep and bear arms.

2.    Millions of Americans have legally purchased stabilizing braces for their pistols, and those braces enable them to shoot their pistols more safely and accurately.

3.    Without a stabilizing brace, large pistols can be more difficult to shoot accurately, especially for people with disabilities and less upper body strength.

4.    Nevertheless, on January 31, 2023, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") published a final rule that rewrites federal statutes and transforms pistols with stabilizing braces into short-barreled rifles.

5.    Although most pistols do not need to be registered under federal law, short-barreled rifles do.

6.    The final rule thus turns millions of law-abiding Americans who possess unregistered pistols with stabilizing braces into criminals.

7.    But ATF cannot rewrite laws: that is Congress's job. The Constitution exclusively vests the legislative power in Congress, and Congress cannot abdicate its legislative role by delegating policy decisions to ATF about whether to make possessing an unregistered pistol with a stabilizing brace a felony. The final rule thus violates Article I, § 1 of the Constitution and separation-of-powers principles.

8.    In any event, even if Congress could constitutionally delegate the authority to create new crimes—which it cannot—it did not do so. Expanding criminal liability and encroaching on Americans' right to keep and bear arms has enormous

political significance, meaning that if Congress wished to delegate this power, it was required to speak clearly. And Congress did not speak clearly here. Because the relevant statutes contain no statement assigning this important policymaking power to ATF, much less a clear statement, ATF exceeded its statutory authority in adopting the final rule.

9.     The final rule fails for yet another reason: it violates the Second Amendment. There is no longstanding historical tradition that justifies the burdens that the final rule places on the right of law-abiding Americans to keep and bear arms. And, to the extent the final rule is a correct interpretation of the statutory firearm restrictions, those provisions likewise violate the Second Amendment. History and tradition do not support requiring individuals to apply to register pistols with stabilizing braces, pay $200, and wait months to over a year for the government's approval to be able to possess pistols with stabilizing braces and exercise their Second Amendment right of self-defense.

10.     The final rule must therefore be declared unconstitutional, set aside, and enjoined; and, to the extent ATF correctly interpreted the relevant statutory provisions, those provisions must be declared unconstitutional.

## **PARTIES**

11.     Plaintiff Blake J. Watterson is a citizen of Texas and is domiciled in Collin County, Texas, where he resides with his family. He owns a stabilizing brace and is injured by the final rule regarding stabilizing braces.

12.     Defendant Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") is a federal agency of the United States, which currently operates under the authority of the Attorney General. 28 U.S.C. § 599A. ATF is headquartered in Washington, D.C.

13.     Defendant Steven Dettelbach is the Director of the ATF. He is sued in his official capacity.

14.     Defendant United States Department of Justice ("DOJ") is a federal agency, which oversees the ATF. 28 U.S.C. § 599A. It is headquartered in Washington, D.C.

15.     Defendant Merrick Garland is the Attorney General of the United States and the head of DOJ. He is sued in his official capacity.

16.     Defendant United States of America is a government entity. It can be sued under the Administrative Procedure Act. *See* 5 U.S.C. § 703.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction and authority to grant the requested relief under 28 U.S.C. §§ 1331, 2201, 2202, and 5 U.S.C. § 701 *et seq.*

18.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because it is where Plaintiff resides.

## STATEMENT OF FACTS

I.   STATUTORY BACKGROUND

A.  **The National Firearms Act**

19.     Congress passed the National Firearms Act ("NFA") in 1934, imposing a tax and registration requirement on firearms it viewed as especially dangerous, such as machine guns and sawed-off shotguns. *See Johnson v. United States*, 576 U.S. 591, 640-41 (2015) (Alito, J., dissenting) (explaining that "sawed-off shotguns were a weapon of choice for gangsters and bank robbers during the Prohibition Era" and Congress responded with the NFA); *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 86 Fed. Reg. 30,826, 30,826-27 (June 10, 2021) ("In 1934, Congress passed the NFA in order to regulate 'gangster' type weapons."); ATF, *National Firearms Act, 1934*, https://www.atf.gov/our-history/timeline/national-firearms-act-1934 (describing the NFA as "a direct response to gang violence, this act imposed criminal, regulatory and tax requirements on weapons favored by gangsters: machine guns, silencers and sawed-off shotguns"). According to the ATF, the tax was

meant to be prohibitively expensive and "curtail, if not prohibit, transactions" in these firearms. ATF, *National Firearms Act*, https://www.atf.gov/rules-and-regulations/national-firearms-act.

20.     The only firearms originally regulated under the NFA and defined as "firearms" were short-barreled shotguns, short-barreled rifles, machineguns, and guns with silencers. *See* 73rd Congress, Sess. 2, ch. 757, 48 Stat. 1236. But the definition excepted pistols, revolvers, and long guns (unless they had silencers), meaning those guns remained free from federal regulations.

21.     Although the NFA definition of "firearm" has been modified somewhat in subsequent years, it still omits pistols and revolvers with rifled bores from the definition (along with rifles and shotguns with long barrels).[1] *See* 26 U.S.C. § 5845(e). As relevant to this suit, the NFA currently defines "firearm" to include "a rifle having a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3). In other words, an NFA "rifle" means short-barreled rifle as the definition excludes rifles with barrels longer than 16 inches. The NFA then distinguishes a "rifle" from other shorter guns by focusing on the fact that rifles are designed to be fired from the shoulder:

> The term "rifle" means a weapon *designed or redesigned, made or remade, and intended to be fired from the shoulder* and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id*. § 5845(c) (emphasis added).

22.     To put it simply, pistols (without silencers) are not subject to NFA provisions, but short-barreled rifles are. And this distinction has serious consequences. Under the NFA, it is a crime to possess a short-barreled rifle with a

---

[1] A rifled-bore barrel has groves that help stabilize a bullet and improve accuracy. Most handguns and rifles use rifled bores, whereas shotguns have smooth-bore barrels.

barrel less than 16 inches in length (or other NFA firearm) that is not registered. *See id.* § 5861(d).

23.    The penalty for that crime is severe; a person who possesses an unregistered short-barreled rifle could face 10 years in prison, seizure of the firearm, and a $250,000 fine. *See* 26 U.S.C. §§ 5871, 5872(a); 18 U.S.C. § 3571(a)-(b); ATF, NATIONAL FIREARMS ACT HANDBOOK §§ 15.1.1, 15.1.2 (rev. Apr. 2009), available at https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download.

24.    If a person wishes to lawfully possess and register an NFA firearm, he can file an Application to Make and Register a Firearm (known as Form 1) and pay a $200 making tax. *See* ATF, *How can I make and register an NFA firearm*? (Jan. 23, 2020), https://www.atf.gov/firearms/qa/how-can-i-make-and-register-nfa-firearm; Application to Make and Register a Firearm, OMB No. 1140-0011, https://www.atf.gov/file/11281/download. Individuals must additionally provide "fingerprints and photographs" with their application, and they must obtain a "law enforcement certification." NATIONAL FIREARMS ACT HANDBOOK § 3.2.3.

25.    Federal Firearm Licensees and Special Occupational Taxpayers are similarly required to register NFA firearms that they import or manufacture by filing a Notice of Firearms Manufactured or Imported, which is known as a Form 2. *See id.* §§ 3.2.4, 3.2.5; Notice of Firearms Manufactured or Imported, OMB No. 1140-0012, https://www.atf.gov/firearms/docs/form/form-2-notice-firearms-manufactured-or-imported-atf-form-53202/download.

**B. The Gun Control Act**

26.    In 1968, Congress passed the Gun Control Act ("GCA"), which bars certain persons, such as convicted felons, from possessing firearms. The GCA accordingly defines firearm more broadly than the NFA:

The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

27.    The GCA, however, also imposes *additional* restrictions on certain weapons, such as short-barreled rifles, for all Americans. Like the NFA, the GCA defines a rifle by focusing on the fact that a rifle is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 18 U.S.C. § 921(a)(7). The GCA additionally defines "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8).

28.    The GCA imposes ongoing restrictions on the sale and use of short-barreled rifles. For example, the GCA prohibits the sale of short-barreled rifles to any person "except as specifically authorized by the Attorney General consistent with public safety and necessity." *Id.* § 922(b)(4). The GCA also prohibits persons from transporting their short-barreled rifles in interstate commerce without specific authorization from ATF. *See id.* § 922(a)(4).[2] A violation of this prohibition could result in five years of imprisonment and a fine. *See id.* § 924(a)(1).

29.    Therefore, there are important legal ramifications and criminal consequences if a gun is a "rifle" under the NFA and a "short-barreled rifle" under the GCA, rather than a pistol.

---

[2] *See also* Application to Transport Interstate or to Temporarily Export Certain National Firearms ACT (NFA) Firearms, OMB No. 1140-0010, https://www.atf.gov/firearms/docs/form/application-transport-interstate-or-temporarily-export-certain-nfa-firearms-atf/download.

### C. ATF's Authority to Administer Gun Laws

30.     The Secretary of the Treasury was originally tasked with administering the NFA and GCA, and ATF was formed to operate within the Department of the Treasury. *See* NATIONAL FIREARMS ACT HANDBOOK § 1.3 ("Until January 24, 2003, authority to administer and enforce Federal firearms laws was the responsibility of the Bureau of ATF within the U.S. Department of the Treasury."). But the task of administering federal gun laws was subsequently transferred to DOJ. *Id.*

31.     ATF now operates as a distinct entity within DOJ and, pursuant to a delegation from the Attorney General, ATF administers the NFA and GCA (as amended) for the Attorney General. *See* 28 U.S.C. §§ 599A(a)(1) (establishing the ATF under the Attorney General's authority), 599A(c)(1) (transferring ATF's "authorities, functions, personnel, and assets" to DOJ); 28 C.F.R. § 0.130(a)(1), (2) (providing that the ATF Director "shall . . . exercis[e] the functions and powers of the Attorney General under the following provisions . . . 18 U.S.C. chapter[ 44] (related to firearms) . . . [and] Chapter 53 of the Internal Revenue Code of 1986, 26 U.S.C. chapter 53 (related to certain firearms and destructive devices)").

32.     Congress did not expressly grant the Secretary or the Attorney General rulemaking authority under the NFA. Instead, 26 U.S.C. § 7801(a)(2)(A) simply tasks the Attorney General with "[t]he administration and enforcement" of the NFA.

33.     Congress did expressly grant rulemaking authority to the Secretary of the Treasury (and then to the Attorney General) to administer the GCA, but that authority is limited. In 1968, Congress specifically rejected a version of the GCA that would have allowed ATF to create new crimes. The bill was introduced with a provision that would impose a fine and imprisonment for a violation "of this chapter *or any rule or regulation promulgated thereunder*," but the Senate deleted the provision authorizing criminal penalties for regulatory violations after hearing arguments the provision was unconstitutional. *See* 114 CONG. REC. 14,792-93 (daily

ed. May 23, 1968) (emphasis added). Senator Griffin expressed his concerns that the

omitted provision would be an impermissible delegation of legislative power:

> [S]urely, if there is one area in which we should not delegate our
> legislative power, it is in the area of criminal law. If we are concerned
> about due process, surely then, we should spell out in the law what is a
> crime. . . . I believe that this provision violates a fundamental principle
> of constitutional law and that, as such, [it] should be stricken from the
> bill.

*Id.* at 14,792 (statement of Sen. Robert P. Griffin). Another senator expressed similar

concerns:

> It seems to me that one of the fundamental principles of constitutional
> protection of the rights of all citizens in the field of criminal law is that
> no one should be made to stand the indictment, the charge, and the
> penalty of imprisonment or fine unless appropriate constituted
> authority of Congress or of the various legislatures of the States of this
> Union has clearly spelled out what constitutes a criminal offense.
>
> To permit, on the one hand, the Secretary . . . to propound regulations
> . . . which are treated as criminal statutes and are punishable as such,
> is to me the height of the abdication of our responsibility with respect to
> the protection of all citizens.

*Id.* (statement of Sen. Howard Baker).

34.     Moreover, Congress further restricted rulemaking authority in 1986

when it amended the GCA with the Firearm Owners' Protection Act. In the Act's

findings, Congress stated that "additional legislation is required to reaffirm the

intent" that federal restrictions not discourage private ownership of firearms by law-

abiding citizens. 100 Stat. 449, § 1(b)(2). Congress specifically "reaffirm[ed] the intent

of Congress, as expressed in section 101 of the Gun Control Act of 1968," stating:

> it is not the purpose of this title to place any undue or unnecessary
> Federal restrictions or burdens on law-abiding citizens with respect to
> the acquisition, possession, or use of firearms appropriate to the purpose
> of hunting, trap-shooting, target shooting, personal protection, or any
> other lawful activity, and that this title is not intended to discourage or
> eliminate the private ownership or use of firearms by law-abiding
> citizens for lawful purposes.

*Id.* Congress then "deleted the discretionary language" that allowed the Secretary to "prescribe such rules and regulations as *he deems reasonably necessary* to carry out the provisions of this chapter." *See* Stephen P. Halbrook, FIREARMS LAW DESKBOOK, § 4:7 (Oct. 2022 Update) (discussing statements from senators indicating that the revision was meant to further curtail the agency's regulatory power). Currently, the Attorney General has congressional authorization to "prescribe *only* such rules and regulations as *are necessary* to carry out" the GCA. 18 U.S.C. § 926(a) (emphases added).

35.    Accordingly, neither the NFA or the GCA authorize Defendants to expand the scope of the definitions in the Acts to cover more weapons, nor do they authorize them to promulgate criminal regulations that create new felonies. *See* Halbrook, §§ 4:7 ("The Gun Control Act contains no explicit power authorizing BATF to promulgate criminal regulations," with the exception of "the misdemeanor offense of false entries by licensees in records required by regulation, and even then the regulation must be authorized by the statute."); 7:7 ("Congress defined various terms and acts in the NFA, and delegated no authority to redefine or expand those terms and acts by regulation so as to create new crimes.").

36.    In contrast, NFA authorizes ATF to *exclude* additional items from the definition of "firearm" if the ATF determines "by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." 26 U.S.C. § 5845(a).

## II.  HISTORY OF STABILIZING BRACES

37.    Pistol stabilizing braces were invented to help disabled veterans. Seeking to assist a friend who is a disabled veteran, Alex Bosco invented a stabilizing brace for large pistols, such as AR-15-style pistols in 2012. He was inspired to create

the device after his friend had to stop shooting a large pistol at a gun range due to his lack of control over the weapon.[3]

38.   Stabilizing braces are designed to secure the pistol to the shooter's forearm to provide the shooter with more control over the firearm, as illustrated by the following patent images:[4]



39.   It is therefore unsurprising that ATF approved the use of a stabilizing brace with large pistols, concluding that it does not legally convert a pistol into a rifle (a gun that is intended to be fired from the shoulder). *See* Exhibit 1, ATF Letter regarding a Forearm Brace (Nov. 26, 2012). Accordingly, ATF recognized that pistols with stabilizing braces were not "rifles" or "short-barreled rifles," and thus are not subject to NFA registration requirements or additional regulations in the GCA. (Of course, the pistols would still be subject to the standard GCA restrictions, such as the prohibition on felons possessing them.)

40.   Stabilizing braces proliferated as different designs were introduced and many individuals enjoyed being able to fire larger pistols more accurately and safely. ATF approved additional stabilizing brace designs, repeatedly concluding that stabilizing braces did not transform a pistol into a short-barreled rifle that would

---

[3] *See* The Company, SB Tactical, https://www.sb-tactical.com/about/company/.
[4] *See, e.g.*, Patent No. US 8,869,444 B2, FIG. 1 (Oct. 28, 2014), https://tinyurl.com/yvhn33z7; Patent No. US 9,664,477 B1, FIG. 1 (May 30, 2017), https://tinyurl.com/ye256s3t.

need to be registered. *See, e.g.*, Exhibit 2, ATF Letter regarding an Adjustable Pistol Stabilizing Brace (Dec. 22, 2015); Exhibit 3, ATF Letter regarding a Forearm Brace Submitted by Gear Head Works, LLC (Jan. 12, 2017).

41.     ATF confirmed that pistols with stabilizing braces were not short-barreled rifles as long as they did not have features like raised ridges on the brace, which could indicate the stabilizing brace was intended to be used as a shoulder stock. *See* Exhibit 2 at 4. Furthermore, ATF did not consider the use of other pistol accessories, such as scopes or hand stops, with a stabilizing brace as indicating a pistol was actually a rifle that was intended to be fired from a shoulder. *See id.* at 3-4 (approving the use of a stabilizing brace on a pistol with a hand stop and scope).

42.     Moreover, ATF recognized that using a stabilizing brace improperly and "firing a pistol from the shoulder would **not** cause the pistol to be classified as [a short-barreled rifle]." *See* Exhibit 4, ATF Letter regarding Firing an AR-15 Type Pistol from the Shoulder (Mar. 5, 2014) ("[C]ertain firearm accessories, such as the SIG Stability Brace have not been classified . . . as shoulder stocks and, therefore, using the brace improperly does not constitute a design change."). In 2015, ATF briefly changed its mind and purported to revoke earlier letters regarding the use of a pistol stabilizing brace as a shoulder stock. *See* Exhibit 5, ATF Open Letter on the Redesign of "Stabilizing Braces." ATF claimed that the use of a pistol stabilizing brace "as a shoulder stock constitutes a 'redesign' of the device because a possessor has changed the very function of the item" and stated that persons who intend to fire a pistol with a stabilizing brace from the shoulder "must first file an ATF Form 1 [to register the gun] and pay the applicable tax because the resulting firearm will be subject to all provisions of the NFA." *Id.*

43.     ATF, however, subsequently reaffirmed that "the mere fact that the firearm was fired from the shoulder at some point" does not mean the firearm is a short-barreled rifle that is subject to the NFA. *See* Exhibit 6, ATF Letter regarding

Reversal of ATF Open Letter on the Redesign of "Stabilizing Braces" (Mar. 21, 2017) (acknowledging that "an NFA firearm has not necessarily been made when the device is not re-configured for use as a shoulder stock – even if the attached firearm happens to be fired from the shoulder"). ATF specifically provided that any contrary construction of the statute in its 2015 letter was incorrect:

> To the extent the January 2015 *Open Letter* implied or has been construed to hold that incidental, sporadic, or situational "use" of an arm-brace (in its original approved configuration) equipped firearm from a firing position at or near the shoulder was sufficient to constitute "redesign," such interpretations are incorrect and not consistent with ATF's interpretation of the statute or the manner in which it has historically been enforced.

*Id.* at 3.

44.     Assured that pistol braces could legally be used and that pistols with stabilizing braces would not be treated as short-barreled rifles under the NFA and GCA, millions of individuals have purchased stabilizing braces over the past decade, enjoying the ability to shoot their larger pistols more safely and with greater accuracy. For some, a stabilizing brace enables them to effectively protect themselves and their families. Others enjoy using stabilizing braces while shooting targets at gun ranges with their friends. And others have found stabilizing braces make their pistols a more effective tool when they are defending their farms and ranches from feral hogs that cause tens of millions of dollars of damage every year in Texas alone.

## III.   ATF's Rulemaking

### A. The Proposed Rule

45.     Even though Defendants lack the authority to redefine "rifle" or "short-barreled rifle" in the federal statutes, ATF issued a proposed rule on June 10, 2021, that would do just that. The proposed rule would "amend the definition of 'rifle' in 27 CFR 478.11 and 479.11, respectively by adding a sentence at the end of each definition" that would make some pistols with stabilizing braces qualify as more

heavily regulated short-barreled rifles. ATF, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 86 Fed. Reg. 30,826, 30,829 (June 10, 2021) ("Proposed Rule").

46.     ATF recognized that stabilizing braces are "designed to be attached to large or heavy pistols and . . . are marketed to help a shooter 'stabilize' his or her arm to support single-handed firing." *Id.* at 30,827. It further acknowledged that stabilizing braces were "inspired by the needs of combat veterans with disabilities who still enjoy recreational shooting but could not reliably control heavy pistols without assistance." *Id.* Nevertheless, ATF believed that some stabilizing braces could be used as shoulder stocks and "may be attached to a weapon platform for the purpose of circumventing the GCA and NFA prohibitions on the sale, delivery, transportation, or unregistered possession and taxation of 'short-barreled rifles.'" *Id.*; *see id.* at 30,845 ("A negative externality addressed by this proposed rule is that individuals and manufacturers may try to use purported 'stabilizing braces' and affix them to firearms to circumvent the requirements of the NFA, which requires registration and taxes to be paid on the making and transfer of NFA.").

47.     ATF thus proposed adding a sentence to its regulations that would expand the definition of "rifle" in the NFA and GCA to include pistols with a "stabilizing brace" that can be used to facilitate firing the gun from the shoulder. *See id.* at 30,851. Specifically, the Proposed Rule provides:

> The term [rifle] shall include any weapon with a rifled barrel equipped with an accessory or component purported to assist the shooter stabilize the weapon while shooting with one hand, commonly referred to as a "stabilizing brace," that has objective design features and characteristics that facilitate shoulder fire, as indicated on Factoring Criteria for Rifled Barrel Weapons with Accessories commonly referred to as "Stabilizing Braces," ATF Worksheet 4999, published on [EFFECTIVE DATE OF THE FINAL RULE].

*Id.*

48.     ATF proposed "to use ATF Worksheet 4999 to determine if a firearm is designed and intended to be fired from the shoulder." *Id.* at 30,830. That worksheet assigns points to purportedly "objective" firearm characteristics and, if a firearm with a stabilizing brace "accumulates 4 points or more" in either "Section II or Section III" (and meets prerequisites related to weight and length), ATF will conclude that it is a short-barreled rifle. *Id.* at 30,829-31.

49.     Many of these purported objective factors, however, are ambiguous to apply, and the worksheet could be interpreted as applying to virtually all AR-style pistols with a stabilizing brace attached. *See, e.g.*, Letter from 48 Senators to Attorney General Merrick Garland and Acting ATF Director Marvin Richardson (June 24, 2021), https://www.cassidy.senate.gov/imo/media/doc/ATF%20Letter.pdf (criticizing the proposed rule as vague and largely subjective and as having the effective of criminalizing millions of pistol braces); Comments of Gun Owners of America, Inc. and Gun Owners Foundation, Docket No. ATF 2021R-08 (Sept. 8, 2021), https://www.regulations.gov/comment/ATF-2021-0002-209066, at 13-32 (describing problems with criteria); Comments of SB Tactical and the Firearms Regulatory Accountability Coalition, Inc., Docket No. ATF 2021R-08 (Sept. 8, 2021), https://www.regulations.gov/comment/ATF-2021-0002-207706 (Ex. 14: Declaration of Richard Vasquez at 3-13) (criticizing the criteria as "subjective" and detailing the problems with the various factors).

50.     What is more, many of the worksheet factors have nothing to do with whether a gun is intended to be fired from the shoulder but will nonetheless result in the gun being classified as a short-barreled rifle. For example, a braced pistol accumulates four points and is thus classified as a rifle simply for having a secondary grip that can facilitate two-handed fire. *See* 86 Fed. Reg. at 30,834. But pistols are frequently fired with two hands, so a secondary grip has no bearing on whether the pistol with the stabilizing brace is intended to be fired from the shoulder. *See, e.g.*,

Comments of SB Tactical (Ex. 13: Report from Gabriel Hurst at 2-3) (explaining that pistols with stabilizing braces are often fired with two hands and that some individuals "with limited functionality" cannot fire pistols with only one hand).[5] Indeed, the military specifically trains servicemembers to shoot pistols using a two-handed stance in most circumstances. *See, e.g.*, U.S. MARINE CORPS, PISTOL MARKSMANSHIP, 54-63, 112-14 (Nov. 25, 2003) https://tinyurl.com/5h4zumv6.

51.     Similarly, the proposed rule classifies a pistol with a hand stop and sight as a rifle even though those accessories do not indicate the pistol is intended to be fired from the shoulder. *See* 86 Fed. Reg. at 30,834; Comments of SB Tactical (Ex. 11: Letter from Tristan Rizzi, Retired Seal Captain) ("Accessories like laser sights and red dots only improve the shooter[']s ability to fire safely and put rounds on target."); *id.* (Ex. 14: Vasquez Declaration at 4) ("Pistols are commonly configured in large rifle calibers, use optical sights and can be fired in a variety of one or two-handed methods."); *id.* at 8 (noting that ATF has approved a gun with a stabilizing brace, sights, and a hand stop as a pistol). Moreover, ATF has previously approved the use of an angled fore grip on a pistol, concluding it did not transform the pistol into an NFA firearm that required registration. *See* Exhibit 7, ATF Letter regarding Manufacturing an AR-15 Type Pistol for Personal Use at 3 (Aug. 30, 2010); Exhibit 8, ATF Letter regarding Magpul Angled Fore-Grip (Aug. 5, 2011).

---

[5] Neither the NFA or the GCA define pistol; however, the GCA defines a "handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(30)(A). ATF has co-opted the handgun definition to define pistol. In its regulations, it has defined a pistol as "[a] weapon originally designed, made, and intended to fire a projectile (bullet) from one or more barrels when held in one hand, and having . . . a short stock designed to be gripped by one hand and at an angle to and extending below the line of the bore(s)." 27 C.F.R. § 479.11. But even assuming this definition is a proper interpretation of the statutes, it does not follow that "[a] weapon originally designed" to be held with one hand ceases to be a pistol simply because it can also be fired with two hands or because modifications are made to further facilitate two-handed fire. *Id.* After all, the weapon is still designed to be, and still can be, fired with one hand.

52.    In any event, no owner of a stabilizing brace (or person who desires to own a stabilizing brace) would have any certainty that they would not be prosecuted for having an unregistered short-barreled rifle under the Proposed Rule. That is because the Proposed Rule purports to "reserve[] the right" to classify any pistol with a stabilizing brace—regardless of whether the gun accumulates less than 4 points on the worksheet—as a short-barreled rifle if ATF determines that it "is an attempt to make a short-barreled rifle' and circumvent the GCA or NFA." *Id.* at 30,830.

53.    The Proposed Rule would necessarily have far-reaching consequences for countless individuals, gun stores, and manufacturers. According to the Proposed Rule, there are 8 manufacturers of stabilizing braces, 3,881 manufacturers of firearms that have a stabilizing brace attachment, and 13,210 dealers of firearms with a stabilizing brace attachment. *See id.* at 30,845.

54.    ATF estimated that "between 3 million and 7 million 'stabilizing braces'" had been sold from 2013 to 2020, and that the Proposed Rule "may affect upwards of 1.4 million individuals." *Id.* at 30,846-51. But this estimate is far too low. As the Congressional Research Service has recognized, "unofficial estimates suggest that there are between 10 and 40 million stabilizing braces and similar components already in civilian hands, either purchased as accessories or already attached to firearms made at home or at the factory." William J. Krouse, *Handguns, Stabilizing Braces, and Related Components*, CONG. RSCH. SERV. (Apr. 19, 2021), at 2, https://crsreports.congress.gov/product/pdf/IF/IF11763. Accordingly, the effect on individuals would be widespread and serious: the Proposed Rule would turn over a million individuals into unlawful possessors of unregistered short-barreled rifles. *See* Proposed Rule, 86 Fed. Reg. at 30,843.

55.    Presumably seeking to ameliorate the criminal consequences that the Proposed Rule's redefinition of rifles would unleash, *see supra* ¶¶ 22-23, 27-29, ATF proposes five options that would allow affected individuals and Federal Firearms

Licensees to comply with the Proposed Rule. *First*, they may be able to "[p]ermanently remove or alter the 'stabilizing brace' such that it cannot be reattached." *Proposed Rule*, 86 Fed. Reg. at 30,843-84. *Second*, they may be able to replace the short barrel with a longer barrel. *Id. Third*, they can "[d]estroy the firearm." *Id.*[6] *Fourth*, they can "[t]urn the firearm into [the] local ATF office." *Id. Fifth*, they can apply to register their firearms with stabilizing braces under the NFA and pay a tax. *Id.*

56.    The Proposed Rule did not explain how these possible compliance options would be consistent with ATF's prior statements that "there is no mechanism for a possessor to register an unregistered NFA firearm already possessed by the person." ATF, *National Firearms Act*, https://www.atf.gov/rules-and-regulations/national-firearms-act; *see* NATIONAL FIREARMS HANDBOOK § 3.3 ("Firearms not lawfully registered as required by the NFA may not be registered and legitimized by the possessors. They are contraband and unlawful to possess.").

**B. Preliminary Regulatory Analysis**

57.    In its preliminary regulatory analysis, ATF estimated that the Proposed Rule would affect 13,210 dealers and 3,881 manufacturers with Federal Firearm Licenses, "many of whom would be considered small businesses." ATF, *Preliminary Regulatory Analysis and Initial Regulatory Flexibility Analysis* (June 2021), at 17-18, 45, https://www.regulations.gov/document/ATF-2021-0002-0002 ("*Preliminary Reg. Analysis*"). It admits, however, that it does not actually know the "number of [Federal Firearm Licensees] that deal in these items," because stabilizing braces are not regulated by ATF. *Id.* at 19.

58.    ATF stated the "proposed rule would affect all individuals who currently own or intend to own a firearm with an attached 'stabilizing brace' as well as individuals who intend to purchase a firearm and attach a 'stabilizing brace' to the

---

[6] Elsewhere in the Proposed Rule, ATF omits this option. *See id.* at 30,846.

firearm." *Id.* at 18. Estimating that there are between "3 million and 7 million 'stabilizing braces' currently in circulation" based on estimated numbers sold from 2013 to 2020, ATF assumes "[b]ased on information gleaned from the disposal of bump-stock-type devices" that the mean individual ownership "is approximately 2." *Id.* at 16, 18. Accordingly, it concludes that about 1.4 million Americans currently own stabilizing braces (and an unknown number who intend to purchase a stabilizing brace) would be affected by the Proposed Rule. *Id.* at 18. That, of course, is likely an underestimate based on the Congressional Research Service's estimates of 10 and 40 million stabilizing braces, William J. Krouse, *Handguns, Stabilizing Braces, and Related Components*, CONG. RSCH. SERV. (Apr. 19, 2021), at 2, https://crsreports.congress.gov/product/pdf/IF/IF11763, and the fact that the ATF does not account for any braces sold from 2020 to 2023, *see Preliminary Reg. Analysis* at 16.

### C. The Final Rule

#### *1. The Rule Was Published in January 2023 and Diverges from the Proposed Rule.*

59.    On January 13, 2023, DOJ announced it was submitting a final rule regarding stabilizing braces to the Federal Register for publication. *See* DOJ, *Justice Department Announces New Rule to Address Stabilizing Braces, Accessories Used to Convert Pistols into Short-Barreled Rifles* (Jan. 13, 2013), https://www.justice.gov/opa/pr/justice-department-announces-new-rule-address-stabilizing-braces-accessories-used-convert. Attorney General Garland signed the final rule the same day, and ATF released the text of the final rule. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://www.atf.gov/rules-and-regulations/factoring-criteria-firearms-attached-stabilizing-braces.

60.    Although the text of the final rule was made available on January 13, 2023, the final rule was not published in the Federal Register until January 31, 2023.

*See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces"* (Jan. 13, 2023), https://www.atf.gov/rules-and-regulations/docs/undefined/factoringcriteriafor firearmswithattachedstabilizingbracespdf/download; ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) (the "Rule"). Due to the delay between the release of the Rule's text and the publication, this Complaint includes page cites to the text that was released on January 13, 2023. That text appears to generally be the same as the published text except where it includes notations such as "INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER" or "INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER" rather than a date.

61.    The Rule revealed that Defendants received over 217,000 comments opposed to the Proposed Rule and only 20,000 supporting the Proposed Rule. *See* Rule at 51. Defendants nevertheless decided to proceed with the rulemaking, incorporating many aspects of the Proposed Rule into the Rule.

62.    The Rule rejected "some aspects of the approach proposed in the [Proposed Rule], specifically the Worksheet 4999 and its point system;" however, it took other criteria from the Proposed Rule and worksheet "and incorporated them into the rule's revised definitions of rifle." *Id.* at 9; *see id.* at 42 ("The factors discussed in the [Proposed Rule] will, under the Rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle' or 'short-barreled rifle' under the GCA and a 'rifle' or 'firearm,' *i.e.*, a short-barreled rifle, subject to regulation under the NFA.").

### 2. The Rule Rewrites Federal Statutes by Expanding the Definition of Rifle.

63.    The Rule revises the definitions of "rifle" in the NFA and GCA so that the statutory phrase "designed or redesigned, made or remade, and intended to be

fired from the shoulder" includes pistols equipped with stabilizing braces. *See* Rule at 288, 290. It specifically changes the definitions as follows:

> *Rifle.* * * * (1) For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.
>
> (2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:
>
>> (i) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>>
>> (ii) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
>>
>> (iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
>>
>> (iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;
>>
>> (v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and
>>
>> (vi) Information demonstrating the likely use of the weapon in the general community.

*Id.* at 288-91.

64.   The Rule therefore redefines "rifle" to include pistols with stabilizing braces and adds a multi-factor test to the definition of rifle. As explained below, the preliminary factor is the Surface-Area Factor followed by six other factors that Defendants will consider in determining whether a pistol with a stabilizing brace is, in Defendant's view, a short-barreled rifle

65.   **Surface-Area Factor**: Under the Surface-Area factor, if a rearward attachment provides "*any* surface area on the firearm that can be used to shoulder fire the weapon," then "the weapon potentially qualifies as a 'rifle.'" *Id.* at 102-03 (emphasis added); *see id.* at 140 ("ATF will consider whether there is any surface area on the firearm that can be used to shoulder fire the weapon."). Not only does the Rule acknowledge that "a majority of firearms equipped with a 'stabilizing brace'" would qualify as a potential rifle under this factor, but it also fails to point to a single, existing stabilizing brace design that would not qualify as a potential rifle. *Id.* at 140. Instead, the Rule theorizes about a possible future design that is unlikely to provide sufficient forearm support. *See id.* (suggesting that "it is possible" that braces could be designed in the future to avoid this factor and proposing "an elastic strap that wraps around the shooter's wrist and a buffer tube," which would not "provide surface area to shoulder fire a weapon"). Therefore, Defendants will likely view every pistol with a stabilizing brace as a potential rifle that needs to be further evaluated under the Rule's six other factors.

66.   **Weight-and-Length Factor**: If the weapon's "weight or length . . . is consistent with the weight or length of similarly designed rifles," the Weight-and-Length factor indicates that "shoulder firing the weapon provides stabilization and is beneficial in firing the weapon, and thus that the firearm is designed made, and intended to be used in this way." *Id.* at 115. To "inform the public" of "weights and lengths that are consistent with rifles," the Rule provides examples of rifles that are 18 ½ to 38 ½ inches in length and weigh between 2 and 8.4 pounds to *Id.* at 115-21.

67.    Given the wide variation of lengths and weights of rifles, the Weight-and-Length Factor would suggest that nearly all pistols with stabilizing braces are rifles, especially since the Rule instructs the weapon to "be measured with the 'stabilizing brace' attached and fully extended." *Id.* at 125; *see id.* at 123 (explaining that "a majority of firearms equipped with a 'stabilizing brace' currently or previously available on the market likely have the requisite design features indicating that the firearm is designed or redesigned, made or remade, and intended to be fired from the shoulder").[7]

68.    The Weight-and-Length Factor, however, overlooks the fact that a stabilizing brace provides an alternative way to stabilize the brace other than shouldering the weapon. This factor thus does not indicate the pistol is actually intended to be fired from the shoulder, rather than braced to the shooter's forearm.

69.    **Length-of-Pull Factor**: The length of pull generally refers to the distance "from the center of the trigger to the rear center of the stock" on a rifle. *Id.* at 155. Accordingly, under the Length-of-Pull Factor, Defendants assess whether the distance from the pistol's trigger to the end of the stabilizing brace is "consistent with similarly designed rifles." *Id.* at 104-05. As with the Weight-and-Length Factor, the Rule provides examples of rifles with lengths of pull ranging from 11 to 19 ½ inches. *Id.* at 156-59. It is likely that Defendants would conclude that this factor often indicates a pistol with a stabilizing brace is intended to be fired from the shoulder.

70.    But the Length-of-Pull Factor ignores that the length of pull that would be ergonomically appropriate for a stabilizing brace to be used as designed—to attach to the shooter's forearm and provide the shooter with more control over the firearm, *see supra* ¶ 38—will often be similar to the length-of-pull on a similar rifle.

_____

[7] Previously, ATF instructed that the weapon's overall length be "measured with the brace in the folded position" when "a stabilizing brace is attached to a firearm via a folding mechanism." Exhibit 9, ATF Letter regarding a stabilizing brace and a folding adaptor (June 25, 2019).

Accordingly, this factor does not indicate that a pistol with a stabilizing brace is intended to be fired from the shoulder as opposed to braced to a shooter's forearm.

71.   **Scope Factor**: If a "weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed," then the Scope Factor "indicate[s] that the firearm is designed, made, and intended to be fired from the shoulder." *Id.* at 106.

72.   The Rule failed to include a list of acceptable sights and scopes that Defendants would not deem to be designed for shoulder fire. *See id.* at 170 (noting a comment requested a "list of acceptable style of optics"), 173-75 (noting that ATF will "determine whether the sights or scopes on the firearm being evaluated must be shouldered to use the sights or scope as designed" and concluding "it is not necessary to provide list of acceptable style optics"). This leaves unnecessary uncertainty regarding how Defendants will apply this factor, especially as some sights are designed for use across gun types (pistols, rifles, and shotguns). Moreover, sights and scopes could be originally designed for shoulder-fired guns yet also be useful for handguns. Some people may choose to use the same sight or scope on different guns they own, rather than incurring the expense of buying additional ones. As such, this Scope Factor is not an appropriate indicator of whether a pistol equipped with a stabilizing brace is intended to be fired while braced to a shooter's forearm or is intended to be fired from the shoulder.

73.   **Attachment Factor**: If a component, accessory, or other rearward attachment "provide[s] additional material to the firearm that is not required for the cycle of operations," it is "an indicator that the firearm is designed, made, and intended to be fired from the shoulder" under the Attachment Factor. *Id.* at 106. The Rule suggests that an attachment is considered necessary for the weapon's cycle of operations if it is required for the gun to operate properly and shoot a bullet when the

trigger is pulled. *See id.* at 162 (explaining how a buffer tube is necessary to the cycle of operations when it includes a spring that drives the bolt forward).

74.     The Rule fails to recognize the fact that an attachment can provide additional material to the weapon and serve a laudable purpose, such as a folding adapter attachment that makes a weapon easier to store in a gun safe to keep it away from children in a home, without indicating that the weapon is intended to be fired from the shoulder. *See id.* at 163-65. Indeed, the Rule specifically concludes that folding adapters "are additional material that, when added to the end of a firearm, may indicate that the firearm is designed, made, and intended to be fired from the shoulder." *Id.* at 166. The Attachment Factor is therefore not a reliable indicator of whether a pistol equipped with a stabilizing brace is designed to be fired from the shoulder.

75.     **Marketing Factor**: Under the Marketing Factor, Defendants look not only at how the stabilizing brace was marketed by the firearm and brace manufacturer, but also how the stabilizing brace was marketed by the seller of the stabilizing brace. *Id.* at 177.

76.     The Rule provides no explanation of how Defendants will assess whether a pistol with a stabilizing brace is a rifle when it is advertised in different ways. For example, a stabilizing brace manufacturer could intend a stabilizing brace to be attached to a shooter's forearm and market it in that fashion, yet a seller could be promoting a misuse of that same stabilizing brace. Accordingly, the Marketing Factor is an arbitrary factor that will not accurately reflect whether a pistol with a stabilizing brace is designed to be fired from the shoulder.

77.     **Likely Use Factor**: Under the Likely Use Factor, Defendants will "examine information demonstrating the likely use of the weapon in the general community, such as the proposed use by the manufacturer or use by members of the firearms industry, firearms writers, and in the general community." *Id.* at 178.

78.    The Rule provides no information regarding how Defendants will determine "likely use" when articles, blogs, and videos show the same weapons and braces being used differently. Nor does the Rule explain why YouTube videos that depict how a few individuals fired a weapon on one occasion demonstrate that braces "are being used extensively as short-barreled rifles." *See id.* at 82 & n.97-98. Indeed, relying on such videos without any way to assess whether those videos reflect the most common use of a brace contradicts the Rule's own statement that "[a] firearm's classification does not change even if the firearm can be used in more than one manner by a particular shooter." *Id.* at 145.

### 3.    The Rule Overrules Classification Letters and Concludes that the Majority of Pistols Equipped with Stabilizing Braces Are Rifles Possessed in Violation of Federal Law.

79.    The Rule's multi-factor amendment to the definition of rifle therefore reclassifies nearly all, if not all, pistols equipped with a stabilizing brace as rifles. *See, e.g.*, *id.* at 12 ("[A] majority of the existing firearms equipped with a 'stabilizing brace' are likely to be classified as 'rifles' because they are configured for shoulder fire based on the factors described in this rule."), 123 ("[A] majority of firearms equipped with a 'stabilizing brace' currently or previously available on the market likely have the requisite design features indicating that the firearms is designed or redesigned, made or remade, and intended to be fired from the shoulder.").

80.    The reclassification even extends to pistols equipped with stabilizing braces that ATF specifically concluded were not rifles. The Rule states that it "is overruling ATF's previous classification letters" and that "possessors of firearms equipped with 'stabilizing braces' that were at issue in those letters may also be in possession of unregistered NFA firearms." *Id.* at 12; *see, e.g.*, *id.* at 11 (providing that "all such prior classifications are no longer valid"), 71-72 ("As a result, and to ensure consistency moving forward, ATF's prior classifications pertaining to 'stabilizing

brace' devices or firearms equipped with a 'stabilizing brace,' are no longer valid or authoritative."), 269 ("All previous ATF classifications involving 'stabilizing brace' attachments for firearms are superseded . . . [and, a]s such they are no longer valid or authoritative, and cannot be relied upon.").

81.     The Rule is a dramatic rewriting of the statutes, but the Rule pretends that Defendants are not changing the law. Instead, the Rule repeatedly insists that the "revised definition reflects the [DOJ's] understanding of the best interpretation of the statute," *id.* at 11, despite ATF's prior interpretations to the contrary, *see id.* at 89 ("[A]n individual's reliance on ATF's prior positions cannot outweigh the effective enforcement of Federal firearm laws pursuant to the best interpretation of the plain language of the relevant statute."); *see also id.* at 3 ("[T]his rule does not impose any new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and the GCA."), 65 ("[The Rule] is not creating a new law; instead, it simply clarifies the definition of 'rifle' . . . as necessary to implement existing law—*i.e.*, the NFA and GCA."), 92 ("[T]he rule does not itself ban or regulate any particular devices; instead, the rule articulates the [ATF's] best interpretation of the relevant statutory provisions, which are the source of any restrictions or regulations on certain firearms."), 190 ("[T]he NFA provides preexisting Federal statutory requirements regarding the transfer and making of certain kinds of rifles; and this Rule sets forth the Attorney General's interpretation of those statutory requirements."), 209 ("This rule does not itself impose any new restrictions; instead, this rule articulates the best interpretation of the relevant statutory terms. Nothing in this rule changes those underlying statutory requirements.").

82.     The Rule therefore concludes that most parties that possess unregistered pistols equipped with stabilizing braces have been violating the NFA and GCA. *See, e.g.*, *id.* at 12 ("many parties . . . may have been violating the NFA"),

203 ("The rule does not impose liability independent of already preexisting requirements for short-barreled rifles under those statutes, *i.e.*, interstate transportation, registration, transfer and making approval, and transfer and making tax."), 242 (concluding that many weapons at issue in the Rule are "unregistered short-barreled rifles" that "have been transferred in violation of the NFA, and further possession of any such unregistered firearm continues to be a violation of the NFA"), 242-43 ("Although [DOJ] disagrees that these unregistered firearms were legal the time of purchase and lawfully possessed, [DOJ] understands that consumers and dealers believed them not to be subject to the NFA when purchasing and selling them.").

83.     In other words, the Rule declares that millions of law-abiding Americans who possess unregistered pistols with stabilizing braces, have transported those pistols across state lines, or transferred those pistols are guilty of felonies under the NFA and GCA and could be imprisoned for years. *See supra* ¶¶ 23, 28.

### 4. The Rule Invokes Enforcement Discretion and Sets Forth Compliance Options for a Subset of Affected Persons.

84.     Defendants, however, suggest the Rule will not turn millions of Americans into felons, because as a matter of their "enforcement discretion," persons affected by the Rule will be given the opportunity to take various steps to comply with the statutory requirements (as modified by the Rule) and avoid prosecution. *See Rule* at 12. The Rule accordingly lays out a "enforcement discretion" scheme that includes a 120-day compliance period for a subset of persons affected by the Rule.

85.     Under the Rule, persons and Federal Firearms Licensed Manufacturers and Importers who possess unregistered weapons that the Rule would characterize as short-barreled rifles on January 31, 2023—*i.e.*, pistols equipped with stabilizing braces—have the following five compliance options.

86.   **Registration Option**: First, the Rule provides that persons who possess unregistered pistols equipped with stabilizing braces may submit forms to register the firearms with the ATF within 120 days after the Rule is published. *See id.* at 12-13. As long as "the registration form is properly submitted and documented within the defined time period, [DOJ] will consider individuals to be in compliance with the statutory requirements between the date on which a person's application is filed and the date a person receives ATF approval or disapproval of the application." *Id.* at 13, 57, 263.[8] The Rule provides that registering the weapon during the 120-day period after the Rule's publication date "will enable affected persons to lawfully retain possession of their firearm under Federal law." *Id.* at 13; *see* 263.

87.   Moreover, the Rule waives the requirement that such persons pay the usual $200 tax to register such weapons. *Id.* at 14, 56, 266, 277. But, if the weapon lacks a serial number that is required on NFA firearms, those persons are still required to incur the costs associated with getting the weapon engraved. *See id.* at 244-45, 270-71. Furthermore, once registered, a person will have to comply with all the additional restrictions imposed on NFA firearms and GCA short-barreled rifles. *See, e.g., supra* ¶¶ 27-28.

88.   This Registration Option is also available to Federal Firearm Licensees who possessed unregistered pistols with stabilizing braces on the Rule's publication date, and includes a forbearance of, as applicable, the making tax or the transfer tax for any transfers of pistols equipped with stabilizing braces that "occurred before the effective date of this final rule." *See* Rule at 14, 56, 272-73, 277.

89.   The Rule, however, does *not* make the Registration Option and waiver of the $200 tax available for persons who possess stabilizing braces that were *not*

---

[8] Notably, the Rule does not appear to provide any sort of safe harbor for persons who make a mistake in submitting their registration form or omit some of the necessary documentation. *See id.* at 13.

attached to their pistols on the date the Rule was published. *See id.* at 14. The Rule states that the Rule "is immediately effective in that [DOJ] may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA." *Id.* at 14. Accordingly, ATF may prosecute any person who attaches a stabilizing brace to his large pistol after the Rule's publication date. *See id.* at 15 ("ATF may enforce the NFA against any person or entity that—any time after the publication date of this rule—newly makes . . . a weapon with an attached 'stabilizing brace that constitutes a short-barreled rifle under the NFA.").

90.   **Modification Option**: Second, the Rule authorizes persons and Federal Firearms Licensees who possess unregistered pistols equipped with stabilizing braces to modify their weapons within 120 days after the Rule is published by replacing the shorter barrel with a "16-inch or longer rifled barrel." *See id.* at 13, 271-73. The Rule provides that if the eligible weapons are modified "within the defined time period," then the weapons may be "lawfully retain[ed] . . . under Federal law." *Id.* at 13; *see id.* at 223.

91.   **Permanent-Removal Option**: Third, the Rule authorizes persons and Federal Firearms Licensees who possess unregistered pistols equipped with stabilizing braces to "[p]ermanently remove and dispose of, or alter, the 'stabilizing brace' such that it cannot be reattached" within 120 days after the Rule is published. *Id.* at 271-74. Although the Rule states that this reconfiguration of "a firearm that was originally received as a 'short-barreled rifle' results in the production of a 'weapon made from a rifle,' as defined by the NFA," DOJ "in its enforcement discretion" will allow the reconfiguration within the specified time period and "not require the registration of these firearms as a 'weapon made from a rifle.'" *Id.* at 271, 273-74.

92.    **Surrender Option**: Fourth, the Rule authorizes persons and Federal Firearm Licensees to turn their pistols equipped with stabilizing braces into their "local ATF office." *Id.* at 272-74.

93.    **Destruction Option**: Fifth, the Rule authorizes persons and Federal Firearms Licensees to destroy their pistols equipped with stabilizing braces and directs persons to refer to ATF's "information regarding proper destruction on its website, www.atf.gov." *Id.* at 272-74.

### 5. *The Rule Concludes that Pistols Equipped with Stabilizing Braces Fall Outside of the Second Amendment's Scope.*

94.    In response to the Proposed Rule's compliance options, which are similar to the Rule's options, Defendants received numerous comments raising Second Amendment concerns. For example, Defendants received thousands of comments citing *District of Columbia v. Heller*, 554 U.S. 270 (2008), that argued classifying pistols with stabilizing braces as short-barreled rifles and thereby imposing additional restrictions on those weapons would impermissibly infringe on law-abiding American's Second Amendment rights. *See id.* at 184. The Rule, however, wrongly rejects such concerns. *See id. at* 185.

95.    The Rule concludes that most pistols with stabilizing braces are, in fact, short-barreled rifles and, as such, "fall outside the scope of the Second Amendment." *Id.* at 185. It bases its conclusion on *Heller*'s alleged rejection of the "'startling' position that 'the National Firearms Act's restrictions on machineguns . . . might be unconstitutional, machineguns being useful in warfare in 1939.'" *Id.* (quoting *Heller*, 554 U.S. at 624); *but see Heller*, 554 U.S. at 624 (rejecting a "startling reading of the [*United States v. Miller*, 307 U.S. 174 (1939)] opinion" and "read[ing] *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns"). It then cites lower court opinions that allegedly "held that short-barreled

shotguns and rifles are dangerous and unusual weapons that fall outside the scope of the Second Amendment because of the danger presented" and concludes those decisions, along with *Heller*, show that NFA firearms "were not historically protected by the Second Amendment and thus fall outside the scope of the Second Amendment." *See* Rule at 186. The Rule further opines that "[n]othing in the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), changes this analysis." *Id.*

96.     The Rule similarly rejects the notion that NFA taxes "infringe on an individual's fundamental right," concluding that "there is no fundamental right to the possession" of pistols with stabilizing braces. *Id.* at 208.

97.     The Rule's Second Amendment analysis is deeply flawed. The Rule is a severe infringement on the Second Amendment rights of Americans, as well as a violation of other constitutional rights.

### 6. The Rule Will Have a Significant Negative Impact.

98.     The Rule violates important constitutional rights and negatively impacts the lives of millions of Americans.

99.     The Rule will impact millions of gunowners who have pistols currently equipped with stabilizing braces, people who own stabilizing braces that are not currently attached to pistols, and persons who intend to purchase stabilizing braces or pistols equipped with stabilizing braces in the future. *See id.* at 282. It will also impact at least 5 manufacturers of braces, 3,881 manufacturers of pistols equipped with stabilizing braces, 13,210 dealers of pistols equipped with stabilizing braces, and countless sellers of stabilizing braces. *Id.*

100.    Furthermore, the Rule is "economically significant" as it "will have an annual effect on the economy of $100 million or more." *Id.* at 278. Indeed, it will have annual societal costs of well over $200 million. *See id.* at 282.

IV.    THE RULE'S IMPACT ON PLAINTIFF

101.    The Rule causes Plaintiff concrete injuries. As the Rule acknowledges, the new regulations affect Americans who own pistols equipped with stabilizing braces and those who intend to own them in the future. *See id.* at 282.

102.    The Rule thus clearly impacts and harms Plaintiff who currently owns a stabilizing brace that is not attached to his AR-15-style pistol and who intends to buy additional stabilizing braces or pistols equipped with stabilizing braces in the future.

103.    Plaintiff primarily owns his AR-15-style pistol for self-defense purposes in his home so that he can protect himself and his family if the need arises. He prefers having that particular type of gun for self-defense purposes. He finds it easier to store safely in his home and not as cumbersome as other types of guns, such as rifles. And, in the event of a home invasion, he could hold his AR-15-style pistol in one hand while calling the police with his other hand, which would not be possible with a rifle.

104.    Moreover, he likes how his AR-15-style pistol allows for customization options and appreciates how multiple accessories are available that can make his pistol even more accurate, convenient, and safe. For example, sights would make it easier to aim his pistol and shoot accurately. A hand stop could be used to brace the pistol against a steady surface to make one-handed firing easier or could be used to stabilize the pistol when shooting with two hands.

105.    One downside of the AR-15-style pistol is that it is heavy, which makes it more difficult to shoot accurately with one hand. Accordingly, Plaintiff became interested in acquiring a stabilizing brace that would make shooting his pistol with one hand easier, more accurate, and safer.

106.    Plaintiff thus purchased a pistol brace that was described as being "ATF Approved" and was designed to provide contact between the pistol and the shooter's forearm, which would give the shooter more control over the firearm. Plaintiff also

purchased a folding adapter attachment. If Plaintiff attached the stabilizing brace and the folding adapter attachment to his AR-15-style pistol, it would allow him to store the pistol in a gun safe more easily.

107.   Plaintiff would like to attach the stabilizing brace, along with his other accessories, including a red-dot sight, magnifier, and hand stop, to his AR-15-style pistol so that he can shoot his pistol more accurately and safely. But the Rule prohibits Plaintiff from attaching the stabilizing brace and other accessories to his pistol.

108.   If the stabilizing brace and other accessories were attached to Plaintiff's AR-15-style pistol, Defendants would classify Plaintiff's pistol as a short-barreled rifle under the Rule. Accordingly, Plaintiff could be subject to prosecution under the Rule if he attached his stabilizing brace and other accessories to his pistol without first registering the pistol as a short-barreled rifle, paying a $200 tax, and receiving approval from Defendants. That is because Defendants purport to make the Rule "immediately effective" and warn that Defendants could prosecute persons like Plaintiff if, "any time after the publication date," they make a weapon with an attached stabilizing brace that Defendants consider a short-barreled rifle under the Rule. *See* Rule at 15.

109.   The Rule is accordingly a direct cause of Plaintiff's injuries. For example, the Rule infringes on Plaintiff's Second Amendment rights, because he cannot attach his stabilizing brace and other accessories to his AR-15-style pistol without risking criminal prosecution under the Rule unless he files a Form 1 and pays a $200 tax. He would then have to wait several months to a year to receive his tax stamp before he could use his stabilizing brace. *See ATF Form 1 & ATF eForm 1 Average Approval Time – NFA Approval Tracker*, https://tinyurl.com/39r3u4yd (indicating the average wait time is 281 days for an ATF Form 1 and 31 days for an eForm 1); Rule at 226 (admitting there "may be a significant waiting period before a

person receives final approval and registration").[9] This exorbitant fee—nearly twice the cost of his stabilizing brace—and lengthy waiting period is an infringement of Plaintiff's Second Amendment rights.

110.   Moreover, if Plaintiff registers his gun, he would be subject to many additional burdens. For example, he would need to notify ATF if he moved and would need to maintain records proving he registered his gun. *See* 26 U.S.C. §§ 5841(e) ("A person possessing a firearm registered as required by this section shall retain proof of registration which shall be made available to the Secretary upon request."); Application to Make and Register a Firearm, OMB No. 1140-0011, https://www.atf.gov/firearms/docs/form/form-1-application-make-and-register-firearm-atf-form-53201/download, at 3 ("The registrant shall notify the NFA Division, Bureau of Alcohol, Tobacco, Firearms and Explosives . . . of any change to the description of the firearm in item 4, or any change to the address of the registrant."); *id.* ("A person possessing a firearm registered as required by the NFA shall retain proof of registration which shall be made available to any ATF officer upon request."). He would similarly be subject to ongoing restrictions on the transfer and transportation of his gun. *See supra* ¶¶ 26-27.

111.   If it were not for the Rule, Plaintiff could attach his stabilizing brace to his pistol without filing a Form 1, paying $200, and being subject to a plethora of additional restrictions. *See* Exhibit 3, at 3 (recognizing that a brace "attached to an AR-type pistol" does not "convert that weapon" into a firearm that would "be subject to the NFA controls"). Similarly, Plaintiff could buy additional stabilizing braces to attach to his pistols and/or pistols already equipped with stabilizing braces without

---

[9] Furthermore, the wait time for a tax stamp will significantly increase if millions of Americans who own stabilizing braces begin to file Form 1s as a result of the Rule. *See* Rule at 225 (acknowledging that the Rule "will likely increase NFA registrations as individuals decide to register the weapons that they previously treated as pistols").

the additional expense and restrictions that the Rule imposes or the fear of prosecution.

112.   In the alternative, to the extent that Defendants are properly interpreting the NFA and GCA—which they are not—those statutes are directly causing Plaintiff the harm described above.

## COUNT I: UNCONSTITUTIONAL DELEGATION IN VIOLATION OF ARTICLE I AND SEPARATION OF POWERS

113.   Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

114.   The Founders recognized that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison). They therefore divided the powers into three separate branches in the Constitution so a charge that these powers were accumulated in the same hands "cannot be supported." *Id.*

115.   The Constitution vests "[*a*]*ll* legislative Powers herein granted" to Congress. U.S. Const. art. I, § 1 (emphasis added). It gives "[t]he executive Power" to the president and tasks him with "tak[ing] Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. Finally, it provides the Supreme Court and inferior federal courts with "[t]he judicial Power." U.S. Const. art III, § 1.

116.   Accordingly, Congress cannot "abdicate or . . . transfer to others the essential legislative functions with which it is thus vested" without violating Article I, § 1 of the Constitution and separation-of-powers principles. *See A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

117.   Deciding what constitutes a crime and can be punished with imprisonment is a paradigmatic example of an essential legislative function. As such, Congress cannot delegate that power. *See United States v. George*, 228 U.S. 14, 21-22

(1913) (explaining that a crime "must have a clear legislative basis" and an agency cannot "enlarge the statute at will," because "[s]uch power is not regulation; it is legislation"); *Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting) ("[Congress] may never hand off to the nation's chief prosecutor the power to write his own criminal code.").[10] A decision about whether to make an action a felony that could subject a person to several years in prison falls within the category of "critical policy decisions" that "Congress and the President insofar as he exercises his constitutional role in the legislative process" must make and cannot be delegated to an Executive agency. *See Indus. Union Dep't, AFL-CIO* v. *Am. Petroleum Institute*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring in judgment).

118.   Congress accordingly cannot delegate to Defendants the ability to expand the definitions in the NFA and GCA and subject over a million individuals to potential imprisonment. Congress cannot abdicate the policy decision of whether to redefine rifles to include pistols with stabilizing braces and transform law-abiding owners of pistols into criminals possessing unregistered short-barreled rifles. To the extent Congress did so, it was an unconstitutional delegation, and the Rule was promulgated in violation of Article I and separation-of-powers principles.

119.   Although the Supreme Court has sometimes blessed delegations that allow agencies to make actions a crime, *see Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 916 (6th Cir. 2021) (en banc) (Murphy, J., dissenting) (collecting cases), there must—at the very least—be a true intelligible principle that meaningfully constrains the agency's discretion. Indeed, even the Controlled Substances Act set forth factors that the Attorney General must consider in deciding whether to add a substance to the list of controlled substances and specific findings that the Attorney

---

[10] Of course, Congress is limited in what criminal laws it can enact; it does not have "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. 549, 566 (1995).

General must make to "schedule a substance on a temporary basis." *Touby v. United States*, 500 U.S. 160, 162-63 (1991); *see Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting) (explaining that, in rejecting a nondelegation challenge to the Controlled Substances Act, "the [*Touby*] Court stressed all these constraints on the Attorney General's discretion and, in doing so, seemed to indicate that the statute supplied an 'intelligible principle' *because* it assigned an essentially fact-finding responsibility to the executive").

120.    Therefore, assuming Congress did delegate authority to Defendants to redefine "rifle" and create new crimes under NFA or GCA, there is no true intelligible principle in NFA or GCA that would allow Defendants to create new crimes without running afoul of the nondelegation doctrine.

## COUNT II: ADMINISTRATIVE PROCEDURE ACT VIOLATION

121.    Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

122.    Under the Administrative Procedure Act ("APA"), a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right," exceeds statutory authority, or is "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (B), (C).

123.    Not only does the Rule violate multiple provisions of the Constitution, *see supra* ¶¶ 113-120, *infra* ¶¶ 129-138, but it also exceeds Defendants' statutory authority. Even if Congress could constitutionally abdicate its legislative power by delegating power to the Executive branch to create new felonies—which it cannot— it did not do so here.

124.    In issuing the Rule, Defendants redefined statutory provisions and expanded criminal liability; however, they lack statutory authority to do so. Defendants claim statutory authority under 18 U.S.C. § 926(a), 26 U.S.C. §§ 7801(a)(2)(A), and 7805(a), *see* Rule at 16, but none of those provisions give

Defendants the authority change statutory definitions, issue the Rule, and reclassify pistols equipped with stabilizing braces as rifles under the NFA and GCA (with the attendant criminal consequences).

125.   Defendants have no authority to expand the definitions in the NFA and GCA; it "is not a situation in which an agency has been delegated authority to promulgate underlying *regulatory* prohibitions, which are then enforced by a criminal statute prohibiting willful violations of those regulations." *See United States v. Kuzma*, 967 F.3d 959, 971 (9th Cir. 2020); *see supra* ¶ 34-35. Furthermore, the fact that the GCA elsewhere expressly "permits the Attorney General to enact rules backed by criminal sanctions" as it relates to limited recordkeeping provisions further undermines Defendants' claim that they possess that power in this context. *See Gun Owners*, 19 F.4th at 919 (Murphy, J., dissenting).

126.   Moreover, Defendants made critical policy decisions regarding public safety and the right to keep and bear arms when issuing the Rule. Because such policy decisions are of great "political significance," Congress must, at the very least, "speak clearly" to assign ATF this important policymaking power. *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022) (quotation omitted). Congress must also speak clearly here because Defendants are intruding into an area that traditionally belongs to the State: general police power. *See id.* at 2621 (Gorsuch, J., concurring) ("[T]his Court has said that the major questions doctrine may apply when an agency seeks to intrud[e] into an area that is the particular domain of state law." (quotation omitted)); *cf. Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (explaining that courts must "be certain of Congress' intent" before finding preemption "in area traditionally regulated by the States"). The Constitution established a federalist system where the states— not the federal government—"possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n.3 (quotation omitted).

127.     Although Congress was required to speak clearly here, it failed to do so. None of the provisions on which Defendants rely, *see supra* ¶ 124, clearly give Defendants the authority to decide to redefine "rifles" to include pistols equipped with stabilizing braces.

128.     Finally, Defendants do not have the authority to make the Rule effective immediately. *See* 5 U.S.C. §§ 553(d) ("The required publication or service of a substantive rule shall be made not less than 30 days before its effective date . . . ."); 801(a)(3) (providing that "[a] major rule relating to a report submitted [to Congress] shall take effect on the latest of . . . the later of the date occurring 60 days after the date on which . . . Congress receives the report submitted . . . [or] the rule is published in the Federal Register"); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 665 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."); *Envtl. Defense Fund v. EPA*, 515 F. Supp. 3d 1135, 1151 (D. Mont. 2021) (concluding that the agency lacked the authority to make a substantive rule "effective immediately on publication" and declaring the "rule is ineffective until 30 days from the date of its publication in the Federal Register").

## COUNT III: SECOND AMENDMENT VIOLATION

129.     Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

130.     The Second Amendment is unequivocal: "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It clearly "confer[s] an individual right to keep and bear arms," and it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582, 595 (2008).

131.     The government can regulate a person's possession and carrying of bearable arms only if it "affirmatively prove[s] that its firearms regulation is part of

the historical tradition that delimits the outer bounds of the right to keep and bear arms." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 (2022).

132.    Defendants cannot carry this heavy burden here. History and tradition do not support the Rule's restrictions on a person's right to keep and bear arms.

133.    Defendants failed to show that pistols with stabilizing braces fall outside of the Second Amendment's scope, because they are dangerous and unusual weapons. *See* Rule at 185-86. Indeed, ATF itself has estimated that between 3 and 7 million affected stabilizing braces have been sold from 2013 to 2020, *see Preliminary Reg. Analysis* at 16, and yet Defendants points to only two incidents where criminals used stabilizing braces in the Proposed Rule and Rule, *see* Proposed Rule, 86 Fed. Reg. at 30,828, Rule at 60.

134.    In the Rule, Defendants also noted that 272 guns with stabilizing braces have been received as "part of criminal investigations," "traced in criminal investigations," or involved in "firearms cases or investigations." *See* Rule at 60-61. But Defendants provide no evidence that those 272 guns with stabilizing braces were used in the alleged crimes, much less used to injure or kill someone. For example, some guns could have been discovered and confiscated when a crime that was unrelated to those guns was being investigated.

135.    This demonstrates that pistols with stabilizing braces are not unusual or dangerous and the overwhelming majority of pistols with stabilizing braces are being used for lawful purposes. Pistols with stabilizing braces are in common use by law-abiding citizens and fall squarely within the Second Amendment's bounds. *See Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (explaining that a weapon is not "unusual" simply because it is a modern invention); *id.* at 417, 420 (Alito, J., concurring) (explaining that "[a] weapon may not be banned unless it is *both* dangerous *and* unusual," and the "pertinent Second Amendment inquiry is whether [the restricted weapons] are commonly possessed by law-abiding citizens for

lawful purposes *today*"); *Heller v. District of Columbia*, 670 F.3d 1244, 1286-87 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that the Second Amendment "protects weapons that have not traditionally been banned and are in common use by law-abiding citizens," including "[s]emi-automatic rifles [that] have not traditionally been banned and are in common use today").

136.    Moreover, there is no longstanding historical tradition that justifies banning a pistol because it has a stabilizing brace or requiring a person to register a pistol due to a stabilizing brace. *Cf. Miller v. Bonta*, 542 F. Supp. 3d 1009, 1024 (S.D. Cal. 2021) ("Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers, or barrel shrouds."), *vacated*, No. 21-55608, 2022 U.S. App. LEXIS 21172, at *2 (9th Cir. 2022) (vacating judgment in light of *Bruen*).

137.    Nor do history and tradition justify forcing people to wait for months to a year to lawfully possess a pistol equipped with a stabilizing brace. *See supra* ¶ 109 & n.9; *Bruen*, 142 S. Ct. at 2138 n.9 (indicating that a shall-issue regime for public carry licenses, that includes "lengthy wait times in processing license applications or exorbitant fees" may impermissibly infringe on the right of law-abiding citizens to public carry).

138.    The Rule therefore violates the Second Amendment. To the extent the Rule is a correct interpretation of NFA and GCA, the NFA and GCA violate the Second Amendment.

## **REQUEST FOR RELIEF**

139.    Plaintiffs request that the Court grant the following relief, which it is authorized to do under 5 U.S.C. §§ 702, 705; 28 U.S.C. §§ 2201, 2202; and Fed. R. Civ. P. 57, 65:

        a.  Enter a judgment (i) declaring that Defendants lacked the authority to promulgate the Rule because Congress cannot delegate its

legislative powers, (ii) declaring that any NFA or GCA provisions delegating such authority are unconstitutional, and (iii) setting aside the Rule as contrary to Article I, § 1.

b.  Enter a judgment (i) declaring that Defendants lacked the authority to promulgate the Rule because Congress did not delegate that authority, and (ii) setting aside the Rule as exceeding Defendants' statutory authority.

c.  Enter a judgment (i) declaring that the Rule (and the NFA and GCA to the extent the Rule is a valid interpretation of those Acts' provisions) violates the Second Amendment, and (ii) setting aside the Rule (and the NFA and GCA to the extent the Rule is a valid interpretation of those Acts' provisions) as being contrary to the Second Amendment.

d.  Enter a judgment declaring that Plaintiff's AR-15-style pistol would not constitute a rifle or short-barreled rifle under the NFA or GCA if it was equipped with his stabilizing brace and his other accessories.

e.  Enter a permanent injunction enjoining Defendants from enforcing the Rule, enforcing the NFA or GCA in accordance with the Rule, prosecuting Plaintiff for possessing unregistered pistols with stabilizing braces, or promulgating additional rules that expand the definitions in the NFA and GCA.

f.  Enter a judgment declaring that Defendants lack statutory authority to make the Rule effective immediately.

g.  Enter a postponement of the Rule's effective date under 5 U.S.C. § 705 and a preliminary injunction under Federal Rule of Civil Procedure 65 enjoining Defendants from enforcing the NFA or GCA in accordance with the Rule.

h.  Grant Plaintiff such additional or different relief as the Court deems just and proper.

Dated: January 31, 2023

Respectfully submitted,

*/s/Autumn Hamit Patterson*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
AUTUMN HAMIT PATTERSON
Texas Bar No. 24092947
apatterson@texaspolicy.com
CLAYTON WAY CALVIN
Texas Bar No. 24132780
ccalvin@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:   (512) 472-2700
Facsimile:   (512) 472-2728

*Counsel for Plaintiff Blake J. Watterson*