# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| BLAKE J. WATTERSON; | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00080 |
| | § | |
| BUREAU OF ALCOHOL, TOBACCO, | § | |
| FIREARMS AND EXPLOSIVES; | § | |
| | § | |
| STEVEN DETTELBACH, in his | § | |
| official capacity as Director of the | § | |
| Bureau of Alcohol, Tobacco, Firearms | § | |
| and Explosives; | § | |
| | § | |
| UNITED STATES DEPARTMENT | § | |
| OF JUSTICE; | § | |
| | § | |
| MERRICK GARLAND, in his official | § | |
| capacity as Attorney General of the | § | |
| United States; | § | |
| | § | |
| UNITED STATES OF AMERICA | § | |
| | § | |
| *Defendants.* | § | |

## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Authorities .............................................................................. iii

Introduction .......................................................................................... 1

Issues to be Decided by the Court ....................................................... 1

Statement of Undisputed Material Facts ............................................. 2

Standard of Review ............................................................................... 5

Summary of the Argument .................................................................. 6

Argument and Authorities ................................................................... 7

   I.   The Court Has Jurisdiction and Can Review the Rule ................... 7

     A.  Plaintiff Has Article III Standing ........................................ 7

     B.  The Court Can Decide Plaintiff's Claims ............................ 8

   II.   Criminalizing the Possession of Unregistered Pistols With Stabilizing Braces Violates the Second Amendment ......................................... 10

   III.  The Rule Violates Article I and Constitutional Separation-of-Powers Principles ......................................................................................... 15

     A.  The Rule Is Unconstitutional Because Congress Cannot Delegate Legislative Power .............................................................. 16

     B.  Because Deciding What Is a Felony Is a Core Legislative Power, Congress Cannot Delegate the Decision to Criminalize Possession of Unregistered Pistols with Stabilizing Braces ......................... 19

     C.  Even if Deciding What Conduct to Criminalize Could Be Delegated, Congress Failed to Provide an Intelligible Principle to Constrain the Department's Discretion ......................................................... 22

   IV.  The Department Lacks the Statutory Authority to Decide What Conduct to Criminalize ..................................................................................... 24

i

A.  There is No Clear Congressional Authorization to Allow the Department to Make Consequential Decisions Infringing on Individual Liberties.... 24

B.  The Department Lacks the Statutory Authority to Rewrite the National Firearms Act and Gun Control Act ........................................................ 25

V.  The Court Should Grant the Relief Requested in the Complaint ................ 29

Conclusion ............................................................................................................. 30

Certificate of Service ............................................................................................. 32

# TABLE OF AUTHORITIES

## *Cases*

*A. L. A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) .................................................................................. 15, 17

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) ............................................................................ 9

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .............................................................................................. 6

*Aposhian v. Wilkinson*,
  989 F.3d 890 (10th Cir. 2021) (en banc) ........................................................... 20

*Ben. Recovery, Inc. v. Donelon*,
  521 F.3d 326 (5th Cir. 2008) .............................................................................. 16

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................................. 8

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ............................................................................................ 29

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ...................................................................................... 11, 12

*Cargill v. Garland*,
  No. 20-51016, 2023 U.S. App. LEXIS 344 (Jan. 6, 2023) .......................... 20, 27

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................................................................ 15

*Collins v. Yellen*,
  141 S. Ct. 1761, 1780 (2021) ........................................................................ 17, 18

*Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*,
  33 F.4th 218 (5th Cir. 2022) .............................................................................. 15

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
  779 F.3d 258 (5th Cir. 2015) ............................................................................ 7, 8

*Data Mktg. P'ship, LP v. DOL*,
  45 F.4th 846 (5th Cir. 2022) .............................................................................. 30

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ...................................................................................... 10

*DOC v. New York,*
    139 S. Ct. 2551 (2019) ................................................................................. 30

*DOT v. Ass'n of Am. R.R.,*
    575 U.S. 43 (2015) ..................................................................... 17, 21, 22, 24

*Firearms Policy Coal., Inc. v. McCraw,*
    No. 4:21-cv-1245-P, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022)
    ............................................................................................................... 11

*Freytag v. Commissioner,*
    501 U.S. 868 (1991) ..................................................................................... 17

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ..................................................................................... 29

*Grosjean v. Am. Press Co.,*
    297 U.S. 233 (1936) ..................................................................................... 15

*Gun Owners of Am., Inc. v. Garland,*
    19 F.4th 890 (6th Cir. 2021) (en banc) .......................................... 20, 21, 25, 29

*Gundy v. United States,*
    139 S. Ct. 2116 (2019) ........................................... 17, 18, 19, 21, 22, 23

*Hamilton v. Segue Software Inc.,*
    232 F.3d 473 (5th Cir. 2000) ............................................................... 6

*Harrison Co., L.L.C. v. A-Z Wholesalers, Inc.,*
    44 F.4th 342 (5th Cir. 2022) ............................................................... 6

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) .................................................... 11, 14

*Indus. Union Dep't, AFL-CIO v. API,*
    448 U.S. 607 (1980) ..................................................................................... 19

*INS v. Chadha,*
    462 U.S. 919 (1983) ..................................................................................... 23

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ........................................... 17, 18, 22, 23

*Kingdomware Techs., Inc. v. United States,*
   579 U.S. 162 (2016) ........................................................................... 30

*Larson v. Domestic & Foreign Commerce Corp.,*
   337 U.S. 682 (1949) ........................................................................... 9

*Liquid Carbonic Indus. Corp. v. FERC,*
   29 F.3d 697 (D.C. Cir. 1994) ............................................................. 8

*Loving v. United States,*
   517 U.S. 748 (1996) ........................................................................... 21

*Mata v. Lynch,*
   576 U.S. 143 (2015) ........................................................................... 30

*Miller v. Bonta,*
   542 F. Supp. 3d 1009 (S.D. Cal. 2021) ............................................. 13

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,*
   460 U.S. 575 (1983) ........................................................................... 15

*Mistretta v. United States,*
   488 U.S. 361 (1989) ........................................................................... 18, 23

*Morrow v. Harwell,*
   768 F.2d 619 (5th Cir. 1985) ............................................................. 30

*Murphy v. Guerrero,*
   No. 1:14-CV-00026, 2016 U.S. Dist. LEXIS 135684 (D. N. Mar. I. Sept. 28,
   2016) .................................................................................................. 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ...................................................................... 10, 11, 14

*Netchoice, L.L.C. v. Paxton,*
   49 F.4th 439 (5th Cir. 2022) ............................................................. 16

*Nuwer v. Mariner Post-Acute Network,*
   332 F.3d 310 (5th Cir. 2003) ............................................................. 6

*Panama Ref. Co. v. Ryan,*
   293 U.S. 388 (1935) ........................................................................... 19

*Paul v. United States,*
   140 S. Ct. 342 (2019) ........................................................................ 19

*Rigby v. Jennings,*
No. 21-1523 (MN), 2022 U.S. Dist. LEXIS 172375 (D. Del. Sept. 23, 2022)... 12

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018) ................................................................... 21, 23

*Staples v. United States,*
511 U.S. 600 (1994) ............................................................................ 21

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ........................................................................... 7, 8

*Terkel v. CDC,*
521 F. Supp. 3d 662 (E.D. Tex. 2021) .................................................. 30

*Texas v. Biden,*
No. 2:21-CV-067-Z, 2021 U.S. Dist. LEXIS 195393 (N.D. Tex. July 19, 2021)
.......................................................................................................... 10

*Texas v. Rettig,*
993 F.3d 408, 409 (5th Cir. 2021) ....................................................... 16

*Texas v. United States,*
50 F.4th 498 (5th Cir. 2022) ................................................................. 9

*Texas v. United States,*
809 F.3d 134 (5th Cir. 2015), *aff'd* 577 U.S. 1101 (2016) .............................. 8, 9

*Texas v. United States,*
86 F. Supp. 3d 591 (S.D. Tex. 2015) ..................................................... 8

*Touby v. United States,*
500 U.S. 160 (1991) ...................................................................... 22, 23

*United States v. Apel,*
571 U.S. 359 (2014) ........................................................................... 27

*United States v. Davis,*
139 S. Ct. 2319 (2019) ........................................................................ 15

*United States v. George,*
228 U.S. 14 (1913) .............................................................................. 20

*United States v. Granderson,*
511 U.S. 39 (1994) .............................................................................. 27

*United States v. Grimaud,*
    220 U.S. 506 (1911) ............................................................................ 21

*United States v. Hudson & Goodwin,*
    11 U.S. (7 Cranch) 32 (1812) .......................................................... 21

*United States v. Kuzma,*
    967 F.3d 959 (9th Cir. 2020) .......................................................... 28

*United States v. Lopez,*
    514 U.S. 549 (1995) ............................................................................ 24

*United States v. Standard Brewery, Inc.,*
    251 U.S. 210 (1920) ............................................................................ 20

*Util. Air Regulatory Grp. v. EPA,* 573 U.S. 302 (2014) ........................... 27

*Vanderstok v. Garland,*
    No. 4:22-cv-00691-O, 2022 U.S. Dist. LEXIS 159459 (N.D. Tex. Sept. 2, 2022)
    ................................................................................................... 26, 28

*Wayman v. Southard,*
    23 U.S. 1 (1825) ................................................................................. 19

*Weiss v. United States,*
    510 U.S. 163 (1994) ............................................................................ 20

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ...................................................................... 24

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ............................................................................ 18

*Young Conservatives of Tex. Found. v. Univ. of N. Tex.,*
    597 F. Supp. 3d 1062 (E.D. Tex. 2022) ............................................ 5

*Yukutake v. Conners,*
    554 F. Supp. 3d 1074 (D. Haw. 2021) ............................................. 11

### Statutes

18 U.S.C. § 921 ..................................................................................... 3, 28

18 U.S.C. § 922 ..................................................................................... 2, 3

18 U.S.C. § 926 ................................................................................... 23, 25

26 U.S.C. § 5845 ................................................................................. 3, 25, 28

26 U.S.C. § 5861 ...................................................................................... 2, 3

26 U.S.C. § 7801 .................................................................................... 23, 25

28 U.S.C. § 2201 ........................................................................................ 29

5 U.S.C. § 704 .............................................................................................. 8

5 U.S.C. § 706 ............................................................................................ 30

## Other Authorities

114 Cong. Rec. at 14,792-93 (May 23, 1968) ............................................ 28

David B. Kopel, *The Second Amendment in the Tenth Circuit: Three Decades of (Mostly) Harmless Error*, 86 DENV. U.L. REV. 901 (2009) ...................................... 14

Ilan Wurman, *Nondelegation at the Founding*, 130 YALE L. J. 1490, 1504, 1523-26 (2021) ........................................................................................... 17

Jamie G. McWilliam, *The Unconstitutionality of Unfinished Receiver Bans*, 2022 HARV. J.L. & PUB. POL'Y PER CURIAM 9, 12-13, 15-16 (Spring 2022) ..................... 13

*Joseph G.S. Greenlee, The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 45, 61-65, 71-78 (2023) ............................................................... 13

Stephen P. Halbrook, FIREARMS LAW DESKBOOK, § 7:7 (Oct. 2022 Update) ............ 28

The Federalist No. 47 (James Madison) .................................................... 17

## Rules

Fed. R. Civ. P. 56 ......................................................................................... 5

## Regulations

86 Fed. Reg. 30,826 (June 10, 2021) ...................................................... 2, 26

88 Fed. Reg. 6,478 (Jan. 31, 2023) ................................................... *passim*

## Constitutional Provisions

U.S. Const. art. I, § 1 ................................................................................ 17

## INTRODUCTION

The defendants (collectively, the "Department") have issued a final rule that seeks to rewrite the National Firearms Act and Gun Control Act by bureaucratic diktat and transform pistols with stabilizing braces into short-barreled rifles that must be registered. According to this rule, millions of law-abiding citizens who possess unregistered pistols with stabilizing braces are criminals guilty of a felony that is punishable by up to 10 years in prison. Moreover, to avoid prosecution under this rule, persons would need to comply with unlawful restrictions on their right to make, possess, transfer, and travel with pistols equipped with stabilizing braces.

This rule thus violates the Second Amendment, which unequivocally declares that the right to keep and bear arms "shall not be infringed." It also violates the structural provisions in the Constitution that vest Congress—not agencies—with the authority to rewrite the law and create crimes with 10-year prison sentences. The rule additionally exceeds the Department's statutory authority. Although the Department will wrongly dispute these legal conclusions, it cannot dispute the underlying material facts. The plaintiff is therefore entitled to summary judgment.

## ISSUES TO BE DECIDED BY THE COURT

1.    Do restrictions on the right to possess pistols with stabilizing braces, including requiring persons to pay $200 and wait several months to a year for registration applications to be processed, violate the Second Amendment right to keep and bear arms?

2.    Can Congress delegate the core legislative power of deciding what conduct to make a felony by allowing the Department to expand statutory definitions and thus criminal liability?

3.    Can the Department define rifles (and thus short-barreled rifles) to include pistols with stabilizing braces and thereby make possession of unregistered pistols with stabilizing braces a crime without explicit statutory authority?

<u>S</u>TATEMENT OF <u>U</u>NDISPUTED <u>M</u>ATERIAL <u>F</u>ACTS

Stabilizing braces were invented to help disabled veterans shoot large pistols, such as AR-15-style pistols, safely with one hand. *See* Ex. 2: ATF*, Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 86 Fed. Reg. 30,826, 30,827 (June 10, 2021) ("Proposed Rule"); Ex. 4: U.S. Patent No. 8,869,444 B2 (Oct. 28, 2014), at MSJ_001-3. As patent applications show, the braces are designed to stabilize a pistol against a shooter's *forearm*, which enables safer and more accurate shooting:[1]



Accordingly, as the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") previously recognized, a pistol equipped with a stabilizing brace is not intended to be fired *from the shoulder*. *See*, *e.g.*, Ex. 6: ATF Letter (Nov. 26, 2012); Ex. 7: ATF Letter (Dec. 22, 2015); Ex. 8: ATF Letter (Jan. 12, 2017); Ex. 9: ATF Letter (Mar. 21, 2017). ATF thus approved the use of stabilizing braces on large pistols and stated that a brace did not transform a pistol into a short-barreled rifle: a weapon that is designed to be fired from the shoulder. *See id.*

This classification is significant because, unlike pistols, short-barreled rifles must be registered and are subject to additional restrictions, including on their transportation and transfer. 26 U.S.C. § 5861; 18 U.S.C. § 922(a)(1), (a)(4), (b)(4). Federal statutes define a rifle (and thus a short-barreled rifle) as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C.

---

[1] *See, e.g.*, Ex. 4 at MSJ_001-4; Ex. 5: U.S. Patent No. 9,664,477 Bl (May 30, 2017), at MSJ_005-08.

§ 5845(c); 18 U.S.C. § 921(a)(7)-(8).[2] To lawfully make and register a short-barreled rifle, a person must file a "Form 1" with ATF, provide fingerprints and photographs, pay a $200 making tax, and obtain a law enforcement certification. Ex. 10: ATF Handbook at § 3.2.3; Ex. 11: Form 1 at MSJ_026, 30. Possession of an unregistered short-barreled rifle is punishable by 10 years in prison and a $250,000 fine, and there are severe criminal penalties, including imprisonment, for non-compliance with other statutory restrictions on them. 26 U.S.C. §§ 5681, 5871, 5872; 18 U.S.C. §§ 922(a)(1), (4), (b)(4); 3571; *see* Compl. at ¶¶ 21-23, 27-29.

Over the past decade, more than a million law-abiding individuals have purchased stabilizing braces or pistols with stabilizing braces attached and enjoyed the ability to shoot larger pistols more safely and accurately without registering their pistols as short-barreled rifles. *See* Ex. 12: CRS Report at MSJ_033; Ex. 1: ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478, 6,560, 6,564 (Jan. 31, 2023) (the "Rule"); Ex. 4 at MSJ_003; Ex. 5 at MSJ_007-8. Plaintiff Blake Watterson is an individual who purchased a stabilizing brace after learning that it could enable him to shoot his pistol more safely and accurately, which could make it more effective for self-defense purposes. *See* Ex. 3: Pl.'s Decl. at ¶¶ 4, 6-10, 15. Even with the prevalence of stabilizing braces (3 million to 40 million) and the lack of restrictions on them, *see* Proposed Rule, 86 Fed. Reg. at 30,845; Ex. 12 at MSJ_033, the braces have been used in relatively few crimes according to the Department's own evidence, *see* Rule, 88 Fed. Reg. at 6,499 (noting two crimes where stabilizing braces were used and 272 investigations involving braces).

The Department nevertheless published a final rule amending the definition of short-barreled rifles in the National Firearms Act and the Gun Control Act to

---

[2] The National Firearms Act only uses the term "rifle" as opposed to "short-barreled rifle;" however, guns with barrels greater than 16 inches are excluded from the definition. *See* 26 U.S.C. § 5845(a)(3).

include pistols with stabilizing braces on January 31, 2023. *See id.* at 6,480. The Rule amends the definition of rifle to include a multi-factor test and deems nearly all, if not all, pistols equipped with a stabilizing brace as short-barreled rifles. *See id.* at 6,480, 6,518; *see also* Compl. at ¶¶ 63-79. The Rule states that it "overrul[es] ATF's previous classification letters" and that even "possessors of firearms equipped with 'stabilizing braces' that were at issue in those letters" may currently possess unregistered short-barreled rifles in violation of federal law. Rule, 88 Fed. Reg. at 6,480; *see id.* ("all such prior classifications are no longer valid"), 6,502, 6,569 (similar). According to the Rule, over a million persons unlawfully possess unregistered short-barreled rifles and are thereby guilty of a felony that carries a 10-year sentence. *See id.* at 6,480, 6,482, 6,563, 6,573.

The Rule sets forth an "enforcement discretion" scheme, which provides five options that would allow some affected persons to comply with the statutory requirements (as modified by the Rule), possess a pistol with a stabilizing brace, and avoid prosecution. *See id.* at 6,480-81, 6,507, 6,549, 6,570-71; *see* Compl. at ¶¶ 84-93. For example, a person who possessed an unregistered pistol equipped with a stabilizing brace on the day the Rule was published, may submit a Form 1 within 120 days after the Rule's publication, Rule, 88 Fed. Reg. at 6,480-81, 6,570, even though there is typically "no mechanism for a possessor to register an unregistered [National Firearm Act] firearm already possessed by the person," Ex. 13: ATF, *National Firearms Act* at MSJ_034; *see* Ex. 10 § 3.3. If this option is chosen, the Rule waives the $200 tax and deems those persons "in compliance with the statutory requirements between the date on which a person's application is filed and the date" of ATF's decision. Rule, 88 Fed. Reg. at 6,480-81, 6,571; *see id.* at 6,507, 6,549 (explaining the registration option allows a person "to lawfully possess" the pistol). In contrast, there is no compliance period for those who did not possess a pistol with a stabilizing brace on the Rule's publication date, and the Rule warns that anyone who transfers or

"newly makes" a pistol with a stabilizing brace (e.g., attaching a stabilizing brace to a pistol) after the publication date is subject to prosecution. *See id.* at 6,480-81.

The Rule injures everyone who possesses or wants to possess a pistol equipped with a stabilizing brace, including Watterson. Ex. 3 at ¶¶ 14-15, 26-30; *see* Ex. 14: *Final Reg. Analysis* at MSJ_037 (describing "those who intend to purchase" as affected), 38 (explaining the Rule "would affect . . . individuals who intend to purchase a firearm and attach a 'stabilizing brace' to the firearm"). The Rule currently prevents Watterson from owning a pistol equipped with a stabilizing brace for self-defense. Ex. 3 at ¶¶ 7-15, 26-31. Although Watterson owns a stabilizing brace, it was not attached to his pistol on January 31, 2023, and he cannot attach it to his pistol, because, if he did, he could be prosecuted for possessing an unregistered short-barreled rifle under the Rule. *Id.* at ¶¶ 10, 14, 17-26, 31. In order to attach his stabilizing brace and thereby have a pistol equipped with a stabilizing brace for self-defense, Watterson would need to pay a $200 tax, comply with other requirements, wait for approval, and then be burdened by additional restrictions that accompany registering a weapon as a short-barreled rifle. *Id.* at 27; *see* Ex. 15: ATF FAQs at MSJ_041 (explaining "tax forbearance only pertains to the firearms with an attached 'stabilizing brace' in your possession at the time the final rule is published"); Ex. 14 at MSJ_039 (estimating costs of fingerprinting). He would face similar burdens and even greater costs if he bought another stabilizing brace or bought a pistol already equipped with a stabilizing brace. Ex. 3 at ¶¶ 29-31.

## STANDARD OF REVIEW

Summary judgment is appropriate whenever a summary-judgment motion "that is properly supported by the evidence" shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, 597 F. Supp. 3d 1062, 1071 (E.D. Tex. 2022) (quoting Fed. R. Civ. P. 56(a)). The "'existence of *some* alleged factual dispute'

is insufficient to defeat a motion for summary judgment;" instead, the nonmovant must "show with 'significant probative evidence'" that the resolution of a legitimate factual dispute "might govern the outcome of the suit." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986), and *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). The court must "view the evidence and the inferences to be drawn therefrom in the light most favorable to the non-moving party," but "unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Nuwer v. Mariner Post-Acute Network*, 332 F.3d 310, 313-14 (5th Cir. 2003); *accord Harrison Co., L.L.C. v. A-Z Wholesalers, Inc.*, 44 F.4th 342, 346 (5th Cir. 2022).

## SUMMARY OF THE ARGUMENT

Because the undisputed facts show that Watterson is entitled to judgment as a matter of law, the Court should grant him summary judgment. Regarding preliminary matters, this Court has Article III jurisdiction and can decide Watterson's claims. The Rule causes an immediate and concrete injury to Watterson, which can be redressed by a favorable decision from this Court. Moreover, the Rule is a final, legislative rule that the Court can review.

Regarding the substantive issues in this case, Watterson likewise prevails. *First*, the Rule and the Department's interpretation of the relevant statutory provisions violate the Second Amendment. That amendment safeguards Watterson's right to keep and bear arms, which includes the right to possess a pistol with a stabilizing brace for self-defense. The Department failed to carry its burden to prove that the registration and related requirements are justified by history or tradition.

*Second*, the Rule is an unconstitutional delegation of legislative power. Congress cannot delegate its core legislative power to decide what constitutes a crime that is punishable by 10 years' imprisonment to unelected officials. This is especially true when Congress fails to provide an intelligible principle as it did here. There is

no intelligible principle to guide the Department's discretion in deciding whether to expand the definition of short-barreled rifles to include pistols with stabilizing braces—and thereby make possession of unregistered pistols a felony.

*Third*, even assuming Congress could delegate the power to decide whether to redefine statutory provisions and expand criminal liability, it did not do so here. Congress failed to speak clearly as required to delegate a decision with such political significance.

ARGUMENT AND AUTHORITIES

## I.    THE COURT HAS JURISDICTION AND CAN REVIEW THE RULE.

### A. Plaintiff Has Article III Standing.

As a threshold matter, there is no doubt that Watterson has standing to invoke this Court's jurisdiction. To establish standing, plaintiffs "must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quotation omitted). Underlying all these elements is "a basic question": "whether the plaintiff is himself an object of the challenged regulation." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (quotation omitted). If so, "there is ordinarily little question" that the regulation has caused an injury that can be redressed. *Id.*

Watterson easily makes the tri-partite Article III showing here. Watterson has constitutional injuries, *see infra* Parts II-III, and a regulatory and monetary injury, *see supra* p. 5. The Department even acknowledges that the Rule affects persons, like Watterson, who intend to have a pistol with a stabilizing brace. *See* Rule, 88 Fed. Reg. at 6,573; Ex. 14 at MSJ_037-38. Watterson has suffered an immediate and concrete injury that was caused by the Department's unlawful rule that expands the statutory definitions and threatens prosecution. *See* Ex. 3 at ¶¶ 15-31. That is because the Rule prevents Watterson from having a pistol equipped with a stabilizing brace for self-

defense without risking a possible 10-year prison sentence or waiting months, paying a minimum of $200, and being subject to numerous restrictions. *See id.* at ¶¶ 27-31; *Contender Farms*, 779 F.3d at 266 ("An increased regulatory burden typically satisfies the injury in fact requirement."); *Susan B. Anthony List*, 573 U.S. at 158-59 (threatened enforcement and prosecution can be an injury in fact). Finally, a favorable decision can redress Watterson's harm. *See Contender Farms*, 779 F.3d at 266 ("[c]ausation and redressability . . . flow naturally from" a regulatory burden). The requested relief will remedy the constitutional injuries and allow Watterson to possess a pistol with a stabilizing brace without risking prosecution or incurring costs and facing ongoing regulatory burdens.

### B. The Court Can Decide Plaintiff's Claims.

There is likewise no doubt that Watterson asserts valid claims that the Court can decide. The Rule is a "final agency action" that is reviewable under the Administrative Procedure Act, and Watterson is "adversely affected or aggrieved" by it. 5 U.S.C. §§ 704, 702. Moreover, Watterson easily satisfies the "[not] especially demanding" zone-of-interest tests. *Texas v. United States*, 809 F.3d 134, 162 (5th Cir. 2015) (quotations omitted), *aff'd* 577 U.S. 1101 (2016); *see Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 704 (D.C. Cir. 1994) ("Parties regulated by a statute or those whom it protects fall within its 'zone of interest.'").

As a final rule that went through notice-and-comment rulemaking, the Rule is the "consummation" of the decisionmaking process and has clear "legal consequences." *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). And the Rule is a substantive, legislative action, because it is "binding" and creates "rights and obligations." *See Texas*, 809 F.3d at 171. The Rule clearly "supplements a statute, adopts a new position inconsistent with existing regulations," and "otherwise effects a substantive change in existing law or policy," *Texas v. United States*, 86 F. Supp. 3d 591, 670 (S.D. Tex. 2015), because it overrules prior classifications, *see* Rule, 88 Fed.

Reg. at 6,480, 6,502, 6,569. Furthermore, the Rule confers benefits by waiving a $200 tax requirement and giving a subset of persons the right to "lawfully retain possession of their Firearm under Federal law," and it removes enforcement discretion to prosecute those who comply with the Rule's compliance options. *Id.* at 6,481; *see, e.g.*, *id.* at 6,480 ("will consider individuals to be in compliance"), 6,480 ("Any penalties . . . would result only from conduct occurring after this time period to take actions ends."); 6,507, 6,549 ("lawfully possess"); 6,570-71 (providing compliance options); Compl. ¶¶ 79-93; *Texas*, 809 F.3d at 148, 171-72, 176 (concluding a memorandum that granted "lawful presence" was likely a binding, substantive rule); *Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022) (explaining an action is substantive if it "has binding effect on agency discretion or severely restricts it" (quotation omitted)).

The Department nevertheless characterizes the Rule as interpretive. *See* Rule, 88 Fed. Reg. at 6,478, 6,480, 6,508-09, 6,554. But that characterization should be viewed with suspicion because the label varies dramatically from what the Rule actually does. *See Texas*, 50 F.4th at 522 (courts are "mindful but suspicious of the agency's own characterization of what it has done," and look to "the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply"). Indeed, the Department's own actions show that it does not view the Rule as interpretative, which is why it went through notice-and-comment rulemaking and why the Rule amends the Code of Federal Regulations. *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) ("[A]n agency presumably intends a rule to be legislative if it has the rule published in the Code of Federal Regulations."). Therefore, the Court can review Watterson's claims under the Administrative Procedure Act.

In any event, the Court can review Watterson's claims under the *Larson* doctrine and grant a permanent injunction. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) ("[I]n case of an injury threatened by his

illegal action, the officer cannot claim immunity from injunction process." (quotation omitted)); *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 U.S. Dist. LEXIS 195393, at *16-17 (N.D. Tex. July 19, 2021) (explaining "the *Larson* doctrine is a well-established line of cases that lets plaintiffs sue, in effect, the United States even without an explicit waiver of sovereign immunity").

## II.   CRIMINALIZING THE POSSESSION OF UNREGISTERED PISTOLS WITH STABILIZING BRACES VIOLATES THE SECOND AMENDMENT.

The Rule—and the National Firearms Act and Gun Control to the extent the Rule properly interprets those statutes—violates the Second Amendment. The Department has failed to prove that historical tradition permits the Rule's (or the statutes') infringement on law-abiding individuals' Second Amendment right to possess or make pistols with stabilizing braces for self-defense purposes.

Despite the Department's claims, the Second Amendment extends to pistols with stabilizing braces. The Second Amendment "confer[s] an individual right to keep and bear arms," and it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582, 595 (2008); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Pistols with stabilizing braces clearly qualify as bearable arms, because they are "modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132; *see* Rule, 88 Fed. Reg. at 6,566 (recognizing that individuals can use pistols with stabilizing braces for "personal defense"); Ex. 4 at MSJ_003-4 (explaining how braces work and improve accuracy and control); Ex. 5 at MSJ_007-8 (similar); *see also* Ex. 3 at ¶¶ 4, 6-15. Accordingly, "the Constitution presumptively protects" the uninfringed possession of pistols with stabilizing braces. *Bruen*, 143 S. Ct. at 2130. That means the Department has the burden of "justifying [its] regulation by demonstrating that it is consistent with the Nation's historical

tradition of firearm regulation" otherwise a court cannot conclude that the regulation abides by "the Second Amendment's 'unqualified command.'" *Id.* (quotation omitted).

The Department has not and cannot carry that burden here. The Department alleges that restrictions on pistols with stabilizing braces can be justified by historical prohibitions on dangerous and unusual weapons, Rule, 88 Fed. Reg. at 6,548, but it does not "affirmatively prove" it, *see Bruen*, 142 S. Ct. at 2127. For starters, it failed to identify specific statutes from 1791 prohibiting dangerous and unusual weapons, and it did not cite evidence that any such statutes were enforced to show such laws are appropriate analogues. *See id.* at 2135-36, 2149 (noting that "not all history is created equal" and criticizing the lack of evidence that specific laws were actually enforced); *Firearms Policy Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 U.S. Dist. LEXIS 152834, at *27-30 (N.D. Tex. Aug. 25, 2022) (concluding evidence that, at most, 22 states enacted laws between 1856 and 1923 imposing "restrictions on 'the purchase or use of firearms' for those younger than 21" failed to prove "a prohibition on law-abiding 18-to-20-year-olds carrying a handgun in public for self-defense is consistent with this Nation's historical tradition of firearm regulation"); *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1082 (D. Haw. 2021) (explaining "a handful of similar laws from the 1930s" does not show a "'longstanding' historical tradition").

Furthermore, any limited historical prohibition on the carrying of dangerous and unusual weapons does not justify "laws restricting the public carry of weapons that are unquestionably in common use today," much less laws restricting the mere possession of such arms. *Bruen,* 142 S. Ct. at 2143; *see Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito J., concurring) (explaining that weapons cannot be banned if they "are commonly possessed by law-abiding citizens for lawful purposes *today*"); *Heller v. District of Columbia*, 670 F.3d 1244, 1286-87 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that the Second Amendment "protects weapons that have not traditionally been banned and are in common use by law-abiding citizens"). And

pistols with stabilizing braces are in common use today and have not been traditionally banned based on the Department's own evidence. The Department acknowledges that at least "1.4 million firearm owners" have "pistols with 'stabilizing braces' attached," Rule, 88 Fed. Reg. at 6,573, and the true figure could be far greater as 3 million to 40 million stabilizing braces have been sold, *see id.* at 6,560; Ex. 12 at MSJ_033. Moreover, over 641,000 short-barreled rifles have been registered, demonstrating that short-barreled rifles are likewise in common use by law-abiding citizens. Rule, 88 Fed. Reg. at 6,550; *See Caetano*, 577 U.S. at 420 (Alito J., concurring) (concluding that the fact hundreds of thousands of citizens— approximately 200,000—lawfully owned stun guns showed the weapons were commonly possessed for lawful purposes). The Department's inability to show pistols with stabilizing brace are unusual dooms its argument that the Rule's restrictions are consistent with the Second Amendment. *See id.* at 417 (explaining the "dangerous and unusual weapons" test is "conjunctive": "A weapon may not be banned unless it is *both* dangerous *and* unusual").

What is more, the Department did not show that pistols with stabilizing braces are unusually dangerous or more likely to be used by criminals than other weapons. The Department can point to only two instances where criminals used stabilizing braces and 272 investigations involving braces. Rule, 88 Fed. Reg. at 6,499. This is insufficient. *See Rigby v. Jennings*, No. 21-1523 (MN), 2022 U.S. Dist. LEXIS 172375, at *16 (D. Del. Sept. 23, 2022) (rejecting argument that untraceable firearms are not commonly used by law-abiding citizens for lawful purposes simply because 24,000 untraceable firearms were recovered at crime scenes). The vast majority of stabilizing braces are used for self-defense and other lawful purposes. *See* Rule, 88 Fed. Reg. at 6,565-66 (acknowledging that pistols with stabilizing braces can be used for "personal defense" and could be helpful in controlling the population of feral hogs, which cause millions of dollars in damages annually); *see also* Ex. 3 at ¶¶ 7-10, 15.

History and tradition do not support the Rule's restrictions on a person's right to possess or make pistols with stabilizing braces. Nor do they support the statutory restrictions to the extent the Rule correctly interprets the National Firearms Act and the Gun Control Act. That is unsurprising, because Americans have enjoyed the right to make, modify, and possess guns for centuries, including the right to attach accessories, such as scopes, to their guns. *See Joseph G.S. Greenlee, The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 45, 61-65, 71-78 (2023); Jamie G. McWilliam, *The Unconstitutionality of Unfinished Receiver Bans*, 2022 HARV. J.L. & PUB. POL'Y PER CURIAM 9, 12-13, 15-16 (Spring 2022). National restrictions on most gun accessories are of recent vintage and lack a historical pedigree. *See Miller v. Bonta*, 542 F. Supp. 3d 1009, 1024 (S.D. Cal. 2021) ("Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers, or barrel shrouds."), *vacated*, No. 21-55608, 2022 U.S. App. LEXIS 21172, at *2 (9th Cir. 2022) (vacating judgment in light of *Bruen*); *Greenlee, The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. at 78 ("Regulations on self-built arms are not longstanding. In fact, there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries.").

Even restrictions on short-barreled rifles did not emerge until the 1930's, and the Department mostly cites cases pre-dating *Bruen* to argue those restrictions are permissible rather than evidence those restrictions are justified by history and tradition or by the purported unusual nature of short-barreled rifles Rule, 88 Fed. Reg. at 6,482, 6,548. And the Department's citation to a conclusory sentence (at 6,548, 6,573) from a 1968 Senate Report that concluded short-barreled rifles, along with bazookas, missiles, and other weapons, "are pimarily [sic] weapons of war and have no appropriate sporting use or use for personal protection" does not prove regulations on short-barreled rifles are consistent with the Second Amendment. S. Rep., No. 90-

1501, at 28 (Sept. 6, 1968). Moreover, this unsupported conclusion is wrong as it relates to short-barreled rifles. Evidence shows that short-barreled rifles "are not and never have been a particular criminal problem," and were "commonly used by hunters, trappers, ranchers, and horseback riders" before the National Firearms Act was passed. *See* David B. Kopel, *The Second Amendment in the Tenth Circuit: Three Decades of (Mostly) Harmless Error*, 86 DENV. U.L. REV. 901, 911 & n. 38 (2009) (explaining short-barreled rifles "were simply added . . . to clarify that longer rifles were not covered by some generic language in the draft [National Firearms Act]").

Nor does the fact that the Rule (and the statutes) do not impose a complete ban on pistols with stabilizing braces or short-barreled rifles show that the restrictions are "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *See Bruen*, 142 S. Ct. at 2127. The Department cites no historical analogue that justifies a registration requirement, much less one that requires law-abiding citizens to wait months to a year to possess a particular type of weapon. *See id.* at 2138 n.9 (indicating that "lengthy wait times in processing license applications or exorbitant fees" may impermissibly infringe on the right of law-abiding citizens to public carry); *Heller*, 670 F.3d at 1270, 1292 (Kavanaugh, J, dissenting) (concluding that a registration requirement for gun owners was not supported by history and tradition); *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 U.S. Dist. LEXIS 135684, at *34-37 (D. N. Mar. I. Sept. 28, 2016) (concluding that a registration requirement with a 15-day waiting period "fails constitutional muster").

The Department likewise points to no historical basis for imposing a tax—that is nearly twice the cost of a stabilizing brace, Ex. 3 at ¶ 10—to attach the brace to a lawfully owned pistol. *See Murphy*, 2016 U.S. Dist. LEXIS 135684, at *79-83 (concluding a $1,000 tax on handguns is an impermissible burden on "the right to keep and bear a handgun for self-defense"). That is likely because Congress did not tax firearms until 1919, *id.* at *80, and a tax that is designed to discourage the

14

exercise of fundamental rights is unconstitutional, *see* Ex. 13 at MSJ_34 (stating that the "underlying purpose" of the tax under the National Firearms Act was "unrelated to revenue collection" and designed to "curtail, if not prohibit, transactions in [certain] firearms"); *cf. Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) (concluding that a "deliberate and calculated device in the guise of a tax" to infringe on a fundamental freedom is impermissible); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592-93 (1983) (explaining that differential taxation of the press "suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional"). And the Department points to no historical analogue to support the ongoing restrictions on transfer and transportation that the Rule would impose on pistols with braces that are registered.

Therefore, the Court should conclude that the Rule—and the federal statutes to the extent the Rule correctly interprets them—violates the Second Amendment.

## III.   THE RULE VIOLATES ARTICLE I AND CONSTITUTIONAL SEPARATION-OF-POWERS PRINCIPLES.

The Court should also conclude that the Rule violates the Constitution's structural provisions. The Department lacks the constitutional authority to decide that possession of an unregistered pistol with a stabilizing brace is a crime, and Congress cannot delegate that power to it. *See United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) ("Only the people's elected representatives in the legislature are authorized to make an act a crime." (quotation omitted)). The legislative power must be exercised by Congress and in accordance with the Constitution's bicameralism and presentment requirements. *See, e.g., A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *cf., e.g., Clinton v. City of New York*, 524 U.S. 417, 448-49 (1998); *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 232-34 (5th Cir. 2022) (Jones, J., concurring).

Although certain opinions have wrongly approved delegations of some

legislative power, a few limits on transferring legislative power remain. A decision about whether to criminalize the possession of commonly used pistols, which carries a possible 10-year prison sentence, is a paradigmatic example of a *core* legislative power that cannot be delegated. In any event, even if Congress could constitutionally delegate the power to create new crimes and make millions of citizens felons, it must provide an intelligible principle to do so. Congress failed to provide an intelligible principle to govern the Department's discretion in deciding whether to criminalize pistols with stabilizing braces. Therefore, the Rule is unconstitutional based on a faithful interpretation of the Constitution and current precedent.

### A. The Rule Is Unconstitutional Because Congress Cannot Delegate Legislative Power.

The Rule is an unconstitutional delegation of legislative power under the original understanding of the Constitution. Although precedent has strayed from the original meaning—and adherence to original meaning is not required for Watterson to prevail—a discussion of original meaning is necessary for three reasons. *First*, we want to preserve the argument that non-originalist cases approving the delegation of legislative power are wrongly decided. *See Ben. Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008). *Second*, it is useful to anchor our discussion on the constitutional principles on which current precedent sits. *See Netchoice, L.L.C. v. Paxton*, 49 F.4th 439, 452-53 (5th Cir. 2022) ("As always, we start with the original public meaning of the Constitution's text."). *Third*, this Court is not required to extend "precedent in direct conflict with the Constitution," and instead should, to the extent possible based on binding precedent, "decide every case faithful to the text and original understanding of the Constitution." *See Texas v. Rettig*, 993 F.3d 408, 409, 417 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc).

As an original matter, the Rule is an unlawful attempt to circumvent constitutional constraints on lawmaking. At the time of ratification, the vesting of

16

legislative power in Congress would have been understood as implicitly prohibiting Congress from divesting itself of that authority and delegating it to others. *See, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2133-35 (2019) (Gorsuch, J., dissenting); Ilan Wurman, *Nondelegation at the Founding*, 130 YALE L. J. 1490, 1504, 1523-26 (2021). The Founders recognized that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison). They were influenced by John Locke and William Blackstone who knew that "freedom required that the power to make the standing rules and the power to enforce them not lie in the same hands" and that vesting the "right both of *making* and of *enforcing* the laws" in one entity was the definition of "a tyrannical government." *DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 72-74 (2015) (Thomas, J., concurring). The Founders thus divided the powers between three separate branches to preserve liberty, giving "[a]*ll* legislative Powers" to Congress. U.S. Const. art. I, § 1 (emphasis added); *see Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021) ("[T]he separation of powers is designed to preserve the liberty of all the people."). Accordingly, Congress cannot "abdicate or . . . transfer to others the essential legislative functions with which it is thus vested" without violating Article I, § 1 of the Constitution and separation-of-powers principles. *Schechter Poultry*, 295 U.S. at 529; *see Gundy*, 139 S. Ct. at 2123 (plurality op.) ("Accompanying that assignment of power to Congress is a bar on its further delegation."); *cf. Freytag v. Commissioner*, 501 U.S. 868, 880 (1991) (government branches cannot waive a structural protection in the Constitution).

After all, if Congress could delegate the "greatest" power—the legislative power—it would subvert the "strict rules" the Constitution imposes to govern the legislative process and to curb the potential for governmental abuses. *Jarkesy v. SEC*, 34 F.4th 446, 459 (5th Cir. 2022); *see Ass'n of Am. R.R.*, 575 U.S. at 61 (Alito, J., concurring) ("Our Constitution, by careful design, prescribes a process for making

law, and within that process there are many accountability checkpoints."); *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting) (noting the Framers viewed "Article I's detailed and arduous processes for new legislation" as the "bulwarks of liberty"). Congress thus cannot subvert these safeguards and "dash the whole [constitutional] scheme" by "giv[ing] its power away to an entity that is not [similarly] constrained."*Ass'n of Am. R.R.*, 575 U.S. at 61 (Alito, J., concurring); *id.* at 68 (Thomas, J., concurring) (similar); *Mistretta v. United States*, 488 U.S. 361, 371-72 (1989) ("[T]he integrity and maintenance of the system of government ordained by the Constitution mandate that Congress generally cannot delegate its legislative power to another Branch." (quotation omitted)). And whenever it does so and "a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins*, 141 S. Ct. at 1780.

To be sure, "the Supreme Court's more recent formulations" allow Congress to delegate some legislative power as long as it "provides an 'intelligible principle' by which the recipient of the power can exercise it." *Jarkesy*, 34 F.4th at 460-61. Under this approach, the Supreme Court has allowed Congress to delegate some policy judgments and has rarely "second-guess[ed] Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001) (quotation omitted). This precedent is wrong and should be revisited. *See Ass'n of Am. R.R.*, 575 U.S. at 77 (Thomas, J., concurring) (concluding that the "intelligible principle" test "does not adequately reinforce the Constitution's allocation of legislative power").

Under a proper understanding of the Constitution, no "degree of policy judgment is permissible when it comes to establishing generally applicable rules governing private conduct." *Id.* at 86. Instead, "[t]he Government may create generally applicable rules of private conduct only through the proper exercise of legislative power." *Id.* The Rule is therefore unlawful: It regulates private conduct

but was improperly issued by the Department rather than passed by Congress in accordance with constitutional requirements.

### B. Because Deciding What Is a Felony Is a Core Legislative Power, Congress Cannot Delegate the Decision to Criminalize Possession of Unregistered Pistols with Stabilizing Braces.

Even acknowledging that Congress can delegate *some* legislative power under current precedent, the Rule is still unconstitutional. That is because the Department exercised *core* legislative power by making a major policy decision about what conduct should be a felony punishable by imprisonment. Such a decision is a paradigmatic example of core legislative power that must be exercised by elected representatives.

Congress "may not transfer to another branch 'powers which are *strictly* and *exclusively* legislative.'" *Gundy*, 139 S. Ct. at 2123 (plurality op.) (emphases added) (quoting *Wayman v. Southard*, 23 U.S. 1, 10 (1825)); *see Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935) ("Congress manifestly is not permitted to abdicate, or to transfer to others, the *essential* legislative functions with which it is thus vested." (emphasis added)). Core, essential legislative powers—such as significant policy decisions—thus cannot be delegated. *See Panama Ref.*, 293 U.S. at 421 (explaining that Congress must itself "lay[] down policies and establish[] standards"); *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring) (explaining that "the critical policy decisions" and "hard choices" are "the very essence of legislative authority under our system" and "must be made by the elected representatives of the people"); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement regarding denial of certiorari) (indicating "congressional delegations . . . to decide major policy questions" may be impermissible).

Accordingly, "[t]he Court has unanimously invalidated legislation in which Congress delegated to others the *essential* legislative functions with which it is . . . vested, and it has read other statutes narrowly to avoid annulling them as excessive

abdications of constitutional responsibility." *Weiss v. United States*, 510 U.S. 163, 189 n.5 (1994) (emphasis added) (quotations omitted). In contrast, many of the delegations that the Court has approved did not "involve an exercise of the core legislative power." *Ass'n of Am. R.R.*, 575 U.S. at 80-82 (Thomas, J., concurring).

If anything falls into the category of a major policy decision that is exclusively legislative and cannot be delegated, it is a policy decision about what constitutes a crime and can be punished with 10 years' imprisonment. Agencies cannot "abridge or enlarge . . . statute[s] at will," because "[s]uch power is not regulation; it is legislation." *United States v. George*, 228 U.S. 14, 22 (1913) (quotation omitted); *see Cargill v. Garland*, No. 20-51016, 2023 U.S. App. LEXIS 344, at *50 (Jan. 6, 2023) (en banc) (suggesting it is problematic "[i]f ATF could change the scope of criminal liability by issuing a regulation," because then "the Executive could wield power that our Constitution reserves to the Legislature"); *cf. United States v. Standard Brewery, Inc.*, 251 U.S. 210, 220 (1920) ("Administrative rulings cannot add to the terms of an act of Congress and make conduct criminal which such laws leave untouched.").

Indeed, it is "a bedrock legal principle that our government cannot criminalize conduct and send people to prison except through democratically passed laws that have made it through both Houses of Congress and been signed by the President." *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 910 (6th Cir. 2021) (en banc) (Murphy, J., dissenting); *see Cargill*, 2023 U.S. App. LEXIS 344, at *5-6 (allowing ATF "rather than Congress . . . to set forth the scope of criminal prohibitions" would violate the principle that "[i]t is the legislature . . . which is to define a crime, and ordain its punishment" (quotation omitted)); *Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir. 2021) (en banc) (Tymkovich, C.J., dissenting) ("ATF has no authority to substitute its moral judgment concerning what conduct is worthy of punishment for that of Congress."). Defining federal crimes is a job for Congress, and it is meant to be a difficult one; not one that can be pawned off on courts, agencies, or prosecutors.

*See United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1812) ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence."); *Davis*, 139 S. Ct. at 2323 ("Only the people's elected representatives in Congress have the power to write new federal criminal laws."); *Staples v. United States*, 511 U.S. 600, 604-05 (1994) ("[T]the definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." (quotation omitted)); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1228 (2018) (Gorsuch, J., concurring) ("Under the Constitution, the adoption of new laws restricting liberty is supposed to be a hard business, the product of an open and public debate among a large and diverse number of elected representatives."). Therefore, Congress cannot delegate the power to expand statutory definitions to subject millions to criminal liability.

To be sure, the Supreme Court has not established an "absolute rule" that Congress cannot delegate "authority to define criminal punishments." *Loving v. United States*, 517 U.S. 748, 768 (1996); *see United States v. Grimaud*, 220 U.S. 506, 521 (1911) (opining that regulations are not "raised from an administrative to a legislative character because the violation thereof is punished as a public offense"). And the Supreme Court has sometimes blessed delegations that allow agencies to make actions a crime. *See Gun Owners*, 19 F.4th at 916 (Murphy, J., dissenting) (collecting cases). But these cases are distinguishable. For example, *Loving* involved a unique military context and did not involve an agency's power to decide what constitutes a crime. *See* 517 U.S. at 751; *id.* at 778-79 (Thomas, J., concurring in judgment). Moreover, *Grimaud* involved what appears to be a public welfare offense with less severe penalties—impermissibly grazing sheep on federal land without permission, *see* 220 U.S. at 521-22—not a serious criminal offense that requires *mens rea* and can result in 10 years' imprisonment, *see Staples*, 511 U.S. at 616.

21

That was admittedly not the case in other cases where imprisonment was a possible penalty. For example, *Touby v. United States*, 500 U.S. 160, 169 (1991), approved the Attorney General's ability to add a substance to the Controlled Substances Act despite the severe penalties involved. But in concluding that statute was constitutional, the Court stressed that the Act "assigned an essentially fact-finding responsibility to the executive." *Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting). Similarly, the statute at issue in *Gundy* did not delegate authority to decide the policy issue of whether a sex-offender registration requirement should apply to pre-act offenders, but rather delegated authority to determine when it was feasible to apply the requirement to pre-act offenders. *Id.* at 2123-25 (plurality op.).

Accordingly, in both cases, core legislative power was not delegated in the same way that it is delegated here. These cases thus do not preclude the Court from concluding that the Rule, which would make over a million citizens guilty of a felony, is an unconstitutional exercise of core legislative power by the Department.

### C. Even if Deciding What Conduct to Criminalize Could Be Delegated, Congress Failed to Provide an Intelligible Principle to Constrain the Department's Discretion.

In any event, even if the power to create new felonies was not a core legislative power and could be delegated, Congress would still need to provide an intelligible principle. It failed to do so here.

Under the intelligible-principle framework, if (1) Congress delegated a power "that would be legislative . . . but-for an intelligible principle to guide its use," the delegation is constitutional only if (2) Congress "provided an intelligible principle such that the agency exercises only executive power." *Jarkesy*, 34 F.4th at 461. Regarding the first prong, the Rule is an exercise of "what would be legislative power absent a guiding intelligible principle." *Id.* It is a substantive rule that affects individual rights and is intended to have the force of law. *See id.* ("Government

actions are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch.'" (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983))); *supra* Part I.B.

Regarding the second prong, Congress failed to provide an intelligible principle to guide the Department's exercise of the legislative power. In other statutory delegations, Congress cabined the discretion of agencies or commissions, such as by setting forth specific factors that must be considered or mandating specific fact findings. *See Touby*, 500 U.S. at 162-63 (discussing the factors and findings required by the Controlled Substances Act); *Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting) (describing the Controlled Substances Act as delegating "an essentially fact-finding responsibility"); *Mistretta*, 488 U.S. at 376-77 (discussing the factors the Sentencing Commission was required to consider and prohibited from considering). As such, Congress arguably delegated executive fact-finding, not policy decisions in those statutes. But here Congress tasked the Department with "[t]he administration and enforcement" of the National Firearms Act, 26 U.S.C. § 7801(a)(2)(A), and instructed the Department to prescribe "such rules and regulations as are necessary to carry out" the Gun Control Act, 18 U.S.C. § 926(a). There is a "total absence of guidance" that would restrict the Department's ability to rewrite the federal statutes by expanding statutory definitions and criminal liability as the Department sees fit, which is "impermissible under the Constitution. *Jarkesy*, 34 F.4th at 463.

Moreover, the Supreme Court requires more specificity and less ambiguity for criminal statutes. *See Davis*, 139 S. Ct. at 2325 (explaining that "[v]ague laws . . . undermine the Constitution's separation of powers"); *Dimaya*, 138 S. Ct. at 1212 (plurality op.) (discussing how the void-for-vagueness doctrine requires Congress to "define what conduct is sanctionable" and to provide clear "standards to govern the actions of police officers, prosecutors, juries, and judges"); *id.* at 1223-27 (Gorsuch, J., concurring) (discussing the danger of vague laws and the historical requirement of

fair notice). It therefore follows that a delegation that involves criminal consequences must provide clear guidance even if lesser intelligible-principle standards are acceptable in other contexts. This further demonstrates that there is no true intelligible principle in the statutes that would allow the Department to create new unregistered possession crimes without violating the Constitution.

## IV.   THE DEPARTMENT LACKS THE STATUTORY AUTHORITY TO DECIDE WHAT CONDUCT TO CRIMINALIZE.

Even if Congress could delegate the decision of whether to expand criminal liability under the federal statutes, it did not do so. Accordingly, the Rule exceeds the Department's statutory authority.

### A. There Is No Clear Congressional Authorization to Allow the Department to Make Consequential Decisions Infringing on Individual Liberties.

Congress did not speak clearly—as required—to give the Department the authority to adopt the Rule. The Rule is a major policy decision of great political significance because it infringes on individual liberties: it turns millions of Americans into criminals guilty of felonies and imposes a plethora of restrictions on the right to make and possess pistols with stabilizing braces. *See, e.g.*, Rule, 88 Fed. Reg. at 6,480-81, 6,563, 6,573. Moreover, the Rule intrudes on the police power of the states, *see United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995), and fundamentally changes the statutory scheme by expanding criminal liability and crafting an "enforcement discretion" scheme with compliance options and tax waivers, *see supra* pp. 4-5, 8-9.

Because the Rule makes decisions of "such magnitude and consequence," those decisions rest with Congress or, at the very least, with "an agency acting pursuant to a clear delegation from that representative body." *West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022); *see id.* at 2609 (recognizing that Congress is unlikely to delegate the power "to make a radical or fundamental change to a statutory scheme" with "oblique or elliptical" language (quotation omitted)); *id.* at 2621 (Gorsuch, J.,

concurring) (noting that "the major questions doctrine may apply when an agency seeks to intrud[e] into an area that is the particular domain of state law" (quotation omitted)). Accordingly, the Department "must point to clear congressional authorization for the power it claims." *Id.* at 2609 (quotation omitted).

The Department fails to do so. Instead, it points to general "administration and enforcement" authority in the National Firearms Act and authority in the Gun Control Act to make "only such regulations as are necessary." 26 U.S.C. § 7801(a)(2)(A); 18 U.S.C. § 926(a); *see* Rule, 88 Fed. Reg. at 6,481. That is insufficient under the major questions doctrine. *See Gun Owners of Am.*, 19 F.4th at 919 (Murphy, J., dissenting) (concluding the "grants of rulemaking power do not 'distinctly' show Congress's intent to allow the Attorney General to create a new crime (as the Bump-Stock Rule purports to do)" and "do not satisfy the clear-statement rule").

### B. The Department Lacks the Statutory Authority to Rewrite the National Firearms Act and Gun Control Act.

Even apart from the major questions doctrine, the Rule exceeds the Department's statutory authority. The Department's rulemaking authority is quite limited in this context and does not extend to expanding statutory definitions and criminal liability. The Department, however, contends that the Rule interprets rather than revises the statute. *See* Rule, 88 Fed. Reg. at 6,478, 6,480, 6,508-09, 6,552-52, 6,554. Accordingly, we first address how the Department rewrites the statutes before addressing its lack of authority to do so.

As a threshold matter, the Rule redefines "rifle" (and thus short-barreled rifle) in the National Firearms Act and Gun Control Act to create new crimes. Congress defined rifle based on whether the weapon was "designed or redesigned, made or remade, *and* intended to be fired from the shoulder." 26 U.S.C. § 5845(c) (emphasis added); 18 U.S.C. § 921. This stands in contrast to other provisions that define a weapon based on its design *or* capabilities, *see* 26 U.S.C. § 5845(b) (defining

machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot"); *see also Vanderstok v. Garland*, No. 4:22-cv-00691-O, 2022 U.S. Dist. LEXIS 159459, at *14 (N.D. Tex. Sept. 2, 2022). Pistols equipped with stabilizing braces generally do not qualify as rifles because they are designed, made, and intended to be used to stabilize the pistol against a shooters' *forearm*. *See* Proposed Rule, 86 Fed. Reg. at 30,827; Ex 4; Ex. 5; Ex. 6. Indeed, the braces would have been designed differently if they were intended to be used as shoulder stocks. *See* Ex. 4; Ex. 5; Ex. 7 at MSJ_013 (noting a brace would have raised ridges removed "so as to preclude its usefulness to be shouldered"); Ex. 3 at ¶ 19.

Nevertheless, the Department decided that pistols equipped with stabilizing braces should be further regulated based on their *potential* to be shoulder fired so it rewrote the statutory language. The Rule revises the statutory definitions of rifle to include weapons "equipped with . . . a 'stabilizing brace'" that (1) have any surface area that could be used for shoulder firing, and (2) fail a prong of a multi-factor test Rule, 88 Fed. Reg. at 6,574-75; *see also* Compl. at ¶¶ 63-78. The Department pretends that each factor goes towards "determining whether the weapon is designed, made, and intended to be fired from the shoulder." Rule, 88 Fed. Reg. at 6,574-75. This is false. The Rule's factors go towards whether a gun *could* be fired from the shoulder, not whether it was *designed*, *made*, *and intended* to be fired in that fashion. *See id.*; Compl. at ¶¶ 65-78 (explaining how the factors do not show that that the pistols are intended be fired from the shoulder rather than braced to the shooter's forearm).

For example, a pistol's heavy weight shows that a stabilizing brace would be helpful if used as intended—to stabilize the gun against the shooter's forearm, *see* Ex. 3 at ¶¶ 9-10, 20; Ex. 4; Ex. 5—but the Rule treats a pistol's weight as indicating that "shoulder firing the weapon" would be "beneficial," Rule, 88 Fed. Reg. at 6,514. The Rule similarly assumes that accessories that serve a useful purpose, such as a folding adapter that makes a pistol easier to store securely in a gun safe, Ex. 3 at ¶¶ 13, 23,

transform a pistol into rifle if they might be helpful if a person shoulder fired the pistol, *see* Rule, 88 Fed. Reg. at 6,540-41. Likewise, the fact that certain gun bloggers or small stabilizing-brace sellers promote the idea that a stabilizing brace could be used to shoulder fire a pistol does not show that shoulder fire is the designed and intended way of shooting a pistol with a stabilizing brace. *Id.* at 6,506, 6,544, 6,546. Elsewhere the Department even concedes that a weapon's "classification does not change even if [it] can be used in more than one manner by a particular shooter." *Id.* at 6,531. The contrary conclusion would be like defining a corkscrew to include hangers, keys, or shoes, because videos and articles demonstrate those items can be used to open a bottle of wine.[3]

The Rule thus constitutes a statutory revision, rather than an interpretation, and redefines a rifle based on how a weapon *could* be used or misused by individuals. Moreover, the Rule's compliance options and exemptions from statutory requirements go far beyond interpreting the statutes. *See supra* pp. 4-5, 8-9; *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("Agencies are not free to adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." (quotation omitted)).[4]

---

[3] *See* Silver Oak, *How to Open a Wine Bottle Without a Corkscrew*, YouTube (Aug. 7, 2018), https://www.youtube.com/watch?v=_4C3WZYuU0A; Emily Saladino, *How to Open a Wine Bottle Without a Corkscrew*, WINE ENTHUSIAST (Aug. 8, 2022), https://www.winemag.com/2022/08/08/how-to-open-a-wine-bottle-without-a-cork screw/; Nick Gerhardt, *10 Ways to Open a Bottle Without a Corkscrew*, Family Handyman (Feb. 24, 2022), https://www.familyhandyman.com /list/10-ways-to-open-wine-without-a-corkscrew/.

[4] Even assuming *arguendo* there is potential ambiguity in the statutory definitions, Defendants could still not replace the statutory definitions with the Rule's definitions. Defendants receive no deference in the interpretation of criminal statutes, *United States* v. *Apel*, 571 U.S. 359, 369 (2014), *Cargill*, 2023 U.S. App. LEXIS 344, at *40-44, and the Rule's definitions would be untenable under the rule of lenity, *see United States v. Granderson*, 511 U.S. 39, 54 (1994) ("[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct[,] we apply the rule of lenity and resolve the ambiguity in" favor of the individual.).

The Department's implausible attempts to characterize the Rule as a mere interpretation are understandable, because it lacks the statutory authority to redefine "rifle" and create new crimes (and compliance options) as a result of the expanded definitions. *See United States v. Kuzma*, 967 F.3d 959, 971 (9th Cir. 2020) (noting the National Firearms Act does not delegate the "authority to promulgate underlying *regulatory* prohibitions, which are then enforced by a criminal statute prohibiting willful violations of those regulations"); Stephen P. Halbrook, FIREARMS LAW DESKBOOK, § 7:7 (Oct. 2022 Update) ("Congress . . . delegated no authority to redefine or expand [the National Firearms Act's] terms and acts by regulation so as to create new crimes."); *see also* 114 Cong. Rec. at 14,792-93 (May 23, 1968) (rejecting statutory language in the Gun Control Act that would have authorized criminal penalties for violations of rules promulgated by the Department). Nor does the Department have the authority to regulate stabilizing braces which, unlike other gun parts, are not swept within the statutory definition of firearm. *See* 26 U.S.C. § 5845(a)(7) (defining "firearm" to include "any silencer"); 18 U.S.C. § 921(a)(3)(B)-(C) (defining "firearm" to include "frame or receiver" and "any firearm muffler or firearm silencer"); *see also Vanderstok*, 2022 U.S. Dist. LEXIS 159459, at *19-20 ("ATF has no general authority to regulate weapon parts.").

Indeed, the National Firearms Act does not even expressly give the Department general rulemaking authority, 26 U.S.C. § 7801(a)(2)(A), and the Gun Control Act constrains the Department's rulemaking authority to prescribing "only such regulations as are necessary to carry out" the Act, 18 U.S.C. § 926(a); *see* Compl. at ¶¶ 32-35. Both statutes define the statutory terms as used in the relevant chapters of the U.S. Code, and do not authorize the Department to pass regulations to redefine or expand the definition of "rifle." *See* 18 U.S.C. § 921(a) (defining terms "[a]s used in this chapter"); 26 U.S.C. § 5845 (defining terms "[f]or the purpose of this chapter").

In contrast, the National Firearms Act specifically gives the Department the ability to *omit* weapons from the definition of "firearm" if it makes specific findings that such weapons are antique firearms that are unlikely to be used as a weapon. *See* 26 U.S.C. § 5845(a). This further demonstrates that Congress did not delegate authority to the Department to *expand* the scope of the definition of "rifle." *See Gonzales v. Oregon*, 546 U.S. 243, 262-63 (2006) (concluding that the express authority to deregister a drug (after the consideration of specific statutory factors) suggested that Congress did not implicitly give the much greater power of declaring an entire class of activity a criminal violation); *Gun Owners*, 19 F.4th at 919 (Murphy, J., dissenting) ("[W]e should view the express inclusions and omissions of regulatory authority as intentional legislative choices.").[5] Accordingly, the Rule exceeds the Department's statutory authority and is unlawful. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 216 (1988). At the very least, Congress did not speak clearly to give the Department the authority to promulgate the Rule and turn millions of Americans into criminals guilty of felonies. *See supra* Part IV.A.

## V.   THE COURT SHOULD GRANT THE RELIEF REQUESTED IN THE COMPLAINT.

Because Watterson is entitled to summary judgment, the Court should grant the relief requested. *See* Compl. ¶ 139. *First*, the Court should issue declaratory relief that settles the legal rights at issue in this case under the Declaratory Judgments Act. *See* 28 U.S.C. § 2201. The Court has "a 'virtually unflagging obligation . . . to exercise that authority' to resolve a case before it," and "[d]eclaring the scope of constitutional power" and rights "is thus proper relief." *Terkel v. CDC*, 521 F. Supp.

---

[5] Similarly, Congress's express delegation of additional authority to promulgate regulations to administer different provisions of the federal statutes indicates that Congress did not *sub silentio* delegate that additional authority in regards to the definition of "rifle." *See* 26 U.S.C. § 5842(a)-(c) (requiring firearms to be identified with such information or in "such manner as the Secretary may by regulations prescribe"); 18 U.S.C. § 922(m) (making it unlawful for licensees to violate recordkeeping requirements in the statute "or regulations promulgated thereunder").

3d 662, 676-77 (E.D. Tex. 2021) (quoting *Mata v. Lynch*, 576 U.S. 143, 150 (2015)).

*Second*, the Court must vacate the Rule as unlawful under the Administrative Procedure Act, because the Rule violates constitutional rights and exceeds the Department's statutory authority. *See* 5 U.S.C. § 706(2)(B)-(C). Not only is vacatur the "default rule" for an unlawful regulation, *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022), but it also required by the Act's plain text, *see Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) ("When a statute distinguishes between 'may' and 'shall' it is generally clear that 'shall' imposes a mandatory duty."); *compare* 5 U.S.C. § 706(2) ("The reviewing court *shall* . . . hold unlawful and set aside agency action . . . . (emphasis added)), *with id.* § 705 ("may").

*Third*, the Court should enter a permanent injunction that enjoins the Department from, among other actions, enforcing the National Firearm Act and Gun Control Act in accordance with the Rule. Injunctive relief is necessary to safeguard Second Amendment rights and enforce constitutional separation-of-powers provisions, because the Department has a history of changing its statutory interpretations and chilling Second Amendment rights. The Department is thus unlikely to "meet constitutional requirements" and rectify its erroneous statutory interpretation. *See Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985) (when officials are ready "to meet constitutional requirements, the court should limit its initial response to a grant of declaratory relief"). And this Court need not believe the Department will abide by a declaratory judgment and respect constitutional limits on its power. *Cf. DOC v. New York*, 139 S. Ct. 2551, 2575 (2019) (noting courts need not "exhibit a naiveté from which ordinary citizens are free" (quotation omitted)).

<u>CONCLUSION</u>

Because Watterson has shown he is entitled to summary judgment on his claims and entitled to the requested relief, the Court should grant Watterson summary judgment on each claim and provide the relief requested in the Complaint.

Date: January 31, 2023

Respectfully submitted,

*/s/ Autumn Hamit Patterson*

ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
AUTUMN HAMIT PATTERSON
Texas Bar No. 24092947
apatterson@texaspolicy.com
CLAYTON WAY CALVIN
Texas Bar No. 24132780
ccalvin@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:   (512) 472-2700
Facsimile:   (512) 472-2728

*Counsel for Plaintiff Blake J. Watterson*

31

**CERTIFICATE OF SERVICE**

I certify that I caused the foregoing document to be served via certified mail on January 31, 2023, to:

Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue NE
Washington, DC 20226

Director Steven Dettelbach
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue NE
Washington, DC 20226

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Attorney General Merrick Garland
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Civil Process Clerk
U.S. Attorney's Office for the Eastern District of Texas
110 North College, Suite 700
Tyler, Texas 75702

                                                    */s/Autumn Hamit Patterson*
                                                    AUTUMN HAMIT PATTERSON