**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| BLAKE J. WATTERSON,<br><br>        *Plaintiff*,<br><br>    v.<br><br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS, AND EXPLOSIVES, *et al.*,<br><br>        *Defendants.* | No. 4:23-cv-80-ALM |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR RELIEF UNDER 5 U.S.C. § 705 OR, ALTERNATIVELY, FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

I.      Statutory and Regulatory Background..........................................................................2

II.     ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"..............................................................................................4

III.    The Rule ....................................................................................................................8

IV.   This Lawsuit ............................................................................................................11

LEGAL STANDARDS........................................................................................................12

ARGUMENT ......................................................................................................................12

I.      Plaintiff is unlikely to succeed on the merits of his claims..........................................12

      A.     The Rule is a valid exercise of ATF's statutorily delegated authority. ............12

      B.     The Rule does not infringe Second Amendment rights. .................................23

            1.     Firearm braces are not bearable arms. ..................................................24

            2.     Registration of short-barreled rifles does not implicate the Second Amendment. ........................................................................................25

            3.     Short-Barreled rifles are dangerous and unusual weapons, and their use is not protected by the Second Amendment. .................................27

            4.     Historical Tradition of Regulation Supports the Rule............................31

      C.     Neither the Department's general rule-making authority nor the Rule violate the constitutional principle of separation of powers.......................................33

            1.     The National Firearms Act and Gun Control Act provide the Department with intelligible standards to which it must conform.................34

            2.     The ATF did not perform a core legislative function by interpreting the statutory definition of a "short-barreled rifle."............................36

II.     Plaintiff will not suffer irreparable harm if the Rule remains in effect.........................38

      A.     Plaintiff has not demonstrated a constitutional violation. ..............................38

      B.     Plaintiff's fear of criminal prosecution is unfounded.....................................39

C.      The time it takes ATF to process a registration application submitted during
        the 120-day compliance period does not constitute irreparable harm.........................39

D.      The cost of compliance with the Rule is *de minimis*. .......................................40

III.   The equities and the public interest weigh against a preliminary injunction. ...........................41

IV.    A § 705 Stay is not an available remedy. ......................................................................................44

CONCLUSION................................................................................................................................46

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) ...................................................................................................34

*Alexander v. Express Energy Servs. Operating, L.P.,*
  784 F.3d 1032 (5th Cir. 2015) ....................................................................................34

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
  878 F.2d 806 (5th Cir. 1989) ......................................................................................12

*Aposhian v. Barr,*
  374 F. Supp. 3d 1145 (D. Utah 2019) .........................................................................13

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
  515 U.S. 687 (1995) ...................................................................................................36

*Bezet v. United States,*
  714 F. App'x 336 (5th Cir. 2017) ...............................................................................25

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ...................................................................................................29

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ...................................................................................................43

*California v. U.S. Bureau of Land Mgmt.,*
  277 F. Supp. 3d 1106 (N.D. Cal. 2017) ......................................................................44

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) .......................................................................................36

*Chacon v. Granata,*
  515 F.2d 922 (5th Cir. 1975) ......................................................................................37

*Ctr. for Biological Diversity v. Regan,*
  597 F. Supp. 3d 173 (D.D.C. 2022) ............................................................................44

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
  710 F.3d 579 (5th Cir. 2013) ......................................................................................38

*Davidson v. Glickman,*
  169 F.3d 996 (5th Cir. 1999) ......................................................................................37

*Dist. of Columbia v. U.S. Dep't of Agic.,*
  444 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................................12

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ............................................................................................... 23, 24, 27

*Duarte v. City of Lewisville,*
   136 F. Supp. 3d 752 (E.D. Tex. 2015) ............................................................................ 37

*Elrod v. Burns,*
   427 U.S. 347 (1976) ......................................................................................................... 38

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ......................................................................................................... 23

*Flight Training Int'l, Inc. v. FAA,*
   58 F.4th 234 (5th Cir. 3034) ...................................................................................... 44, 45

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ..................................................................................................... 43

*Gonzales v. Oregon,*
   546 U.S. 243 (2006) ......................................................................................................... 13

*Guedes v. ATF,*
   356 F. Supp. 3d 109 (D.D.C. 2019) ................................................................................ 13

*Gun Owners of Am., Inc. v. Garland,*
   19 F.4th 890 (6th Cir. 2021) ............................................................................................ 15

*Gundy v. United States,*
   139 S. Ct. 2116 (2019) ........................................................................................ 34, 35, 37

*Hardaway v. Nigrelli,*
   __ F. Supp. 3d __, 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3, 2022),
   *injunction stayed pending appeal,*
   No. 22-2933, 2022 U.S. App. LEXIS 36046 (2d Cir. Dec. 7, 2022) ........................... 42–23

*Holland Am. Ins. Co. v. Succession of Roy,*
   777 F.2d 992 (5th Cir. 1985) ........................................................................................... 38

*Hollis v. Lynch,*
   827 F.3d 436 (5th Cir. 2016) ............................................................................... 23, 27, 28

*Huddleston v. United States,*
   415 U.S. 814 (1974) ........................................................................................................... 3

*In re Lothian Oil, Inc.,*
   508 F. App'x 352 (5th Cir. 2013) .................................................................................... 17

*J.W. Hampton, Jr. & Co. v. United States,*
   276 U.S. 394 (1928) ......................................................................................................... 35

*John Doe # 1  v. Veneman*,
    380 F.3d 807 (5th Cir. 2004) ........................................................................................43

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    849 F.3d 1129 (D.C. Cir. 2017).................................................................................38

*Kanarr Corp. v. United States*,
    188 Ct. Cl. 1051 (1969) ......................................................................................18, 21

*Kelly Servs., Inc. v. Creative Harbor, LLC*,
    846 F.3d 857 (6th Cir. 2017) .....................................................................................21

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) .....................................................................................25

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................................37

*Liesegang v. Sec'y of Veterans Affs.*,
    312 F.3d 1368 (Fed. Cir. 2002), *amended on reh'g in part*, 65 F. App'x 717 (Fed. Cir. 2003) ..............45

*Lomont v. O'Neil*,
    285 F.3d 9 (D.C. Cir. 2002) .........................................................................................2

*Loving v. United States*,
    517 U.S. 748 (1996) ..................................................................................................35

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ..................................................................................................12

*Memphis A. Philip Randolph Inst. v. Hargett*,
    978 F.3d 378 (6th Cir. 2020) .....................................................................................37

*Mistretta v. United States*,
    488 U.S. 361 (1989) .................................................................................. 33, 34, 35, 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................................15

*N.Y. City Transit Auth. v. Beazer*,
    440 U.S. 568 (1979) ..................................................................................................13

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ......................................................................................*passim*

*Nat. Res. Def. Council v. Abraham*,
    355 F.3d 179 (2d Cir. 2004).......................................................................................45

*Nat. Res. Def. Council v. U.S. Dep't of Energy,*
   362 F. Supp. 3d 126 (S.D.N.Y. 2019) ...................................................................44

*Nat'l Broadcasting Co. v. United States,*
   319 U.S. 190 (1943) ...............................................................................................35

*Nat'l Council for Adoption v. Blinken,*
   4 F.4th 106 (D.C. Cir. 2021) ................................................................................44

*Nat'l Nutritional Foods Ass'n v. Mathews,*
   557 F.2d 325 (2d Cir. 1977) ..................................................................................21

*Nat'l Rifle Ass'n v. Brady,*
   914 F.2d 475 (4th Cir. 1990) ................................................................................14

*Nixon v. Mo. Mun. League,*
   541 U.S. 125 (2004) ...............................................................................................19

*Nken v. Holder,*
   556 U.S. 418 (2009) ...............................................................................................41

*O'Donnell v. Harris Cty.,*
   892 F.3d 147 (5th Cir. 2018) ................................................................................43

*Or. Firearms Fed'n, Inc. v. Brown,*
   No. 2:22-CV-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ...................26

*Panama Ref. Co. v. Ryan,*
   293 U.S. 388 (1935) ...............................................................................................34

*Perez v. Mortgage Bankers Ass'n,*
   575 U.S. 92 (2015) .................................................................................................37

*Romag Fasteners, Inc. v. Fossil, Inc.,*
   140 S. Ct. 1492 (2020) ....................................................................................21, 22

*Rosa v. McAleenan,*
   583 F. Supp. 3d 850 (S.D. Tex. 2019) .................................................................38

*Rural & Migrant Ministry v. E.P.A.,*
   565 F. Supp. 3d 578 (S.D.N.Y. 2020) .................................................................43

*Safety-Kleen Corp. v. EPA,*
   Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ...............................44

*Sampson v. Murray,*
   415 U.S. 61 (1974) ...........................................................................................37, 40

*Sig Sauer, Inc. v. Brandon,*
  826 F.3d 598 (1st Cir. 2016) ................................................................................................20

*Sipes v. United States,*
  321 F.2d 174 (8th Cir. 1963),
  *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968)......................21

*Sorenson v. Sec'y of Treasury,*
  475 U.S. 851 (1986) ...............................................................................................................44

*Texas v. Biden,*
  10 F.4th 538 (5th Cir. 2021) ..................................................................................................39

*Thompson/Ctr. Arms Co., a Div. of the K.W. Thompson Tool Co. v. Baker,*
  686 F. Supp. 38 (D.N.H. 1988)..............................................................................................40

*TXI Operations, LP v. City of Mckinney,*
  2023 WL 161942 (E.D. Tex. Jan. 11, 2023) ..................................................................16, 17

*United States v. Al-Azhari,*
  No. 8:20-CR-206-T-60AEP, 2020 WL 7334512 (M.D. Fla. Dec. 14, 2020).......................24

*United States v. Cox,*
  906 F.3d 1170 (10th Cir. 2018) ..............................................................................23, 24, 28

*United States v. Elmowsky,*
  No. 19-cr-175, 2022 WL 138086 (S.D.N.Y. Jan. 14, 2022) ...............................................18

*United States* v. *Gilbert,*
  286 F. App'x 383 (9th Cir. 2008)...........................................................................................28

*United States v. Golding,*
  332 F.3d 838 (5th Cir. 2003) ................................................................................................28

*United States v. Gonzalez,*
  No. 2:10–cr–00967, 2011 WL 5288727 (D. Utah Nov. 2, 2011)..........................................28

*United States v. Grimaud,*
  220 U.S. 506 (1911) ..............................................................................................................35

*United States v. Hasson,*
  No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) .......................................24, 25

*United States v. Hayes,*
  555 U.S. 415 (2009) ..............................................................................................................19

*United States v. Majid,*
  No. 4:10CR303, 2010 WL 5129297 (N.D. Ohio Dec. 10, 2010).........................................28

*United States v. O'Hagan,*
  521 U.S. 642 (1997) ..................................................................................................36

*United States v. Rose,*
  695 F.2d 1356 (10th Cir. 1982) ........................................................................... 18, 21

*United States v. Santoro,*
  242 F. App'x 627 (11th Cir. 2007) ................................................................................18

*United States v. Schuhmann,*
  963 F.2d 381 (9th Cir. 1992) .............................................................................. 18, 21

*United States v. Syverson,*
  90 F.3d 227 (7th Cir. 1996) ........................................................................................20

*United States v. Thompson/Center Arms Co.,*
  504 U.S. 505 (1992) ...............................................................................3, 14, 18, 28

*United States v. Zeidman,*
  444 F.2d 1051 (7th Cir. 1971) ....................................................................................18

*Utility Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ....................................................................................................23

*VanDerStok v. Garland,*
  Civil Action No. 4:22-cv-00691-O, 2022 WL 4809376,
  2022 U.S. Dist. LEXIS 180398 (N.D. U Tex. Oct. 1, 2022) ................................ 41, 43

*VanDerStok v. Garland,*
  4:22-cv-00691-O, 2022 WL 4009048,
  2022.S. Dist. LEXIS 159459 (N.D. Tex. Sept. 2, 2022) ..............................................40

*Washington v. Davis,*
  426 U.S. 229 (1976) ................................................................................................20-21

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ........................................................................................ 22, 23

*White v. Carlucci,*
  862 F.2d 1209 (5th Cir. 1989) ....................................................................................38

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................................12

*Wis. Gas. Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ....................................................................................38

*Yakus v. United States,*
  321 U.S. 414 (1944) .............................................................................................. 34, 35

**Federal Statutes**

5 U.S.C. § 553 ................................................................................................................. 36, 45

5 U.S.C. § 705 ................................................................................... 2, 11, 12, 43, 44

5 U.S.C. § 706 ................................................................................................................12

5 U.S.C. § 801 ................................................................................................................45

18 U.S.C. § 921 ........................................................................................................ *passim*

18 U.S.C. § 922 ................................................................................................. 3, 4, 34, 36

18 U.S.C. § 926 ................................................................................................. 4, 13, 14, 35

18 U.S.C. §§ 921–931 ......................................................................................................3

18 U.S.C. §§ 922–923 ......................................................................................................3

26 U.S.C. §§ 5801–5872 ..................................................................................................2

26 U.S.C. § 5801 ......................................................................................................... 2, 3

26 U.S.C. § 5802 ............................................................................................................3

26 U.S.C. § 5811 ................................................................................................. 1, 3, 34, 36

26 U.S.C. § 5812 ................................................................................................. 3, 35, 37

26 U.S.C. § 5821 ................................................................................................. 1, 3, 34, 36

26 U.S.C. § 5822 ................................................................................................. 3, 34, 36

26 U.S.C. § 5841 ................................................................................................. 1, 3, 34, 36

26 U.S.C. § 5845 ........................................................................................................ *passim*

26 U.S.C. § 7421 ................................................................................................................40

26 U.S.C. § 7422 ................................................................................................................40

26 U.S.C. § 7801 ................................................................................................. 4, 13, 37

26 U.S.C. § 7805 ........................................................................................................ *passim*

Pub. L. No. 90–351, 82 Stat. 236 (1968) ............................................................................ 3

**State Statutes**

Ala. Code § 13A-11-63 ................................................................................................................30

Alaska Stat. Ann § 11.61.200 .....................................................................................................30

Ariz. Rev. Stat. Ann. § 13-3101 .................................................................................................30

Cal. Penal Code § 16590 .............................................................................................................30

Colo. Rev. Stat. Ann. §§ 18-12-102 ...........................................................................................30

D.C. Code Ann. § 7-2502.02 ......................................................................................................30

Fla. Stat. Ann. §§ 790.221 ..........................................................................................................30

Ga. Code Ann § 16-11-121 .........................................................................................................30

Ga. Code Ann § 16-11-122 .........................................................................................................30

Haw. Rev. Stat. Ann. § 134-8 .....................................................................................................30

Iowa Code Ann § 724.1C ............................................................................................................30

La. Rev. Stat. Ann. § 40:1379.3(West Cum. Supp. 2022) ..........................................................27

La. Stat. Ann. § 40:1785 .............................................................................................................30

Md. Code Ann., Pub. Safety § 5-203 ..........................................................................................30

Mich. Comp. Laws Ann. § 750.224b ..........................................................................................30

Miss. Code. Ann. § 45-9-101 (2022) ..........................................................................................27

Mo. Ann. Stat. § 571.020 ...........................................................................................................30

Mont. Code Ann. § 45-8-340 ......................................................................................................30

N.C. Gen. Stat. Ann. § 14-288.8 .................................................................................................30

N.D. Cent. Code Ann. § 62.1-02-03 ...........................................................................................30

Neb. Rev. Stat. Ann. § 28-1203 ..................................................................................................30

Nev. Rev. Stat. Ann. § 202.275 ..................................................................................................30

Ohio Rev. Code Ann. § 2923.17 .................................................................................................30

Okla. Stat. Ann. tit. 21, § 1289.18 .............................................................................................30

Or. Rev. Stat. Ann. § 166.272 ......................................................................................................30

S.C. Code Ann. § 16-23-250 ........................................................................................................30

Tex. Gov't Code Ann. § 411.174 (West Cum. Supp. 2021) .......................................................27

Tex. Penal Code Ann. § 46.05 .....................................................................................................30

Va. Code Ann. § 18.2-303.1 ........................................................................................................30

Wash. Rev. Code Ann. § 9.41.190 ..............................................................................................30

Wis. Stat. Ann. § 941.28 ..............................................................................................................30

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017 ................................. 2, 18

S. Rep. No. 90–1501 (1968) .........................................................................................................28

S. Rep. No. 1097 (1968) .................................................................................................................3

**Regulations**

27 C.F.R. § 478.11 ............................................................................................................. 9, 15, 44

27 C.F.R. § 479.11 ............................................................................................................. 9, 15, 44

27 C.F.R. part 478 ................................................................................................................... 4, 13

27 C.F.R. part 479 ................................................................................................................... 4, 13

28 C.F.R. § 0.130 ............................................................................................................... 4, 13, 35

*Commerce in Firearms and Ammunition*,
    33 Fed. Reg. 18555 (Dec. 14, 1968) .......................................................................................13

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
    86 Fed. Reg. 30,826 (June 10, 2021) .........................................................................................9

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
    88 Fed. Reg. 6478 (Jan. 31, 2023) .....................................................................................*passim*

*Machine Guns and Certain Other Firearms: Miscellaneous Amendments,*
    26 Fed. Reg. 2407 (Mar. 22, 1961) .........................................................................................13

*Objective Factors for Classifying Weapons with "Stabilizing Braces,"*
    85 Fed. Reg. 82,516 (Dec. 18, 2020) .........................................................................................9

*Objective Factors for Classifying Weapons with "Stabilizing Braces"; Withdrawal of Guidance,*
   85 Fed. Reg. 86,948 (Dec. 31, 2020) ........................................................................9

## Other Authorities

2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822
   (1823) ..............................................................................................................32

15 The Public Records of the Colony of Connecticut 191 (1890) ...................................32

1631 Va. Acts 174, Acts of February 24th, 1631, Act LVI......................................31

1759-1776 N.H. Laws 63, An Act About Powder Money...........................................32

1775-1776 Mass. Acts..............................................................................................32

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue,
   chap. 25, § 27, pt. 15........................................................................................33

1893 S.C. Acts 426, An Act To Amend An Act Entitled "An Act To Provide For A License
   For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State"............32

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191
   (codified at ARK. CODE ANN. ch. 48 § 1498 (1894)..........................................32

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25
   (codified at 1879 Tex. Crim. Stat. 24) .............................................................32

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352................................................32

Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27 ................................................33

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27....................................32

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210
   (codified at KAN. GEN. STAT. § 1003 (1901) ...................................................32

Act of Mar. 16, 1870, no. 68, § 3, sixth, 1870 La. Acts 126.....................................32

Act of Mar. 26, 1879, , ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231 ....................32

Acts of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws .........................................................32

"An Act for the better regulating of the Militia of this Province,"
   1747, McCord, *Statutes at Large* ....................................................................31

"An Act for the regulating, training, and arraying of the Militia,"
   1781, New Jersey Session Laws .......................................................................31

ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*,
https://perma.cc/BK6C-BRGQ ..........................................................................4

ATF, *Current Processing Times*,
https://www.atf.gov/resource-center/current-processing-times ...................................26

ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
https://perma.cc/MRR9-ZBJ2 .......................................................................11

ATF, *FINAL RULE 2021R-08F: Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
https://perma.cc/W6ZW-8FUL .....................................................................14

ATF, *National Firearms Act Handbook* (April 2009),
https://perma.cc/P3NL-G35G .......................................................................4

Christopher Ingraham, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership,* The Washington Post, (June 19, 2018 at 10:31am EDT),
https://perma.cc/LNE7-8TZQ ......................................................................29

CNN, *10 killed in Colorado grocery store shooting* (Mar. 23, 2021),
https://perma.cc/HG5S-3NAF .......................................................................8

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890) .......................32

Gear Head Works, *Tailhook Mod 1*,
https://perma.cc/5FD2-ZNCM ......................................................................17

IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961) .............................19

IRS, Rev. Rul. 61-203, 1961-2 C.B. 224, 1961 WL 12793 (Jan. 1. 1961) ............................19

Joe Walsh, *U.S. Bought Almost 20 Million Guns Last Year — Second-Highest Year On Record*, Forbes
(Apr. 14, 2022 at 2:05pm EDT),
https://perma.cc/TVS8-NNVW .....................................................................29

Lands, and Granting Donations Thereof to the State Page 182, Image 182 (1848)
available at The Making of Modern Law: Primary Sources..........................................33

Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807
(1807).................................................................................................32

Laws of the State of Maine (1830)...................................................................32

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor,
Aldermen, and Commonalty, of the City of New York (1763) ......................................32

Order of the Governor and Council, March 28, 1667, in John Russell Bartlett, ed., *Records of the Colony of Rhode Island and Providence Plantations,*
(Providence: A. Crawford Greene and Brother, 1857) ...............................................31

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139 (2007) ..................................................................................................31

Tactical Life, *4 Pistol Stabilizing Braces for Every American Shooter* (Feb. 28, 2022), https://perma.cc/8W5W-4TLG ....................................................................................19

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911) .....................................................................................32

U.S. Dep't of Justice, *Justice Department Announces New Rule to Address Stabilizing Braces, Accessories Used to Convert Pistols into Short-Barreled Rifles* (Jan. 13, 2023), https://perma.cc/4SNB-2SSB ......................................................................................9

USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole* (Aug. 6, 2019), https://perma.cc/89XK-SNVR ......................................................................................8

## INTRODUCTION

For nearly a century, Congress has regulated the possession, manufacture, and distribution of certain types of firearms that it judged especially dangerous, including short-barreled rifles. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel of less than 16 inches in length, it is a "short-barreled rifle" within the meaning of the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls, 26 U.S.C. §§ 5811, 5821.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though "stabilizing braces" are frequently advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them so that they may be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a "stabilizing brace" are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. at 6,478 (Jan. 31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a "stabilizing brace" or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining

1

whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired from the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiff challenges the Rule but fails to meet his burden to show that it is unlawful. Congress empowered and obligated ATF to determine whether and when pistols with "stabilizing braces" become "rifles" as defined under federal law. The modest registration requirements that federal law imposes on Plaintiff do not violate the Second Amendment. And in any event, the right to bear arms does not protect the use of specific firearm modifications used to evade federal firearms laws. The Rule fits neatly within centuries of firearm laws, which similarly required taxes, surveys, inspections, and licenses for firearms.

The Rule is lawful, and Plaintiff's demand for a preliminary injunction and for a stay under 5 U.S.C. § 705 should be denied. Plaintiff's claims fail on the merits, he is not irreparably harmed, and the balance of interests favor ATF. The Court should therefore deny Plaintiff's motion.

## BACKGROUND

### I.    Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see, e.g., Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles— *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of

less than 16 inches in length." *Id.* § 5845(a)(3), (4); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifle" targets "a concealable weapon" "likely to be used for criminal purposes.").[1] The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

**2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–931, to comprehensively regulate the manufacture and distribution of firearms and ammunition. Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and motivated by concerns that "the ease with which firearms could be obtained" had "contributed significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (citing Pub. L. No. 90-351, § 1201, 82 Stat. 197, 236 (1968); S. Rep. No. 90-1097, at 108 (1968)), the GCA increased federal controls for persons engaging in the business of importing, manufacturing, or dealing in firearms.[2] *See, e.g.*, 18 U.S.C. §§ 922–923.

Among these were specific controls on the interstate transport of "short-barreled rifles" and

---

[1] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

[2] The GCA defines the term "firearm" more broadly than the NFA, such that it includes, *inter alia*, "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

the obligation of Federal Firearms Licensees (or "FFLs") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's definition. *See id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *See* ATF, *National Firearms Act Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.   ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *see also, e.g.*, ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ (providing visual

4

examples of weapons configured with common "brace" devices). And though manufacturers have nominally claimed that "brace" devices are meant to attach to or stabilize against a shooter's forearm, "stabilizing braces" often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a "stabilizing brace" falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a "stabilizing brace" (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. *See* ECF No. 6-7; 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. ECF No. 6-7. According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. *Id.* Based on its evaluation of the materials submitted, ATF concluded that the particular "brace" device, when configured with a pistol, would not convert that firearm into a weapon designed

or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.*; 88 Fed. Reg. at 6,483. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of "stabilizing braces" of varying designs. 88 Fed. Reg. at 6,479. But unlike the 2012 prototype, these newer "brace" designs began to include characteristics common to shoulder stocks. *Id.* at 6,479; *see also, e.g.*, *id.* at 6,529 (comparing two "stabilizing braces" to similarly designed shoulder stocks); *id.* at 6,528 (noting that a manufacturer listed a "stabilizing brace" as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some "stabilizing braces" were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g.*, *id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546–47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different "brace" devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a "brace" device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a "brace" device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters, as well as a 2015 Open Letter, suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the "stabilizing brace," as either a device assisting single-handed fire or for shoulder fire. *See, e.g.*, *id.* at 6,484, 6,487–88. ATF also occasionally focused on the "brace" device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several "brace"-equipped firearms as short-barreled rifles after considering, for example,

6

whether the "brace" device served any purpose other than to extend the rearward surface to enable shouldering, *see, e.g., id.* at 6,485, or whether the device, as configured with the firearm, created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel "brace"-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's incidental use of the firearm. *Id.* at 6,491. In 2018, ATF informed classification requestors that, to properly evaluate how a "brace" device affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the "brace" device attached. *Id.* at 6,492.

And by mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 "brace" device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a "stabilizing brace" as a short-barreled rifle after determining that the weapon's objective design features indicated that it had been designed, made, and intended to be fired from the shoulder. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the

same company). Notably, neither manufacturer sued to challenge these short-barreled-rifle classifications as an arbitrary or otherwise unlawful determination.

### III.   The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling "brace" devices as "ATF compliant" without having submitted that particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using "brace" devices to create short-barreled rifles without complying with NFA requirements, *see id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *see supra* at p. 3.

In March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a "stabilizing brace" opened fire at a supermarket in Boulder, Colorado, killing ten people, including an on-duty police officer. *See* CNN, *10 killed in Colorado grocery store shooting* (Mar. 23, 2021), https://perma.cc/HG5S-3NAF. This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual similarly armed with an AR-type pistol equipped with a "stabilizing brace" killed nine people and injured 17 others within approximately 30 seconds from firing the first shot. *See* USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole* (Aug. 6, 2019), https://perma.cc/89XK-SNVR. In both instances, the shooters reportedly used the "brace" devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.[3]

---

[3] Since 2014, ATF has received 104 classification requests in connection with federal criminal investigations involving firearms equipped with a "stabilizing brace." 88 Fed. Reg. at 6,499.

**2.** In light of its pre-existing concerns, as well as the real-world violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of weapons equipped with "stabilizing braces." *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to the regulations in 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. *See Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 86 Fed. Reg. 30,826 (June 10, 2021).[4] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made, and intended to be fired from the shoulder, including weapons equipped with "stabilizing braces" or other similar attachments. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

ATF announced the rule on January 13, 2023, *see* U.S. Dep't of Just., *Justice Department Announces New Rule to Address Stabilizing Braces, Accessories Used to Convert Pistols into Short-Barreled Rifles* (Jan. 13, 2023), https://perma.cc/4SNB-2SSB, and it was published in the Federal Register on January 31, 2023, 88 Fed. Reg. at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–69, contains the following key provisions:

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the

---

[4] In December 2020, ATF published a notice of proposed rulemaking entitled *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516 (Dec. 18, 2020), but withdrew the notice two weeks later, *see* 85 Fed. Reg. 86,948 (Dec. 31, 2020).

weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–6,513—are:

(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with "stabilizing braces," including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. As relevant here, an individual who was an unlicensed possessor of a "brace"-equipped short-barreled rifle before the Rule was published has until May 31, 2023, to come into compliance with the NFA by:

(i) filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

(ii) removing the firearm from the definition of "short-barreled rifle," 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the "brace" device so that it cannot be reattached to the weapon;

(iii) turning the firearm into a local ATF office; or

10

(iv)  destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

*Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for persons who possessed short-barreled rifles equipped with "stabilizing braces" prior to the Rule's publication. *Id.* at 6,571. As relevant here, these individual possessors will not be subject to the $200 making tax so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

*Rescission of prior classifications.* As a final matter, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of firearms equipped with "stabilizing braces." *Id.* at 6,480. These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[5]

## IV.    This Lawsuit

Plaintiff contends that the Rule (1) exceeds ATF's statutory authority in violation of the Administrative Procedure Act ("APA"), (2) contravenes the Second Amendment, and (3) violates Article I of the Constitution and the separation-of-powers doctrine. Compl. ¶¶ 113–38, ECF No. 1. The same day he filed suit, Plaintiff moved for summary judgment on all three claims. Mot. for Summ. J., ECF No. 6 ("MSJ"). And two days later, he filed a motion to stay the Rule's effective date (which had already gone into effect, 88 Fed. Reg. at 6,478) under 5 U.S.C. § 705 or, "alternatively," to preliminarily enjoin the Rule. Pl.'s Mot. for Relief Under 5 U.S.C. § 705 or, Alternatively for a Prelim. Inj., ECF No. 7 ("PI Mot.").

---

[5] ATF also issued additional guidance in conjunction with the Rule's announcement, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of commercially available firearms and common weapon platforms equipped with "stabilizing braces" that ATF has determined are short-barreled rifles under the NFA and the GCA. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). This same four-part test governs the issuance of a § 705 stay. *Dist. of Columbia v. U.S. Dep't of Agic.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). Failure to demonstrate any one of these elements requires denial of preliminary relief. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

## ARGUMENT

## I.   Plaintiff is unlikely to succeed on the merits of his claims.

ATF's Rule is a faithful application of Congress's longstanding mandate to bring all short-barreled rifles within the purview of the GCA and the NFA. Plaintiff's argument that ATF lacks the authority even to promulgate the Rule is baseless. Likewise misguided are his arguments that ATF has impermissibly construed the statutory definition of a "rifle." And Plaintiff's claims grounded in the Second Amendment take him nowhere since, *inter alia*, stabilizing braces are not bearable arms for constitutional purposes and the registration requirements for short-barreled rifles do not infringe Second Amendment rights. For all these reasons, Plaintiff is unlikely to succeed on the merits and his demand for an injunction should be denied on that basis alone.

### A.   The Rule is a valid exercise of ATF's statutorily delegated authority.

Plaintiff claims that ATF lacked authority to promulgate the Rule, asserting that the Rule "rewrites" rather than interprets the statutory definition of "rifle" and runs afoul of the "major questions doctrine." PI Mot. at 8–10; *see also* 5 U.S.C. § 706(2)(C). But his arguments on this score rest on bare assertions that, in any event, do not comport with basic principles of statutory construction.

12

On the contrary, the Rule fits comfortably within ATF's delegated authority and correctly construes the relevant statutory provisions.[6]

**1.** As a threshold matter, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. *See* 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms contained in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret the enactments Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established. *See Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret and . . . to define terms included in the [NFA's] statutory definition[s]"); *accord Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1150–51 (D. Utah 2019). Indeed, ATF has maintained regulations for over half a century that clarify the meaning of statutory terms that Congress did not itself fully define.[7] And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon

---

[6] Before reaching Watterson's constitutional challenges to the Rule, the Court should first address his statutory contentions. *See, e.g.*, *N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979).

[7] *See, e.g.*, *Machine Guns and Certain Other Firearms: Miscellaneous Amendments*, 26 Fed. Reg. 2407 (Mar. 22, 1961); *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18555 (Dec. 14, 1968); *see also* 88 Fed. Reg. at 6,500 (collecting other examples).

designed or redesigned, made or remade, and intended to be fired from the shoulder." *See* 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The need for this Rule, *see* 26 U.S.C. § 7805, cannot be gainsaid. *See Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) (noting that § 926's delegation "inevitably confers some measure of discretion" to ATF "to determine what regulations are in fact 'necessary'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *Thompson/Center Arms*, 504 U.S. at 517. A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, among other things, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if these criteria are met.

Then the "stabilizing brace" arrived and quickly proliferated. As explained, *see supra* p. 4, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. As these requests suggest, the need for ATF to determine these weapons' classifications was obvious from the beginning. While "stabilizing braces" are purportedly meant to assist single-handed fire by stabilizing against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a "stabilizing brace," it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *See, e.g.*, 88 Fed. Reg. at 6,493–94, 6,529; ATF, *FINAL RULE 2021R-08F: Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and

14

even explicitly marketed) various "brace" devices to effectively convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used "braced"-equipped firearms to carry out mass shootings, *see supra* n.28. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations, 27 C.F.R. §§ 478.11 and 479.11, to provide a consistent, predictable analytical framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). As the Rule explains, a weapon equipped with a "stabilizing brace" may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule thoroughly explains, *id.* at 6,513–43, ATF's firearms expertise and years of experience in classifying "brace"-equipped weapons informs these criteria. *See, e.g.*, *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021) ("ATF unquestionably has abundant experience and expertise in determining which devices" are NFA firearms.).

The Rule therefore rests squarely on the well-established authority delegated to ATF to issue all necessary rules for the administration and enforcement of the NFA and the GCA, and is consistent

with its longstanding practice of promulgating rules to clarify its understanding of the meaning and proper application of statutory terms.[8]

**2.**   The nature of Plaintiff's challenge only provides further support that the Rule falls within ATF's delegated authority and correctly construes the statutes at issue. One would expect Plaintiff to bring a concrete challenge to ATF's actual or anticipated classification of *his* firearm; after all, Plaintiff's alleged injury stems solely from whether he is required to register, modify, surrender, or destroy his AR-15-style pistol equipped with a stabilizing brace. *See* Compl. ¶¶ 101–12. While he appears to contest in his declaration whether certain factors identified in the Rule properly apply to his rifle, *see* ECF No. 6-4 ¶¶ 19, 20, tellingly, he brings no legal claim contesting that his firearm is properly classified as a "rifle," nor does he otherwise assert that his firearm is not intended to be fired from the shoulder. *See* Compl. ¶ 108 ("If the stabilizing brace . . . were attached to Plaintiff's AR-15-style pistol, Defendants would classify Plaintiff's pistol as a short-barreled rifle under the Rule."). A depiction of Plaintiff's Gear Head Tailhook stabilizing brace configured with an AR-style pistol reveals why:



---

[8] Plaintiff suggests that ATF lacked authority to provide compliance options for affected persons. PI Mot. at 9–10. But he offers no argument and cites no authority in support of that bare contention. *See TXI Operations, LP v. City of Mckinney*, No. 4:20-cv-353, 2023 WL 161942, at \*18 (E.D. Tex. Jan. 11, 2023) (Mazzant, J.) ("[I]t is not the Court's duty to make arguments or do the research on behalf of a party."). Nor does he explain how he has standing to challenge that portion of the Rule, which causes him no perceivable injury. In any event, as the Rule explains, these compliance options are a valid exercise of ATF's enforcement discretion. *See* 26 U.S.C. § 7805(b) (granting discretion to determine retroactive effect of regulations relating to the internal revenue laws).

Gear Head Works, *Tailhook Mod 1*, https://perma.cc/5FD2-ZNCM. Plaintiff understandably does not bring any claim to dispute that this firearm, as he would prefer to configure it, is "designed or redesigned, made or remade, and intended to be fired from the shoulder[.]" 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Because the statute's application here is unquestioned, any purported "injury" to Plaintiff is not traceable to the Rule at all, and instead stems solely from the statute. It is thus unclear that Plaintiff even has standing to challenge the Rule, as divorced from the statute. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (injury must be "fairly traceable to the challenged action") (quotation and alterations omitted)). Moreover, although Plaintiff raises abstract challenges to ATF's authority and the constitutionality of the Rule, it is the statute—not the Rule in a vacuum—that imposes the relevant obligations on Plaintiff.[9]

3.   Plaintiff does not dispute that ATF has the statutory authority to interpret and clarify the NFA's and the GCA's provisions. Instead, he suggests that ATF lacked authority to promulgate the Rule because the Rule "rewrites" rather than interprets the statutory definition of "rifle." PI Mot. at 9. In his view, that definition "necessarily excludes" all "pistols with stabilizing braces" because "they are designed to be braced against a shooter's forearm, not . . . a shooter's shoulder." *Id.* But Plaintiff marshals no evidence or interpretive analysis to support that conclusory, factually incorrect, and categorical assertion. *See TXI Operations*, 2023 WL 161942, at *18 ("[I]t is not the Court's duty to make arguments or do the research on behalf of a party."); *In re Lothian Oil, Inc.*, 508 F. App'x 352, 357 (5th Cir. 2013) ("[U]ndeveloped arguments are rightly ignored."). At any rate, Plaintiff's argument does not comport with the statutory text, congressional purpose, prior judicial constructions, or common sense.

---

[9] It is similarly unclear that a challenge to the Rule in the abstract constitutes a challenge of final agency action under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (final agency action must be one by which "rights or obligations have been determined"); *see also Valero Energy Corp. v. EPA*, 927 F.3d 532, 538 (D.C. Cir. 2019) (clarifying interpretive document not final agency action).

The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a "stabilizing brace" can be a "rifle" within the meaning of the NFA and the GCA.

Because Plaintiff does not elaborate on his statutory theory, it is unclear how he has reached the conclusion that all pistols equipped with stabilizing braces are "necessarily exclude[d]" from the definition of "rifle." *See* PI Mot. at 9. Surely, he cannot be suggesting that, because such a weapon is created from a *pistol*, it cannot constitute an NFA "rifle." Not only would that argument ignore the statute's use of the broad and inclusive term "weapon," but it would conflict with the Supreme Court's reasoning in *Thompson/Center Arms*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (citing 26 U.S.C. § 5845(c)). Lower courts have likewise applied that same reasoning. *See, e.g.*, *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007).

As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as one of the component parts, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder. That is why even those weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *See Kanarr Corp. v. United States*, 188 Ct. Cl. 1051, 1055–57 (1969) (grenade launcher); *United States v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis with collapsible stocks); *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992) (Uzi with a folding stock); *cf. United States v. Elmowsky*, No. 19-cr-175, 2022 WL 138086, at *4–6 (S.D.N.Y. Jan. 14, 2022) (Uzi).[10]

---

[10] The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, the House Committee on Ways and Means report confirmed that the definition was intended to replace any reliance on "ordinarily accepted definitions" in determining whether a particular weapon is an NFA "rifle." *See* H.R. Rep. No. 83-1337, at A395. Moreover, ATF

It is therefore beyond reasonable dispute that a pistol equipped with a shoulder stock can be a "rifle" within the plain meaning of the NFA. Plaintiff's arguments that a pistol equipped with a "stabilizing brace," on the other hand, can *never* be a "rifle" do not withstand scrutiny.

Plaintiff insists that "stabilizing braces" are categorically designed and intended to be fired while "braced against a shooter's forearm," not a shooter's shoulder. PI Mot. at 9. The factual record before the ATF belies this assertion. *See, e.g.*, 88 Fed. Reg. at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47; *see also, e.g.*, Tactical Life, *4 Pistol Stabilizing Braces for Every American Shooter* (Feb. 28, 2022), https://perma.cc/8W5W-4TLG. In support of his counterfactual view, Plaintiff appears to look only to a manufacturer's or designer's description of the weapon as determinative of the weapon's design and intended use. *See* MSJ at 2 (citing a patent application for one "stabilizing brace" to show how all "brace" devices are designed and intended to be fired); PI Mot. at 9 (citing manufacturers' descriptions of "stabilizing braces" provided with classification requests). But a manufacturer's assertion cannot itself be determinative. As the Rule explains and as courts have recognized in analogous contexts, while a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would frustrate Congress's purpose in enacting the NFA and the GCA, would lead to absurd results, and would permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. 88 Fed. Reg. at 6,544; *see also United States v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting a construction of a statute that "would frustrate Congress' manifest purpose" and would have meant that the statute was "'a dead letter' in" many of its applications (citation omitted)); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 138 (2004) (relying

---

has long recognized that pistols can be modified in such a way as to fall within the NFA's definition of "rifle." *See, e.g.*, IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961) (determining that a handgun with an attachable shoulder stock is a short barreled rifle); IRS, Rev. Rul. 61-203, 1961-2 C.B. 224, 1961 WL 12793 (Jan. 1. 1961) (similar).

on the principle that a court "will not construe a statute in a manner that leads to absurd" results). If a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the buttstock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule carefully explains. 88 Fed. Reg. at 6,544.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer,—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g.*, *United States v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court reasoned, "it is hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.*

To avoid these absurd results, and to properly apply and give effect to the statutory definition of "rifle," the Rule explains that ATF considers, in addition to a manufacturer's description of a particular weapon, the objective design features of that weapon in determining whether it is designed and intended to be fired from the shoulder. This objective approach to discerning intent "is a very familiar one in the law." *Id.* at 601. In fact, "[f]requently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of

mind of the actor." *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring).[11]

Elsewhere, Watterson appears to suggest that the statutory definition of "rifle" should be limited only to weapons designed, made, and intended to be fired *exclusively* from the shoulder, thus excluding pistols equipped with "stabilizing braces." *See* MSJ at 26 (arguing that "stabilizing braces" "would have been designed differently if they were intended to be used as shoulder stocks"). On that theory, a pistol equipped with a "stabilizing brace" could never be an NFA "rifle" if it were designed in such a way as to allow effective single-handed fire (or, for that matter, two-handed, non-shoulder fire). 88 Fed. Reg. at 6,501. That would not be a novel theory, as many litigants have made the same argument in suggesting that their firearms were not designed, made, and intended to be fired from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *See, e.g., Rose*, 695 F.2d at 1357–58; *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963) ("That [the weapon] had no sights or that it could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition."), *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57.

As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a "stabilizing brace" that it is designed, made, and intended to be fired from the shoulder is an NFA "rifle," regardless whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. *See* 88 Fed. Reg. at 6,501. The opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is nowhere found in the statutory text. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor

---

[11] *See, e.g., Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977) ("In determining whether an article is a 'drug'" under a statute because of an "intended therapeutic use, the FDA is not bound by the manufacturer's subjective claims of intent but can find actual therapeutic intent on the basis of objective evidence."); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017) (determining under the Lanham Act whether an applicant intends to use a trademark in commerce by looking to "*objective* evidence of intent," noting that Congress did not intend for the issue to turn on whether an applicant simply declares that it "did truly intend to use the mark" (citations omitted)).

does this Court usually read into statutes words that aren't there."). Moreover, Congress indicated in the very same statutory provision how to impose such a limitation by defining a "silencer" to include "any part *intended only for use* in [the] assembly or fabrication" of a firearm silencer or firearm muffler. *See* 26 U.S.C. § 5845(a)(7) (emphasis added) (cross-referencing 18 U.S.C. § 921); 18 U.S.C. § 921; *Romag Fasteners*, 140 S. Ct. at 1495 (noting that the Court is "doubly careful" not to read into statutes words that aren't there when Congress "included the term in question elsewhere in the very same statutory provision"). But Congress chose to define "rifle" to mean any weapon designed, made, and intended to be fired from the shoulder, irrespective of whether the weapon has an alternate use.

**4.** Finally, Watterson's reliance on the "major questions doctrine," PI Mot. at 8–9, is misplaced for several reasons. *First*, this doctrine applies only in "extraordinary cases" involving "decisions of vast economic and political significance" or assertions of "extravagant statutory power over the national economy" or of "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022) (citations omitted). The Rule—which interprets the NFA and the GCA as they relate to firearms classifications, ATF's bread and butter—bears none of these features, either as a matter of reach or impact.

*Second*, Watterson neglects to mention that major-questions principles are relevant only when an agency action involves a "novel" or "unprecedented" interpretation of regulatory authority involving "ancillary" statutory provisions. *Id.* at 2605. But nothing of the sort happened here. ATF has long exercised clear delegated authority in issuing rules clarifying terms within the NFA and the GCA and issuing firearm classifications in accordance with those terms. Consistent with that longstanding practice, the Rule simply amends existing regulations to clarify for the regulated community ATF's understanding of the proper application of one specific statutory phrase, the meaning of which has been the subject of substantial confusion. That can hardly be described as an

22

enormous, "transformative expansion [in the agency's] regulatory authority," *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), resting on an "ancillary provision," *see West Virginia*, 142 S. Ct. at 2605.

*Third*, before applying "major questions" principles, the Supreme Court has considered whether the challenged action is outside the agency's traditional field of expertise, whether it intrudes on matters typically governed by state law, *id.* at 2606, 2612–13, and whether Congress has already expressly considered and rejected the measure, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000). None of these factors are present here, and Watterson argues nothing to the contrary.

\*     \*     \*

In sum, Watterson has failed to demonstrate a likelihood of success on his claim that ATF lacked authority to promulgate the Rule.

### B.     The Rule does not infringe Second Amendment rights.

Plaintiff likewise fails to demonstrate any likelihood of success on the merits of his Second Amendment claim. The Rule does not implicate the right to bear arms for three independent reasons. First, stabilizing braces do not constitute "bearable arms," meaning that Plaintiff lacks a Second Amendment right to use them. Second, the basic firearm registration requirements set forth in the NFA and manifested in the Rule do not implicate the right to bear arms. Third and finally, short-barreled rifles constitute dangerous and unusual weapons, and the Second Amendment does not reach the use of such weapons. Moreover, even if the Rule somehow touched on Plaintiff's right to bear arms, a robust history and tradition of firearm regulation supports the Rule.

1.     Firearm braces are not bearable arms.

Under *District of Columbia v. Heller*, the Second Amendment extends only to "instruments that constitute bearable arms." 554 U.S. 570, 582 (2008); *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (same). Indeed, "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an "Arm[]." *United States v. Cox*, 906

F.3d 1170, 1186 (10th Cir. 2018); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Consistent with this requirement, *Heller* explained that the historical understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581.

Because the Second Amendment protects only the right to use "bearable arms," laws and regulations that regulate the use of firearm "accessories" or "attachments" do not generally impinge on that right. For instance, the NFA requires registration and payment of a $200 tax—the same requirements for a short-barreled rifle—when making a firearm equipped with a "silencer."[12] Courts have uniformly held that because "[a] silencer is a firearm accessory . . . it can't be a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *see also United States v. Al-Azhari*, No. 8:20-CR-206-T-60AEP, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020) (same). Indeed, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm[,]" and "a firearm remains an effective weapon without a silencer of any type attached." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4-*5 (D. Md. Sept. 20, 2019). Accordingly, the Second Amendment does not reach the use of silencers as attachments to firearms. *See id.* (collecting cases).

Stabilizing braces fall outside the scope of the Second Amendment for these same reasons. Pistol braces are not themselves weapons or arms, and they serve no useful purpose except as attachments to firearms. And as Plaintiff admits, his firearm remains useful and effective without any brace attached. He avers that he currently owns a "large AR-15-style pistol" specifically for "self-defense purposes" because "it is easier to store and not as cumbersome as a rifle." Declaration of Blake J. Watterson ¶ 7, ECF No. 6-4 ("Watterson Decl."). Plaintiff states that he wishes to use a

---

[12] "Silencer" is defined by statute to include "any device for silencing, muffling, or diminishing the report of a portable firearm," as well as "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25).

stabilizing brace only so that he can use the firearm "more safely" and to shoot it "more accurately with one hand." *Id.* ¶ 10. But while Plaintiff may wish to use a brace to "improve the usage of a firearm," the brace itself is not a bearable weapon, nor necessary for the functioning of the firearm to which it is attached, and so the attachment of firearm braces is "not protected by the Second Amendment." *See Hasson*, No. GJH-19-96, 2019 WL 4573424, at *5. Plaintiff's Second Amendment claim fails for this reason alone.

      2.   Registration of short-barreled rifles does not implicate the Second Amendment.

The Rule does not ban any firearms; to the contrary, pursuant to the NFA, the Rule explicitly permits possession of short-barreled rifles upon registration with, and approval by, ATF. Although Plaintiff repeatedly claims that the Rule "prevents" him from attaching his stabilizing brace "without risking prosecution and a 10-year prison sentence," PI Mot. at 10, he concedes that, in fact, he could simply register and receive approval for the firearm. Watterson Decl. ¶ 27.

Plaintiff is thus left to argue that the ATF registration process itself constitutes a Second Amendment violation. *See* Compl. ¶ 109 (alleging, among other things, that the registration "fee" and "lengthy waiting period is an infringement of Plaintiff's Second Amendment rights"). But as the Fifth Circuit previously explained, similar firearm licensing requirements such as being "photographed and fingerprinted" do not harm any a legally protected interest, and are "merely 'additional costs and logistical hurdles' that all citizens bear as ancillary to living under a government." *Bezet*, 714 F. App'x 336, 340 (5th Cir. 2017); *see also Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, distinguishing laws imposing "minor inconveniences" from those amounting to "an absolute deprivation" of the right to bear arms).

Indeed, Justice Kavanaugh reiterated in his *Bruen* concurrence that 43 states employ concealed-carry licensing regimes that may demand "fingerprinting, a background check, a mental health records, check, and training in firearms handling and in laws regarding the use of force, among other possible

requirements." 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring). He explained that these licensing regimes, which used "objective licensing requirements," created no Second Amendment violation. *Id.* And the majority's opinion took pains to note this point. *Id.* at 2138 n. 9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of such licensing regimes). Similarly, ATF's application procedure uses certain features that posed no constitutional problem in *Bruen*, such as fingerprinting and a background check. If such procedures create no constitutional infirmity when employed by state governments, the same holds true for federal registration. *Accord Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (holding constitutional, under *Bruen*, state firearms permit requirement that includes a "background check, fingerprinting, a mental health check, and training in firearms").

Nor can Plaintiff show the extraordinary circumstances left open by the *Bruen* Court whereby otherwise constitutional licensing might infringe Second Amendment rights, namely where registration requires "lengthy wait times" or "exorbitant fees" which effectively "deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n. 9. Plaintiff claims that he would need to "wait several months to a year for approval," PI Mot. at 2, but ATF's current estimated processing times, which Plaintiff himself repeatedly references, state that the average processing time for a "Form 1," the type of Application Plaintiff would submit, is 45 days for a paper submission and 30 days for an electronic form. *See* Watterson Decl. ¶ 27 (citing ATF, *Current Processing Times*, https://www.atf.gov/resource-center/current-processing-times). Moreover, the specific length of time required here is irrelevant to Plaintiff's Second Amendment claim, because if Plaintiff submits his application on or before May 31, 2023, the Rule provides that he may properly retain possession of the firearm until receipt of "a response from ATF on [the] application." 88 Fed. Reg. at 6559. Because Plaintiff is explicitly permitted to possess his short-barreled rifle while his application is

pending, the length of that waiting period cannot serve to "deny" Plaintiff any right to carry that firearm.

Similarly, Plaintiff does not allege that the $200 tax prohibits him from compliance with the registration requirements. For one thing, as explained more below, Plaintiff has no tax obligation at all under the Rule. And even if he were required to pay a tax, apart from a passing reference to the tax as "exorbitant," Compl. ¶ 109, Plaintiff fails to allege that payment of this amount will impose any financial hardship, let alone that the amount is so significant that Plaintiff is effectively denied his right to carry a firearm. Indeed, this exact tax has remained constant since the NFA was enacted in 1934. And to the extent that Plaintiff argues the Second Amendment is violated whenever *any* tax or fee is required in firearm licensing, that position would threaten every state and federal licensing or registration requirement where a tax or fee is involved. Such a position is precluded by *Bruen*, given that the very licensing regimes whose unconstitutionality was not even "suggest[ed]" frequently require the payment of some amount of money. *See, e.g.,* La. Rev. Stat. Ann. § 40:1379.3 (H)(2) (West Cum. Supp. 2022) ($25 fee per year); Miss. Code. Ann. § 45-9-101 (5)(c) (2022) ($80 license fee); Tex. Gov't Code Ann. § 411.174(a)(6) (West Cum. Supp. 2021) ($40 application and license fee); *see also Bruen*, 142 S. Ct. at 2123 nn. 1, 9 (listing state laws regulating concealed-carry licenses).

      3.  Short-Barreled rifles are dangerous and unusual weapons, and their use is not protected by the Second Amendment.

While the Court need not even reach this issue for the reasons set forth above, the Second Amendment is not implicated for the final reason that there is no right to bear dangerous and unusual arms, such as short-barreled rifles. In *Heller* the Supreme Court explained that the "historical understanding" of the Second Amendment does not encompass "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. The lodestar decision in this Circuit on "dangerous and unusual" weapons is *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016). There, the Court of Appeals held that machine guns are both dangerous and

unusual, and as a result "do not receive Second Amendment protection." *Id.* at 451. This Court should follow the analytical approach used in *Hollis* and reach the same conclusion with regard to short-barreled rifles.

The *Hollis* court first evaluated dangerousness and found "persuasive to its analysis" precedent holding that unlawful possession of a machine gun constitutes a crime of violence for purposes of a sentence enhancement. *Id.* at 449. That very precedent explains how the same conclusion applies to all firearms specifically identified in the NFA, including short-barreled rifles. *See United States v. Golding*, 332 F.3d 838, 843 (5th Cir. 2003). In addition, the *Hollis* court relied on decisions from other courts that agreed that machine guns are dangerous and so fall outside the Second Amendment's coverage. 827 F.3d at 448. And just as with the machine guns in *Hollis*, courts have uniformly agreed that the inherent dangerousness of short-barreled rifles places them beyond the ambit of the Second Amendment. *See, e.g., Cox*, 906 F.3d at 1185 (holding that "possession of short-barreled rifles falls outside the Second Amendment's guarantee," given dangerousness of such weapons, because their "concealability fosters [their] use in illicit activity") (citation omitted); *see also Thompson/Center Arms*, 504 U.S. at 517 (observing that a short-barreled rifle is a "concealable weapon" that is "likely to be used for criminal purposes").[13]

The Rule echoes these decisions, noting that "[s]hort-barreled rifles specifically are dangerous and unusual due to both their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to

_____

[13] *See also United States* v. *Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (approving jury instructions that an individual does not have a Second Amendment right to possess a short-barreled rifle, and observing that, "[u]nder *Heller*, individuals still do not have the right to possess machineguns or short-barreled rifles []"); *United States v. Gonzalez*, No. 2:10–cr–00967, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011) ("Congress specifically found that 'short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection.'" (quoting S. Rep. No. 90–1501, at 28 (1968))); *United States v. Majid*, No. 4:10CR303, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010) ("[T]he short-barrel AR–15 is not a weapon that is typically possessed by law-abiding citizens for lawful purposes.").

shoulder the firearm for better accuracy." 88 Fed. Reg. at 6,499. For all the above reasons, under the analysis required by *Hollis*, short-barreled rifles constitute dangerous weapons.

The *Hollis* court found that machineguns are also unusual firearms. Noting that courts have taken different approaches in determining "usualness," *Hollis* looked to Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which suggested that the evaluation involves, at the very least, looking to the "absolute number" of weapons at issue "*plus*" the number of states where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50 (emphasis in original).

Plaintiff simply stops at the first step, however, arguing only that the number of short-barreled rifles in use precludes their classification as unusual. But even this abbreviated argument is in error. Even generously assuming that there are now approximately 3.6 million short-barreled rifles in use in the United States (641,000 previously registered SBRs and 3 million firearms with braces attached), that falls far short of the requisite thresholds referenced by the Fifth Circuit. *See Hollis*, 827 F.3d at 449–50 (comparing numbers of machine guns to "50 million large-capacity magazines" in use, or the "more than 8 million AR and AK-platform semi-automatic rifles"). Here, the number of short-barreled rifles is far below even the lower of the benchmarks cited by the Fifth Circuit.

And the Fifth Circuit also recognized that "[p]ercentage analysis may also be relevant," in evaluating the relevant proportion of firearms at issue. *Id*. at 449. Conservatively estimating that there are approximately 400 million civilian-owned firearms in the United States, the number of short-barreled rifles amounts to less than one percent of this amount (0.9%).[14] Where, as here, the relative

---

[14] *See* Christopher Ingraham, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, The Washington Post, (June 19, 2018 at 10:31am EDT) https://perma.cc/LNE7-8TZQ (citing 2018 study estimating 393 million civilian-owned firearms in the United States). Total current firearm ownership is likely far higher than 400 million, as consumers have purchased nearly twenty million firearms *per year* in recent years. *See* Joe Walsh, *U.S. Bought Almost 20 Million Guns Last Year — Second-Highest Year On Record*, Forbes (Apr. 14, 2022 at 2:05pm EDT) https://perma.cc/TVS8-NNVW (citing estimates that 19.9 million firearms were purchased in 2021 and 22.8 million were purchased in 2020).

number and percentage of firearms at issue is "quite low," *Hollis*, 827 F.3d at 450, there is little question that the weapon at issue is unusual.

Moreover, although Plaintiff points out that 200,000 stun-guns in *Caetano* did not render them unusual, *Hollis* explicitly rejected the argument that the "absolute number [of firearms] by itself was sufficient" in *Caetano* to determine usualness. *Hollis*, 827 F.3d at 450. Rather, the Fifth Circuit looked also to the number of states where machine guns could be "lawfully possessed." *Id.* Specifically, the Court added together states in which machine guns were "entirely ban[ned]," and states where machine guns are banned "unless the weapon is legal under federal law." *Id.* Concluding that 34 states "prohibit possessing machineguns," the Fifth Circuit found this to be further support that machine guns are unusual. *Id.* There are a similar number of prohibitory laws concerning short-barreled rifles; at least four states ban short-barreled rifles entirely, and 24 states ban short-barreled rifles unless properly registered under the NFA.[15] Given that possession of short-barreled rifles is prohibited by state law to an extent similar to that of machine guns, such stringent regulations further supports a finding that such firearms are unusual. In sum, short-barreled rifles are dangerous and unusual weapons, which fall outside the Second Amendment.

    4.  Historical tradition of regulation supports the Rule.

While the Rule does not implicate the Second Amendment, even if the right to bear arms was affected here, the Rule and the statutes are constitutional because they rest upon centuries of similar taxation and registration requirements.

---

[15] *See* Cal. Penal Code § 16590; D.C. Code Ann. § 7-2502.02; Haw. Rev. Stat. Ann. § 134-8.; Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann §§ 16-11-122, 16-11-121(4); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

Where a regulation affects the Second Amendment, the Government may justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  The Government may do so by pointing to "a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar," meaning that they impose a "comparable burden" on the right of armed self defense that is "comparatively justified." *Id.* at 2132-33.  This historical analysis can be "nuanced," particularly in "cases implicating unprecedented societal concerns or dramatic technological changes," where it is especially important to account for the fact that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132.

From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements.  Indeed, colonial and early state governments regularly sought to gather information regarding firearm ownership in their jurisdiction. As early as 1631, Virginia required a regular survey of people in the colony and "also of arms and munition."[16] Likewise, door-to-door surveys of firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[17] In a similar vein, militia members in Massachusetts (1775) were required to have their

---

[16] 1631 Va. Acts 174, Acts of February 24th, 1631, Act LVI.

[17] *See* Order of the Governor and Council, March 28, 1667, in John Russell Bartlett, ed., *Records of the Colony of Rhode Island and Providence Plantations* (Providence: A. Crawford Greene and Brother, 1857), 2:196; "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:645; "An Act for the regulating, training, and arraying of the Militia," 1781, New Jersey Session Laws, ch. XIII, § 1. *See generally* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).

firearms inspected, with an official record documenting all such inspections, and New York (1778) imposed similar requirements, with the required inspections performed at the owner's expense.[18] In 1805 Massachusetts required that all musket and pistol barrels be "proved" (inspected and marked by designated individuals) upon payment of a fee, to insure their safe condition, as did Maine in 1821.[19] Licenses or inspection were also required in certain states to transport gunpowder (akin to modern ammunition), such as in Massachusetts (1651, 1823), Connecticut (1775), and New Hampshire (1830).[20] South Carolina authorized the issuance of licenses for the sale of pistols (1893).[21] And personal firearm licenses for sporting purposes were required in Hawaii (1870) and Wyoming (1899).[22]

Further, while Plaintiff is exempt from the NFA's tax here, Plaintiff's assertion that there is no "historical analogue" to the NFA's tax is belied by multiple historical statutes. New Hampshire imposed a tax on the importation of gunpowder in 1759,[23] and New York City enacted a similar gunpowder tax in 1763.[24] Taxes on firearms specifically were common through the 19th century.

---

[18] 1775-1776 Mass. Acts at 18; Acts of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws at 62.

[19] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259-61 (1807); Laws of the State of Maine 546 (1830).

[20] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 15 The Public Records of the Colony of Connecticut 191 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823)

[21] 1893 S.C. Acts 426, An Act To Amend An Act Entitled "An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State", § 2. Also, multiple states prohibited the sale or exchange of pistols, including Texas (1871), Kansas (1872), Wyoming (1875), Tennessee (1879), and Arkansas (1881). *See* Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231; Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)).

[22] Act of Mar. 16, 1870, no. 68, § 3, sixth, 1870 La. Acts 126, 127; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

[23] 1759-1776 N.H. Laws 63, An Act About Powder Money.

[24] Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Page 18-19 (1763). Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

Indeed, taxes were specifically levied on pistols and certain other firearms in Alabama (1837), Mississippi (1844, 1867), North Carolina (1856, 1858), and Georgia (1866).[25]

Taken together, the above laws illuminate an unbroken historical tradition of American firearm regulation "relevantly similar" to that required by the NFA. *Bruen*, 142 S. Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the modern NFA and its corresponding regulations seek to raise revenue through taxation, regulate but do not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Accordingly, any modest burden imposed by the NFA's taxation and registration is certainly "comparable" and "comparably justified" to the numerous historical laws listed above. Given this history and tradition, there is no constitutional violation and Plaintiff's claim necessarily fails.

### C. Neither the Department's general rule-making authority nor the Rule violate the constitutional principle of separation of powers.

Plaintiff argues that the Rule violates separation-of-powers principles because the Rule is the product of an unconstitutional delegation and because the Rule is "an unconstitutional exercise of core legislative power." PI Mot. at 5–8. For the reasons that follow, Plaintiff unlikely to succeed on the merits of this claim.

      1.   The National Firearms Act and Gun Control Act provide the Department with intelligible standards to which it must conform.

"Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989) (citation omitted). But here, ATF did not engage in legislative rulemaking. *See infra* pp. 42, 44. As stated, all of the negative impacts of which Plaintiff complains are provided by statute. *See supra Part* I.A.2. Therefore, the non-delegation doctrine is not implicated. And even if the Rule did implicate the non-delegation doctrine, Congress is not constrained in the way

---

[25] Lands, and Granting Donations Thereof to the State Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources; 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15; Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27, 27–28;

Plaintiff suggests: the Constitution does not "deny[ ] to the Congress the necessary resources of flexibility and practicality [that enable it] to perform its function[s]." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Yakus v. United States*, 321 U.S. 414, 425 (1944) (internal quotation marks omitted)). "So long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Mistretta*, 488 U.S. at 372 (internal quotation omitted).

Only twice has the Supreme Court struck down legislation as violating the non-delegation doctrine. Both occasions were in 1935 when the Court concluded that two New Deal statutes unconstitutionally delegated Congress' rulemaking authority. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935). Since then, the Supreme Court has upheld, "without deviation, Congress' ability to delegate power under broad standards." *Mistretta*, 488 U.S. at 373. The Supreme Court "has made clear" that the standards for compliance with non-delegation principles "are not demanding."[26] *Gundy*, 139 S. Ct. at 2129.

Here, Congress defined the terms "firearm," and "short-barreled rifle," as those terms are used in the NFA and GCA, respectively. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7), (a)(8). These statutes then regulate the making, buying, selling, and registration of certain regulated weapons, including short-barreled rifles. *See, e.g.*, 18 U.S.C. § 922(a)(4); 26 U.S.C. § 5841. For example, Congress provided that firearms falling under the purview of the NFA require approval by the Attorney General before their transfer or making, and are subject to transfer and making taxes. 26 U.S.C. § 5811–12, § 5821–22. Congress then expressly delegated to the Attorney General the authority to prescribe "such

---

[26] Elsewhere in his briefing, Plaintiff acknowledges the breadth of the intelligible principles standard, but invites the Court to "revisit" the core principles of delegation. MSJ at 18, ECF No. 6. This Court is, however, bound by controlling Supreme Court precedent. *Alexander v. Express Energy Servs. Operating, L.P.*, 784 F.3d 1032, 1037 (5th Cir. 2015) (refusing to accept plaintiff's argument because court is "bound to follow clear and controlling Supreme Court precedent").

rules and regulations as are necessary to carry out the provisions of [the GCA]," and the authority to create "all needful rules and regulations for the enforcement of [the NFA]." 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a). In turn, the Attorney General has delegated his rule-making responsibility to ATF, a bureau within the Department of Justice. 28 C.F.R. § 0.130. The ATF enacted the Rule pursuant to this delegation. 88 Fed. Reg. at 6,481, 6,500 (responding to comments regarding statutory authority and delegation). Given that the Supreme Court has "over and over upheld even very broad delegations," like ones requiring an agency merely "to regulate in the 'public interest,'" the general delegations, statutory definitions, and regulatory schemes underlying the Rule pass the "intelligible principle" test, and have for decades. *Gundy*, 139 S. Ct. at 2129 (citing *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943)).

That there may be criminal consequences for individuals who fail to register their qualifying pistols equipped with stabilizing braces does not change this result. As an initial matter, those criminal consequences flow directly from a violation of the statute, not from some violation of the Rule. In any event, it is well-established that Congress can delegate authority to the Executive Branch (or independent agencies) to engage in rulemaking without violating principles of non-delegation, even where violating the underlying statute may lead to criminal consequences. *See Loving v. United States*, 517 U.S. 748, 768 (1996) (documenting the Supreme Court's history of "uphold[ing] delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal"); *see also, e.g., J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) (citing *United States v. Grimaud*, 220 U.S. 506, 518 (1911)) (other citations omitted); *Yakus*, 321 U.S. at 418 (upholding delegation of authority to agency to issue price-limit regulations under Emergency Price Control Act even though violating the regulations carried criminal penalties, and rejecting non-delegation and separation-of-powers challenges by criminal defendants convicted of violating those regulations); *Mistretta*, 488 U.S. at 371–74 (upholding delegation of authority to Sentencing Commission to define

criminal sentencing ranges and rejecting non-delegation and separation-of-powers challenges by criminal defendant); *United States v. O'Hagan*, 521 U.S. 642 (1997); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995) (upholding an agency's interpretation of ambiguous statutory language, even though a violation could carry criminal consequences).

> 2. The ATF did not perform a core legislative function by interpreting the statutory definition of a "short-barreled rifle."

Relatedly, Plaintiff argues that the Rule is "an unconstitutional exercise of core legislative power" because it relates to statutes with criminal consequences and has policy implications. PI Mot. at 6. But Plaintiff cites no case in which an agency's regulation was invalidated as an unconstitutional delegation simply because violating the underlying statute carried criminal penalties. Instead, Plaintiff relies on *Cargill v. Garland*, 57 F.4th 447, 471–72 (5th Cir. 2023). But the Fifth Circuit "d[id] not reach" the issue of delegation in *Cargill* and addressed it only in dicta. *Id.* at 472 and n.6. And as Plaintiff acknowledges, the Supreme Court has repeatedly approved of delegations in the criminal context. PI Mot. at 7.

Here, Congress defined a rifle as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder…," and a short-barreled rifle as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(7); 18 U.S.C. § 921(a)(8). Congress—not the ATF—has imposed criminal penalties for failure to comply with the NFA and GCA's requirements. *See* 18 U.S.C. § 922(a)(4); 26 U.S.C. §§ 5811–12, 5821–22, 5841.

The Rule makes clear that the only source of legal force for the registration requirements for short-barreled rifles is Congress's statutory definition, not the rule itself. 88 Fed. Reg. at 6,480 ("This revised definition reflects the Department's understanding of the best interpretation of the statute, and it is immediately effective. *See* 5 U.S.C. § 553(d)(2)."); 88 Fed. Reg. at 6,499–500 (responding to

commenters who asserted the Rule exceeds ATF's authority to enforce the NFA and GCA). The Department has not usurped in a core legislative function by issuing a Rule interpreting the relevant statutory definitions.[27] *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96–97 (2015) (contrasting interpretive rules with "legislative rules" that have "the force and effect of law") (quotation omitted)); *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999). Plaintiff offers no sound basis for concluding that an expert agency has no authority to advise the public of its views regarding whether a pistol, equipped with a shoulder brace, and displaying objective features indicating that it is designed and intended to be fired from the shoulder constitutes as a short-barreled rifle under these statutory definitions. *See Gundy*, 139 S. Ct. at 2129 (collecting examples of permissible delegations).

## II.   Plaintiff will not suffer irreparable harm if the Rule remains in effect.

Plaintiff has also failed to show that he is likely to suffer irreparable harm, an "'indispensable' requirement for a preliminary injunction[.]" *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted); *accord Sampson v. Murray*, 415 U.S. 61, 88 (1974). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical," *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. 2015) (Mazzant, J.) (citation omitted), and must be "so imminent that there is a clear and present need for equitable relief to prevent" it. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation omitted); *accord Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). A plaintiff cannot "make a clear showing of irreparable harm" based on

---

[27] Plaintiff argues in passing that the Department cannot be delegated the authority to implement an "'enforcement discretion' scheme that waives statutory requirements for certain persons if they abide by one of the Rule's compliance options." PI Mot. at 6–7. As explained, Plaintiff is not injured by this exercise of enforcement discretion and so lacks standing to challenge it. In any event, Plaintiff provides no support for this argument. The Internal Revenue Code, 26 U.S.C. § 7801(a)(2)A), grants the Attorney General the legal authority to determine and assess the amount of taxes owed by taxpayer with respect to enforcement the provisions of the NFA. Therefore, ATF has authority—consistent with the Internal Revenue Code—to classify firearms and assess the appropriate tax liability of the manufacture, making, or transfer of the item under the NFA. *See* 88 Fed. Reg. at 6501 (responding to comments concerning lack of authority regarding tax collection).

"speculative injur[ies]" or "unfounded fear[s]." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (alteration adopted and citation omitted). Nor can a plaintiff make this showing with "unsubstantiated and conclusory assertions," *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), but must substantiate any claim or irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). A plaintiff also "must show that the alleged harm will directly result from the action which [he] seeks to enjoin." *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

### A.     Plaintiff has not demonstrated a constitutional violation.

Plaintiff first argues that in the absence of preliminary relief, he will continue to be deprived of his constitutional rights. PI Mot. at 8, 10. Defendant agrees with the general proposition that if a plaintiff demonstrates a constitutional violation, no further irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). But here, Plaintiff has shown no likelihood of success on the merits of his constitutional claim, and this baseless claim cannot give rise to a cognizable injury. *See supra* Part I.B; *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 884 (S.D. Tex. 2019) ("As Petitioners have not established a violation of their constitutional or statutory rights, they fail to demonstrate an irreparable injury.").

### B.     Plaintiff's fear of criminal prosecution is unfounded.

Beyond the alleged constitutional violation, Plaintiff argues that he faces a "credible threat of prosecution." PI Mot. at 10. But as the Fifth Circuit has recognized, unfounded fears are insufficient to demonstrate irreparable harm. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). And here, Plaintiff is under no credible threat of criminal prosecution that would support a finding of irreparable harm.

Although it is not entirely clear when Plaintiff acquired his stabilizing brace, it is apparent from his declaration that he was in possession of pistol and stabilizing brace that he intends to attach to the pistol at the time Rule went into effect. Watterson Decl. ¶¶ 6, 10 (executed January 31, 2023).

38

Therefore, it is ATF's position that Watterson was in possession of a qualifying NFA weapon prior to January 31, 2023, and he is eligible to participate in any one of the Rule's compliance options on or before May 31, 2023. 88 Fed. Reg. at 6553. In his declaration, Watterson addresses the scenario in which the Rule considers him to have been in possession of a qualifying weapon prior to January 31, and he does not mention the threat of criminal prosecution. Watterson Decl. ¶ 28.

Accordingly, Plaintiff is under no threat of criminal prosecution whatsoever until after May 31, 2023, and after that date, only if he has chosen not to register his weapon. Plaintiff has not argued that he is unable to meet this deadline and thus faces a potential enforcement action, only that he does not wish to do so. This type of "self-inflicted" injury "does not qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam).

### C. The time it takes ATF to process a registration application submitted during the 120-day compliance period does not constitute irreparable harm.

Next, Plaintiff argues that "there is no way for [him] to avoid an infringement of his Second Amendment rights" because even if he attempted to register his weapon, "it would take months to a year to receive permission to possess a pistol equipped with a stabilizing brace." PI Mot. at 11. Here again, Plaintiff blends an alleged constitutional violation with a separate argument for harm. Because Plaintiff has not established a constitutional violation, Defendant separately addresses whether the processing time of an application to register a short-barreled rifle constitutes irreparable harm.

As the Rule states, "provided the registration form is properly submitted and documented within the defined time period, the Department will consider individuals to be in compliance with the statutory requirements between the date on which a person's application is filed and the date a person receives ATF approval or disapproval of the application." 88 Fed. Reg. at 6,480–81. Because Plaintiff can possess his pistol and stabilizing brace during the pendency of his application, he will not suffer any injury, let alone irreparable harm, if the Rule is not preliminarily enjoined.

The other harms articulated by Plaintiff—that, in the absence of an injunction, he would be required to register his weapon under the NFA or else be unable to defend himself with the benefit of a stabilizing brace—are minimal and speculative. As stated in the Rule, the Rule "does not ban the use of firearms with an attached 'stabilizing brace.' Individuals can and will continue to be able to use such firearms for personal defense." *Id.* at 6566. The Rule simply does not require Plaintiff to relinquish, destroy, or otherwise not use his pistol equipped a stabilizing brace, leaving him without its use for self-defense in a hypothetical scenario. He need only register the weapon to do so. Thus, these potential harms do not support the issuance of an injunction.

### D.    The cost of compliance with the Rule is *de minimis*.

Lastly, Plaintiff argues that "[t]o be able to lawfully attach his stabilizing brace under the Rule and thereby have a pistol with a stabilizing brace for self-defense," Watterson would have to pay a $200 tax. PI Mot. at 2. But as he recognizes, the Rule provides tax forbearance to those with existing qualifying weapons who submit their applications during the 120-day compliance period. And even if Plaintiff were required to pay a tax to possess his weapon during the pendency of this suit, he would be able to request and/or sue for a refund if the Rule was later invalidated. 26 U.S.C. § 7422. This "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90. And to the extent Plaintiff seeks to preemptively avoid payment of a tax, the Anti-Injunction Act bars such a suit, as the statute establishes that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." 26 U.S.C. § 7421(a); *see also Thompson/Ctr. Arms Co., a Div. of the K.W. Thompson Tool Co. v. Baker*, 686 F. Supp. 38, 41–42 (D.N.H. 1988) (holding that Anti-Injunction Act barred challenge to firearm classification).

Plaintiff cites *VanDerStok v. Garland* to support his argument. Civil Action No. 4:22-cv-00691-O, 2022 WL 4009048, 2022 U.S. Dist. LEXIS 159459, *29 (N.D. Tex. Sept. 2, 2022). But there and

in other related proceedings, the court held that *de minimis* compliance fees are insufficient to show irreparable harm. *Id.* at *27–28; *see also VanDerStok v. Garland*, Civil Action No. 4:22-cv-00691-O, 2022 WL 4809376, 2022 U.S. Dist. LEXIS 180398, at *13 (N.D. Tex. Oct. 1, 2022) ("The Court agrees that the [individual plaintiffs] alleged financial injury is not sufficient for a showing of irreparable harm."). Because any costs of compliance that Plaintiff faces are similarly *de minimis*, they do not support a showing of irreparable harm.

While Defendant remains confident in the legality of the Rule—*see supra* Part I—should it be invalidated in this suit, Plaintiff will be in the same position he is in today, as long as he simply submits a registration application, free of charge, to the ATF by May 31, 2023. These minor inconveniences are *de minimis* at best. And if there are any additional costs of compliance, Plaintiff has not specified them. Because Plaintiff has not shown a substantial likelihood that he will suffer irreparable harm in the absence of an injunction, his request for injunctive relief should be denied.

## III.     The equities and the public interest weigh against a preliminary injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decidedly against the issuance of a preliminary injunction here.

In particular, the Rule benefits public safety. While Plaintiff minimizes this benefit as "speculative,"[28] PI Mot. at 6, this characterization is in error. 88 Fed. Reg. at 6566. Congress passed

---

[28] Plaintiff also minimizes as "only two crimes" the two mass shootings specifically described in the Rule. In these cases, the shooters each used a pistol equipped with a stabilizing brace in massacres that killed a combined 19 people. The cities of Dayton, Ohio and Boulder, Colorado expressed support for the Rule and submitted comments noting that short-barreled rifles are uniquely dangerous because they "combine the power of shoulder-mounted rifles with the concealability of handguns" and that "stabilizing braces" are functionally equivalent to shoulder stocks. 88 Fed. Reg. at 6,498. Indeed, the increased accuracy of short-barrel rifles over handguns, and the fact that they can be concealed more easily than standard rifles, are two of the characteristics that make short-barreled rifles unusually

the NFA for the express purpose of regulating specific firearms, like short-barreled rifles, which Congress determined posed a greater risk to public safety, as "gangster type" weapons of an especially unusual and dangerous nature. *Id.* The fact that stabilizing braces make firing a standard pistol more accurate or more enjoyable for law-abiding citizens is "irrelevant." *Id.* at 6557.

The Rule makes clear ATF's understanding that a firearm cannot evade the short-barreled rifle classification under the NFA if it has objective design features that indicate (or if there are marketing materials or other information demonstrating likely use in the general community that indicate) it is designed, made, and intended to be fired from the shoulder and has a barrel length of less than 16 inches. *See id.* at 6556. The risk posed to public safety by these weapons was identified by Congress, and this rule acts to prevent the circumvention of the NFA. *Id.* The Rule enhances public safety by clarifying and supporting the enforcement of the laws passed by Congress to address these risks. Plaintiff's request to enjoin the Rule would, conversely, decreases public safety.

In support of his public safety counterargument, Plaintiff cites an unpublished case from the Western District of New York, in which the court enjoined a law criminalizing the possession of a firearm in a place of worship in part because it "created a vulnerable population of attendees." PI Mot. at 13 (citing *Hardaway v. Nigrelli*, __ F. Supp. 3d __, 2022 U.S. Dist. LEXIS 200813, at *43–44 (W.D.N.Y. Nov. 3, 2022)). But nothing in the Rule prevents Plaintiff from carrying a pistol for self-defense where otherwise allowed. It simply requires him to comply with the NFA to maintain his pistol *with a stabilizing brace*. Thus, even to the extent the concern articulated by the *Hardaway* court is persuasive, it does not exist in this case. And notably, the Second Circuit has stayed the *Hardaway*

---

dangerous. *Id.* ("Similarly, other commenters, including former law enforcement officers, voiced support for the rule and reclassification of weapons with an attached 'stabilizing brace' as NFA firearms because they are effectively short-barreled rifles, which, as evidenced by their use in the Boulder and Dayton mass shootings, 'are unusually dangerous because they can be easily concealed like a handgun but have the firepower and accuracy of a rifle.'"). This Rule, the commenters argued, "would be a positive step in helping cities like Boulder and Dayton protect their citizens . . . from devasting attacks" from firearms with an attached "stabilizing brace." *Id.*

injunction pending appeal. No. 22-2933, 2022 U.S. App. LEXIS 36046 (2d Cir. Dec. 7, 2022).

Lastly, Plaintiff argues that the "public's interest in allowing 'law-abiding citizens . . . to engage in historically lawful conduct' outweighs any speculative interest the Department has" in its interpretation the NFA. PI Mot. at 13. But of course citizens *can* continue possessing short-barreled rifles, they need only comply with the NFA's requirements. What's more, any concern is mitigated by the 120-day compliance deadline for individuals who possessed pistols with stabilizing braces at the time the Rule was promulgated as well as the 60-day pause on enforcement actions. Indeed, the public has been on notice of the basic specifics of the Rule since the Notice of Proposed Rulemaking was issued on June 10, 2021. 88 Fed. Reg. at 6,494. Pointedly, the public interest is not served by allowing owners of short-barreled rifles, however constructed, to circumvent the NFA. *See supra* at pp. 15, 19.[29]

## IV.   A § 705 Stay is not an available remedy.

Aside from failing to satisfy any of the four prerequisites to preliminary relief, Plaintiff's request for a § 705 stay fails for an additional reason: While § 705 authorizes courts in some circumstances to delay the effective date of an agency action, it cannot be used where, as here, the agency action has already taken effect. *See Rural & Migrant Ministry v. E.P.A.*, 565 F. Supp. 3d 578, 605 (S.D.N.Y. 2020) ("Section 705 of Title 5 specifically permits a court, *in advance of the effective date* of a regulation, . . . to postpone the effective date of an agency action.'" (emphasis added)). Courts construing § 705 have routinely interpreted the phrase "postpone the effective date" of an agency

---

[29] If this Court were to disagrees with the analysis above and preliminarily enjoin the Rule, any injunction should apply only to Plaintiff. Indeed, when crafting an injunction, district courts are guided by the Supreme Court's instruction that "'the scope of injunctive relief is dictated by the extent of the violation established.'" *O'Donnell v. Harris Cty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Thus, a "district court abuses its discretion if it does not 'narrowly tailor an injunction to remedy the specific action which gives rise to the order.'" *Id.* (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)). Accordingly, "an injunction must 'redress the plaintiff's particular injury,' and no more." *VanDerStok v. Garland*, No. 4:22-CV-00691-O, 2022 WL 4809376, at *2 (N.D. Tex. Oct. 1, 2022) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018)).

action to authorize the postponement of "the effective date of a *not yet effective rule*[] pending judicial review," but not suspension of a rule that is already in effect. *See, e.g.*, *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996) (emphasis added); *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. 2022) (collecting cases); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017). Although these cases address an agency's decision to "postpone the effective date," § 705 uses identical language when referring to "the reviewing court . . . postpon[ing] the effective date of an agency action." It therefore must be presumed that the identical phrases in the first and second sentences of § 705 were intended to carry the same meaning. *See, e.g.*, *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986). And the plain language of § 705 reinforces this conclusion. "'The word 'postpone' means 'to put off to a later time,' or to 'defer.''" *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 205 (citation omitted). "But, once a rule has taken effect," a court "can no longer 'put off' the effective date." *See id.*

Here, the Rule went into effect on January 31, 2023, 88 Fed. Reg. at 6,478. It is thus too late for Plaintiff to request postponement of an effective date that has already come and gone. And contrary to Plaintiff's arguments, PI Mot. at 14–15, nothing prevented ATF from making the Rule immediately effective. For reasons already explained, *supra* pp. 13, *see also* 88 Fed. Reg. at 6,480, the Rule's amendment to the regulatory definition of "rifle," 27 C.F.R. §§ 478.11, 479.11, is a quintessential interpretive rule, as it simply "advise[s] the public of [ATF's] construction of the statutes and rules which it administers." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240–41 (5th Cir. 2023) (citation omitted); *accord Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) ("[Interpretive rules] explain[] *pre-existing* legal obligations . . . ."). And the Rule's provision of options for affected persons are mere "general statements of policy," issued by ATF "to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power"—*i.e.*, its enforcement

44

discretion. *See Flight Training Int'l*, 58 F.4th at 242 (citation omitted). The APA's requirement that a "substantive rule" go into effect no sooner than 30 days from publication is therefore inapplicable. *See* 5 U.S.C. § 553(d)(2) (exempting "interpretive rules and statements of policy").

Nor does the Congressional Review Act ("CRA") affect the Rule's immediately effective date. In arguing to the contrary, PI Mot. at 14 n.1, Plaintiff invokes a provision of the CRA, 5 U.S.C. § 801(a)(3), providing that a "major rule . . . shall take effect on the latest of" 60 days after it is submitted to Congress or it "is published in the Federal Register." But as several courts have held, that provision "does not change the date on which the regulation becomes effective." *Liesegang v. Sec'y of Veterans Affs.*, 312 F.3d 1368, 1375 (Fed. Cir. 2002), *amended in part on reh'g*, 65 F. App'x 717 (Fed. Cir. 2003); *accord Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004). Rather, "the CRA merely provides for a 60-day waiting period before the agency may enforce the major rule so that Congress has the opportunity to review the regulation." *Liesegang*, 312 F.3d at 1375. Accordingly, "[f]or purposes of the [CRA]," ATF made the Rule "immediately effective," but provided that the agency would wait to "initiate enforcement actions for at least 60 days from publication of the [R]ule in the Federal Register." 88 Fed. Reg. at 6,481 (citing 5 U.S.C. § 801(a)(3)).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for preliminary relief.

Dated: February 23, 2023    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Faith Lowry*
FAITH E. LOWRY (TX Bar No. 24099560)
MICHAEL DREZNER
JODY D. LOWENSTEIN (MT #55816869)
Trial Attorneys
U.S. Department of Justice

45

Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: 202-305-5581
Email: faith.e.lowry@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On February 23, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Faith Lowry
Trial Attorney
U.S. Department of Justice

47