# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| BLAKE WATTERSON, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 4:23-cv-00080 |
| v. | § | Judge Mazzant |
| | § | |
| BUREAU OF ALCOHOL, TOBACCO, | § | |
| FIREARMS AND EXPLOSIVES et al., | § | |
| | § | |
| | § | |
| *Defendants.* | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiff's Motion to Reconsider and Modify the Court's June 7, 2023 Order (Dkt. #42). Having considered the motion and the relevant pleadings, the Court finds that Plaintiff's Motion to Reconsider and Modify the Court's June 7, 2023 Order should be **DENIED**.

## BACKGROUND

### I.      The Final Rule and Its Origin

The National Firearms Act of 1934 ("NFA") and the Gun Control Act of 1968 ("GCA") are two of the primary means by which Congress regulates the possession, manufacture, and distribution of certain types of firearms, including short-barreled rifles ("SBRs"). 26 U.S.C. §§ 5801–5872; 18 U.S.C. §§ 921–931. The NFA and GCA define the term "rifle" to mean a weapon that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel of less than sixteen inches in length, it is an SBR within the meaning of the NFA and the GCA. 26 U.S.C. § 5845(a)(3)–(4); 18 U.S.C. § 921(a)(8). SBRs are subject to certain registration and taxation requirements, among other federal controls. 26 U.S.C. §§ 5811, 5821, 5841.

Recently, firearm manufacturers have created and marketed stabilizing braces, which are devices generally designed to attach to the rear end of a pistol (Dkt. #23 at p. 16). These stabilizing braces vary greatly in their design (Dkt. #23 at p. 16). Some are advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, while others resemble common shoulder stocks so that they may be used to convert pistols into shoulder-fired weapons similar to SBRs (Dkt. #23 at p. 16). Defendants Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Steven Dettelbach in his official capacity as Director of the ATF, United States Department of Justice ("DOJ"), Merrick Garland in his official capacity as Attorney General of the United States, and the United States of America (collectively "Defendants") contend that the latter-designed stabilizing braces have resulted in the circumvention of Congress's requirements for SBRs (Dkt. #23 at p. 16).

Stabilizing braces have evolved over time. In 2012, the first stabilizing brace, pictured below, emerged as a device that attaches to an AR-type pistol and would allow the brace-equipped firearm to rest against the user's forearm. 88 Fed. Reg. at 6,482–83. This device "did not convert that weapon to be fired from the shoulder." *Id.* at 6,483.



**2012 submission of original "stabilizing brace" attached to an AR-type pistol**

*Id.* Over the next several years, new varieties of stabilizing braces emerged, many of which more closely resembled rifle stocks allowing the firearm to be fired from the shoulder. *Id.* at 6,482–94. Defendants claim that some stabilizing braces, such as the device pictured below, effectively convert firearms into SBRs because those firearms are "designed, made, and intended to be fired from the shoulder" (Dkt. #23 at pp. 16; 20). 88 Fed. Reg. at 6,493.



**Pistol with attached "stabilizing brace" (top) compared to rifle (bottom), both marketed by the same company**

88 Fed. Reg. at 6,493. In response to the evolving braces, the ATF promulgated a rule, Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Final Rule"). The Final Rule establishes a multi-factor criterion by which the ATF determines whether a weapon equipped with a stabilizing brace is "designed or redesigned, made or remade, and intended to be fired from the shoulder" under the NFA and GCA's definitions of "rifle" (Dkt. #23 at pp. 24–25).

Under the Final Rule, "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder," includes any weapon "that is equipped with an accessory, component, or other rearward attachment," such as a stabilizing brace, "that provides surface area that allows the weapon to be fired from the shoulder, provided that other factors indicate that the

weapon is designed, made, and intended to be fired from the shoulder" (Dkt. #23 at pp. 24–25).

88 Fed. Reg. at 6,569. The "other" factors used in this determination are:

1) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
2) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
3) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
4) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;
5) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and
6) information demonstrating the likely use of the weapon in the general community

(Dkt. #23 at p. 25). 88 Fed. Reg. at 6,569–70.

Persons possessing a weapon equipped with a stabilizing brace may come into compliance

with the Final Rule by completing one of the following:

1) Remove the short barrel and attach a 16-inch or longer rifled barrel to the firearm, thus removing it from the scope of the NFA;
2) Submit through the eForms system an Application to Make and Register a Firearm, ATF Form 1 by May 31, 2023;
3) Permanently remove and dispose of, or alter, the "stabilizing brace" such that it cannot be reattached, thereby removing the weapon from regulation as a "firearm" under the NFA;
4) Turn the firearm into a local ATF office; or
5) Destroy the firearm

(*See* Dkt. #23 at pp. 25–26). *See* 88 Fed. Reg. at 6,570.

## II.     Procedural Background

While the current case has proceeded in this Court, parallel cases have been filed across

multiple districts within the Fifth Circuit challenging the Final Rule on various grounds. Below,

4

the Court explains the procedural posture of various related cases and the ways in which those cases are intertwined with the current case. The Court also explains the procedural developments in the current case.

### A.   *Mock v. Garland*

The day the Final Rule went into effect, plaintiffs William T. Mock, Christopher Lewis, Maxim Defense Industries, LLC, and Firearms Policy Coalition, Inc. ("FPC") sued defendants Merrick Garland in his official capacity as Attorney General, the DOJ, Steven Dettelbach in his official capacity as Director of the ATF, and the ATF. *Mock v. Garland*, 666 F. Supp. 3d 633, 639 (N.D. Tex. 2023) [hereinafter *Mock I*]. Three weeks after filing suit, the plaintiffs moved for a preliminary injunction. *Id.* The plaintiffs attacked the Final Rule on six grounds:

> (1) that it infringes on Individual Plaintiffs' and FPC's members' Second Amendment Rights; (2) that it violates the First Amendment by chilling speech; (3) that it runs afoul of the Fifth Amendment's due process guarantee; (4) that it violates the Constitution's structural provisions; (5) that it violates the APA as it was issued in excess of ATF's statutory authority; and (6) that it violates the APA's procedural requirements because it was not a logical outgrowth of the proposed rule.

*Id.* at 640. The court began by evaluating whether the plaintiffs' claims related to APA violations were substantially likely to succeed on the merits. First, while the plaintiffs contended the ATF had exceeded its statutory authority when "interpret[ing] the statutorily defined and unambiguous term 'rifle,'" the court found that "it [was] not substantially likely that the Final Rule exceed[ed] the [ATF's] scope of authority" since the NFA and GCA "include[] ambiguous terms in [their] definition[s] of rifle" and "other courts have recognized ATF's authority to interpret the statutes it has been charged with administering when there is an ambiguity." *Id.* at 641.

Second, the court found that plaintiffs were not substantially likely to succeed on their logical outgrowth claim. The plaintiffs argued that the "Final Rule violates the APA's procedural requirements because it [is] not a logical outgrowth of the proposed rule." *Id.* at 642. The defendants argued "the Final Rule is merely interpretive, not [legislative][1], and thus the logical outgrowth test does not apply." *Id.* While the court indicated the Final Rule was likely interpretive and not legislative, it still examined whether the Final Rule would satisfy the logical outgrowth test in the event the Final Rule was in fact legislative. *Id.*

In conducting its analysis, the court compared the two mechanisms the ATF created to determine if a weapon is a "rifle." The court first considered Worksheet 4999, the point system initially proposed as the determination mechanism the ATF would use to "classify a firearm as a 'rifle' based on objective characteristics." *Id.* The court then considered the six-factor test that replaced Worksheet 4999 as the determination mechanism in the Final Rule. *Id.* The court found that even though "the Final Rule did not incorporate Worksheet 4999 as originally proposed, the [notice of proposed rulemaking ('NPRM')] indicated that ATF was considering a rule 'to aid the firearms industry and public in understanding the criteria that [the agency] considers when evaluating' the classification of firearms under the NFA and [GCA]." *Id.* The court then found that "while [the ATF] abandoned the point system in response to the public comments criticizing that approach, the Final Rule's six criteria to be used for classifying firearms were 'derived from the NPRM and proposed Worksheet 4999,'" which was "enough to put the affected public on notice of the subjects and issues the Final Rule would address, and indeed, the very criteria the

---

[1] The *Mock I* court refers to legislative rules as "substantive" rules. *Mock I*, 666 F. Supp. 3d at 641–42. To maintain consistency, the Court will refer to "substantive" rules as "legislative" rules.

agency would employ in classifying firearms." *Id.* Thus, the court determined the plaintiffs did not demonstrate a substantial likelihood of success on the merits of their logical outgrowth claim.

The court then went on to analyze the substantial likelihood of success on the merits of the plaintiffs' various constitutional claims, finding plaintiffs did not carry their burden for any of those claims. *Id.* at 642–45. The court did not analyze the remaining preliminary injunction factors, and it denied the plaintiffs' request for injunctive relief. *Id.* at 645.

### B.    Fifth Circuit Motions Panel Decision in *Mock v. Garland*

The plaintiffs in *Mock I* subsequently filed an emergency motion for injunction pending appeal, and a motions panel for the Fifth Circuit granted the injunction. *Mock v. Garland*, No. 23-10319 (5th Cir. May 23, 2023), Dkt. No. 52. The motions panel also ordered the appeal to be expedited to the next available Oral Argument Calendar. *Id.* No further instructions were given. *Id.*

### C.    This Court's Injunction Pending *Mock v. Garland* Decision

While the *Mock* proceedings were ongoing, Plaintiff in this case filed his Motion for Relief Under 5 U.S.C. § 705 or, Alternatively, for a Preliminary Injunction (Dkt. #7). On June 7, 2023, the Court granted in part Plaintiff's motion (Dkt. #37). Because the motions panel for the Fifth Circuit enjoined the Final Rule as to the plaintiffs in *Mock I* pending an expedited appeal, the Court determined that similar relief should be afforded to Plaintiff in this case (Dkt. #7 at p. 2). The Court explained that the "Fifth Circuit's upcoming opinion will likely answer pertinent legal issues that face the Court" (Dkt. #7 at p. 2). Therefore, the Court enjoined Defendants from enforcing the rule against Plaintiff pending the Fifth Circuit's decision (Dkt. #7 at p. 2). The preliminary injunction was to remain in effect pending resolution of the Fifth Circuit's decision in *Mock* (Dkt. #7 at p. 2).

### D. Fifth Circuit's *Mock v. Garland* Decision

On September 25, 2023, the *Mock* mandate issued (Dkt. #156). The Fifth Circuit reversed the *Mock I* order denying a preliminary injunction, finding that plaintiffs were substantially likely to succeed on the merits of their claim that the Final Rule was not a logical outgrowth of the proposed rule in violation of the procedural requirements of the APA. *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023) [hereinafter *Mock II*].

The APA "requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (citing 5 U.S.C. § 553(b)(3)). The Fifth Circuit interprets this to mean that the proposed rule must provide "fair notice" of what will become the final rule. *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021). In other words, "the ultimate changes in the proposed rule [must be] in character with the original scheme or a logical outgrowth of the notice." *Mock II*, 75 F.4th at 586 (citing *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1107 (4th Cir. 1985)).

In order for an agency's rule to be subject to the APA's notice-and-comment procedure, it must be legislative in character. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). "Legislative rules are ones with the force and effect of law." *Mock II*, 75 F.4th at 578. The Fifth Circuit adopted a test to determine whether the Final Rule was legislative. *Id.* at 580–81. The test consists of five factors. *Id.* at 580.

> The five factors are, first, whether the agency intended to speak with the force of law. We examine the language actually used by the agency. Second, we see whether the agency published its rule in the Code of Federal Regulations. Third, we examine whether the agency explicitly invoked its general legislative authority. Fourth, we note whether the agency claimed *Chevron* deference. Finally, in the Fifth Circuit,

> courts scrutinize whether the rule will produce significant effects on private interests.

*Id.* (cleaned up). After analyzing each of the factors, the Fifth Circuit determined that the Final Rule is legislative in character. *Id.* at 583.

Because the Final Rule is legislative, it must adhere to the APA's notice-and-comment procedure, "including providing the public with a meaningful opportunity to comment on the proposed rule." *Id.* (citing 5 U.S.C. § 553(c)). The final rule the agency adopts must be a logical outgrowth of the proposed rule. *Id.* "[T]he logical-outgrowth test requires that the proposed rule 'fairly apprises interested persons of the subjects and issues the agency is considering.'" *Id.* at 584 (citation omitted).

The Fifth Circuit held that the Final Rule was not a logical outgrowth of the proposed rule. *Id.* at 586. The court explained that the proposed rule centered entirely around Worksheet 4999, which utilized a point system to determine whether a firearm was classified as a "rifle" under the NFA. *Id.* at 583. But, in the Fifth Circuit's view, nothing in the proposed rule put the public on notice that Worksheet 4999 and its accompanying point system would be replaced with a six-factor criterion. *Id.* Thus, the public was not put on fair notice of the Final Rule. *Id.* at 586. Because the *Mock* plaintiffs were not on notice, nor could they comment on the expanded rule, the plaintiffs had sufficiently demonstrated prejudice. *Id.* Accordingly, the Fifth Circuit concluded that the *Mock* plaintiffs were substantially likely to succeed on the merits of their logical-outgrowth APA claim. *Id.*

The Fifth Circuit reversed the order denying a preliminary injunction and remanded the case. *Id.* at 588. To "ensure relative stability," it also maintained the preliminary injunction pending appeal that the motions panel issued on May 23, 2023. *Id.* The injunction was set to expire 60 days

after the date of decision, or once the district court ruled on the preliminary injunction, whichever came first. *Id.* The Fifth Circuit declined to enter a nationwide injunction. *Id.* at 587.

      **E.**      ***Mock v. Garland* Decision on Remand and Other District Court Decisions**

As previously mentioned, the Final Rule has sparked litigation across the country, including the Fifth Circuit. *E.g.*, *Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 6:23-CV-00013, 2023 WL 7116844, at *1 (S.D. Tex. Oct. 27, 2023); *Britto v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 2:23-CV-019-Z, 2023 WL 7418291, at *1 (N.D. Tex. Nov. 8, 2023); *Second Amend. Found., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:21-CV-0116-B, 2023 WL 7490149, at *1 (N.D. Tex. Nov. 13, 2023). Before discussing this Court's proceedings following the Fifth Circuit's decision in *Mock II*, the Court takes the opportunity to summarize various decisions by other district courts applying the *Mock II* decision within the Fifth Circuit.

      **1.**      ***Mock v. Garland*, No. 4:23-cv-00095-O, 2023 WL 6457920 (N.D. Tex. Oct. 2, 2023) [hereinafter *Mock III*]**

After the Fifth Circuit's decision in *Mock II*, the case was returned to the district court. On remand, the court acknowledged the new controlling law of the case establishing "that [p]laintiffs ha[d] demonstrated, *a fortiori*, an *actual* success on the merits of their APA challenge to the Final Rule" with respect to the logical-outgrowth test and "adopt[ed] that conclusion." *Mock III*, 2023 WL 6457920, at *6. The court then analyzed the remaining preliminary injunction factors.

The court analyzed the substantial threat of irreparable harm first with regard to individual plaintiffs (Mock, Lewis, and other similarly situated individual members of the FPC), followed by commercial plaintiffs (Maxim Defense and other commercial FPC members). The court found the individual plaintiffs were threatened with irreparable injuries stemming from "(i) sustaining

permanent and nonrecoverable costs from their compliance with an unlawfully issued regulation; and (ii) suffering impairment of their fundamental right to keep and bear lawful arms in self-defense." *Id*. The court acknowledged the ATF's "approximat[ion] that an individual will suffer $2,500 or more in losses from the destruction or divestiture of their braced firearms" and explained those costs would not be recoupable to the individual plaintiffs. *Id*. at *8. The court also found an impairment of a fundamental Second Amendment right because, in its estimation, "the braced pistols regulated under the Final Rule are commonly used by law-abiding citizens for lawful purposes . . . and therefore [are] within the ambit of Second Amendment protection." *Id*. at *10.

The court also found the commercial plaintiffs were threatened with irreparable injuries, stemming from "(i) permanent and nonrecoverable costs of compliance with an unlawfully issued regulation; and (ii) substantial financial injury leading to permanent closure of businesses." *Id*. at *13. The court classified the financial injuries facing the commercial plaintiffs as "exorbitant" and "so great as to threaten the existence" of the commercial plaintiffs' business. *See id*. at *16.

Finally, the court concurrently evaluated the "final two elements necessary to support a grant of injunctive relief—the balance of equities . . . and the public interest" because "the government is a party." *Id*. The court found these elements favored the plaintiffs because "the government-public-interest equities evaporate upon an adverse decision touching upon the merits." *Id*. at *17. Accordingly, the court granted preliminary injunctive relief to the plaintiffs, but it "decline[d] [p]laintiffs' invitation to extend the scope of the injunctive relief 'nationwide.'" *Id*. at *18.

This case is currently on appeal. *Mock v. Garland*, No. 23-11199 (5th Cir.).

### 2. *Texas v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 6:23-CV-00013, 2023 WL 7116844 (S.D. Tex. Oct. 27, 2023)

Shortly after the ATF implemented the Final Rule, one individual plaintiff (Brady Brown), two non-profit corporations (Gun Owners Foundation ("GOF") and Gun Owners of America ("GOA")), and the State of Texas filed suit against the ATF, the DOJ, and Steven M. Dettelbach in his official capacity as Director of the ATF. *Texas*, 2023 WL 7116844, at *4. Shortly after filing suit, the plaintiffs requested a preliminary injunction on the basis that the Final Rule

> (1) exceeds the ATF's statutory authority, (2) violates the Second Amendment, (3) unconstitutionally taxes the exercise of a constitutional right, (4) violates the Fifth Amendment, (5) is not a proper exercise of Congress' taxing power, (6) is arbitrary and capricious, and (7) was not a logical outgrowth from the notice of proposed rulemaking ("NPRM").

*Id.* The court, recognizing the case before it "involve[d] many of the same challenges brought by the *Mock* plaintiffs, . . . granted in part [p]laintiffs' request for preliminary injunction 'pending resolution of the expedited appeal in [*Mock I*].'" *Id.*

After the Fifth Circuit's decision in *Mock II*, the court in *Texas* decided the merits of plaintiffs Brown and GOA's preliminary injunction motion.[2] It found, following *Mock II*, that Brown and GOA "ha[d] a substantial likelihood to succeed on the merits of their logical-outgrowth claim." *Id.* at *9. When determining irreparable harm, the court found it could apply the logic from *Mock III* since it was "equally applicable" to the case before it. *Id.* at *10. And the court added that, assuming a scenario in which plaintiffs brought their weapons into compliance with the Final Rule, the plaintiffs would incur non-recoupable costs, no matter if the plaintiffs brought their weapons into compliance either before or after the May 31, 2023 deadline. *See id.* at *11.

---

[2] The court in *Texas* found that defendants GOF and the State of Texas did not establish standing to request injunctive relief. *Id.* at *8–9.

In deciding the balance of equities and public interest factors, the court found those favored plaintiffs as well since "the balance of equities tip[ped] in [p]laintiffs favor because the Final Rule's effect on [p]laintiffs is immediate and imminent while the effect on [d]efendants, especially the ATF, is more administrative and speculative." *Id.* Accordingly, the court granted preliminary injunctive relief to the plaintiffs Brown and GOA. But the court, like the court in *Mock III*, declined to grant a nationwide injunction. *Id.* at *12.

This case is currently on appeal. *State of Texas v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 23-40685 (5th Cir.).

### 3. *Britto v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 2:23-CV-019-Z, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023)

Three marines brought suit against the ATF, claiming that the Final Rule "(1) violates the Second Amendment; (2) violates separation of powers and nondelegation principles; (3) conflicts with the NFA's definition of 'rifle'; (4) is arbitrary and capricious under the [APA]; and (5) is void for vagueness." *Britto*, 2023 WL 7418291, at *2. The plaintiffs requested that the court "enter an injunction prohibiting Defendant from enforcing the [Final Rule]." Pls.' Br. in Supp. of Mot. for Prelim. Inj. at 31, *Britto*, No. 2:23-CV-019-Z (Feb. 7, 2023), Dkt. No. 15. The court only addressed the plaintiffs' arbitrary and capricious claim. *Britto*, 2023 WL 7418291, at *3. The court reasoned that the plaintiffs have demonstrated a likelihood of success on the merits of their APA claim because the Fifth Circuit found that the Final Rule violates the APA in *Mock II*. *Id.* The court applied the reasoning of the Fifth Circuit in *Mock II* by equating an arbitrary and capricious claim with a logical outgrowth claim. *See id.*

Next, the court analyzed each of the remaining preliminary injunction factors. *Id.* at *4–5. The court found that irreparable harm existed "in the form of nonrecoverable compliance costs."

*Id.* at *4. Further, the court found that the third and fourth factors favored the plaintiffs because "no public interest [exists] in the perpetuation of unlawful agency action." *Id.* at *5 (internal citations omitted). Therefore, the court granted the plaintiffs' motion and stayed the Final Rule "in its entirety" pursuant to 5 U.S.C. § 705 ("*Britto* Stay"). *Id.* at *5.

> Under 5 U.S.C. § 705:
>
> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. Such a stay is a "temporary form of vacatur." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023). The stay "does not order the defendant to do anything; it only removes the source of the defendant's authority." *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 428–29 (2009)). Further, the stay "effectively rescinds the unlawful agency action" and "temporarily voids the challenged authority." *Id.*

This case is currently on appeal. *Britto v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 23-11203 (5th Cir.).

    **4.**      ***Second Amendment Foundation, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 3:21-CV-0116-B, 2023 WL 7490149 (N.D. Tex. Nov. 13, 2023)**

Second Amendment Foundation, Inc., Rainier Arms, LLC, Samuel Walley, and William Green brought suit against the ATF, Steven M. Dettelbach in his official capacity as Director of the ATF, the DOJ, and Merrick Garland in his official capacity as Attorney General challenging the Final Rule in the United States District Court for the Northern District of Texas. *Second Amend.*

*Found., Inc.*, 2023 WL 7490149, at *4. The plaintiffs argued that the Final Rule "(i) is not a logical outgrowth of the proposed rule, (ii) is promulgated in excess of agency authority and contradicts the statute the ATF seeks to interpret, (iii) has an unlawful effective date, (iv) is unconstitutionally vague, (v) is arbitrary and capricious . . . , and (vi) is unconstitutional under the Second Amendment." *Id.* at *1. The plaintiffs did not assert a logical outgrowth claim in their initial preliminary injunction briefing, but they added a logical outgrowth claim in the supplemental briefing ordered by the district court after the Fifth Circuit's decision in *Mock II. Id.* at *5.

While the plaintiffs added a logical outgrowth claim against the Final Rule, the court rejected this challenge anyway because the plaintiffs did not show prejudice. *Id.* at *6–7. If an agency does not comply with the APA, the challenging party must show that the lack of compliance caused harm to said party. *City of Arlington v. FCC*, 668 F.3d 229, 243–44 (5th Cir. 2012). The court adhered to *Mock II* and found that the Final Rule is not a logical outgrowth of the proposed rule. *Second Amend. Found., Inc.*, 2023 WL 7490149, at *6. However, the plaintiffs never argued that the lack of a logical outgrowth harmed them, specifically only claiming that their claim "matches" that in *Mock II. Id.* Therefore, the court rejected the plaintiffs' logical outgrowth claim. *Id.*

Then, the court rejected the plaintiffs' claims that the ATF acted in excess of its statutory authority in creating the Final Rule and that the Final Rule results in a statutory contradiction. *Id.* at *7–8. The court found that the Final Rule did not exceed the statutory authority that Congress gave to the ATF via the GCA and NFA. *Id.* at *7. Additionally, the court found that the Final Rule "provides, at the very least, some comprehensible standard for enforcement by placing brace-equipped devices that act like SBRs and are being marketed as SBRs into the statutory definition of SBRs." *Id.* It also determined that no statutory contradiction occurred because "all of the factors

[in the Final Rule] are textually grounded in the inquiry posed by the definitional phrase in 'rifle' under the NFA" and "a rational connection [exists] between the Final Rule's factors and the underlying factual record." *Id.* at *8.

Next, the court rejected the plaintiffs' argument that the Final Rule is invalid because its effective date was the same as its date of publication. *Id.* at *9. The court found that a violation of the APA did occur because the Final Rule's effective date was not at least 30 days after its publication. *Id.* However, the court found that this error was harmless because the plaintiffs did not show that they were prejudiced. *Id.*

The court also rejected the plaintiffs' claim that the Final Rule is void due to unconstitutional vagueness. *Id.* at *10–11. The court determined that "[t]here are at least some instances in which a reasonable person can infer meaning from the Final Rule to determine whether a brace-equipped pistol is 'designed, made, and intended to be fired from the shoulder' under the NFA." *Id.* at *11.

Further, the court rejected plaintiffs' argument that the Final Rule is arbitrary and capricious because "the ATF failed to conduct a full Second Amendment inquiry." *Id.* at *11. The plaintiffs complained that the ATF did not address the second step of *New York State Rifle & Pistol Association v. Bruen*. *Id.* at *11. However, the court determined that "[n]othing in *Bruen* requires one to unconditionally proceed to the second step of the inquiry where the first step is not met." *Id.* at *12. "The APA requires that agency action is 'reasonably explained,' which the ATF has done here." *Id.* "The [ATF] raised the operative law and applied it reasonably." *Id.*

Finally, the court determined that both stabilizing braces and pistols equipped with stabilizing braces do not implicate the Second Amendment. *Id.* at *13–14. The court found that as

an "accessory" akin to a silencer, stabilizing braces are not "bearable arms" and thus do not fall under the Second Amendment. *Id.* at *13. Further, the court found that pistols equipped with stabilizing braces are equivalent to SBRs, which are "dangerous and unusual" weapons that lie outside of the protections of the Second Amendment. *Id.* at *13–14.

Based on the above reasoning, the court determined that the plaintiffs were not likely to succeed on the merits of their claims and a preliminary injunction was inappropriate. *Id.* at *6–15. Additionally, the court considered and rejected the plaintiffs' arguments regarding irreparable harm and balance of the harms. *Id.* at *14–19.

This case is currently on appeal. *Second Amendment Foundation, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 23-11157 (5th Cir.).

**F.      This Court's Actions Post-*Mock II***

On August 9, 2023, Plaintiff filed his Motion to Reconsider and Modify the Court's June 7, 2023 Order (Dkt. #42) and his Emergency Motion for Expedited Consideration of the Motion to Reconsider and Modify the Court's June 7, 2023 Order, or in the Alternative, Expedited Consideration of Plaintiff's Motion for Summary Judgment (Dkt. #43). On August 14, 2023, the Court granted Plaintiff's Emergency Motion for Expedited Consideration of the Motion to Reconsider and Modify the Court's June 7, 2023 Order, or in the Alternative, Expedited Consideration of Plaintiff's Motion for Summary Judgment (Dkt. #44), finding that, pursuant to *Mock II*, Plaintiff had established a likelihood of success on the merits of his claim under the APA and requesting additional briefing that focused on the irreparable-harm, balance-of-equities, and public-interest factors pertaining to Plaintiff's motion for a preliminary injunction. Plaintiff filed his Supplemental Brief on August 21, 2023 (Dkt. #45). The ATF filed its Response on August 28,

2023 (Dkt. #47). Plaintiff filed his Reply on August 30, 2023 (Dkt. #48). At that time, the Court began evaluating the merits of Plaintiff's motion to reconsider and modify.

On September 25, 2023, Plaintiff filed a Notice of Mandate Issuance (Dkt. #49) notifying the Court that the mandate issued in *Mock II* earlier that day. The following day, Plaintiff filed his Notice of Appeal (Dkt. #51) arguing that because there was no longer an injunction or other relief in effect since the *Mock II* mandate issued, the Court had effectively denied his motion for a preliminary injunction and refused to modify the temporary injunction (Dkt. #51 at p. 3).

As the Fifth Circuit has made clear, a notice of appeal from an interlocutory order "divests the district court of jurisdiction over those aspects of the case on appeal." *Alice L. ex rel. v. Dusek*, 492 F.3d 563, 564 (5th Cir. 2007). Though the Court intended to expeditiously consider the merits of Plaintiff's request for reconsideration and modification of the injunctive relief previously granted, the Court no longer had jurisdiction to do so. On November 29, 2023, the Fifth Circuit remanded this case for the limited purpose to rule on Plaintiff's Motion to Reconsider and Modify the Court's June 7, 2023 Order (Dkt. #54).

On February 16, 2024, in light of the *Mock* decisions and the *Britto* Stay, the Court ordered the parties to submit supplemental briefing on whether Plaintiff's Motion to Reconsider and Modify the Court's June 7, 2023 Order is now moot or otherwise impacted (Dkt. #56). Plaintiff and Defendants filed their respective supplemental briefs on February 26, 2024 (Dkt. #57; Dkt. #58).

In his supplemental brief, Plaintiff contends that his motion to reconsider and modify is not moot (Dkt. #57 at p. 4). He further argues that the *Britto* Stay "alone does not sufficiently alleviate the chilling of [his] Second Amendment rights" because, "even with a stay, [he] still faces

prosecution risks if he attaches his brace to his pistol" (Dkt. #57 at p. 5). Though Plaintiff acknowledges the "temporary 'void[ing]' of the Rule" under *Britto*, he still argues that a preliminary injunction is necessary (Dkt. #57 at pp. 6–7). Plaintiff also argues that the *Britto* Stay "does not obviate [his] need for this Court to stay the Rule under § 705" (Dkt. #57 at p. 7). He states that "the *Britto* [S]tay is tied to that case and could soon be vacated by the Fifth Circuit. In contrast, [he] seeks relief that will remain in effect until *his* case is resolved on the merits" which would provide him more "certainty" (Dkt. #57 at p. 7) (emphasis in original).

In their supplemental brief, Defendants acknowledge that "the Rule is stayed nationwide" and the "ATF is not enforcing it" (Dkt. #58 at p. 2). However, Defendants go on to explain that "the government has appealed the *Britto* decision, and has argued, among other things, that the nationwide relief . . . should never have been granted" (Dkt. #58 at p. 2). Defendants also argue that, based on the *Britto* Stay, "Plaintiff faces no risk of imminent, irreparable injury (at least while the stay remains in effect)" (Dkt. #58 at p. 2). Thus, Defendants argue that, in the current posture, Plaintiff cannot demonstrate a substantial threat of irreparable injury that is both likely and imminent, and therefore, Plaintiff's motion to reconsider and modify should be denied (Dkt. #58 at p. 3).

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: 1) a substantial likelihood of success on the merits; 2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; 3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and 4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary

injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

### I.      The Court's August 14, 2023, Order

The Court's August 14, 2023, Order (Dkt. #44) found that Plaintiff had established a likelihood of success on the merits of his claim under the APA for the reasons stated in Plaintiff's motion, as well as the reasons articulated in the Fifth Circuit's recent decision in *Mock II*. However, the Defendants correctly assert that the specific APA grounds contemplated in *Mock II* are not before the Court in Plaintiff's motion for preliminary injunctive relief (Dkt. #47 at p. 2).

In *Mock II*, the plaintiff brought, among other claims, a claim for a procedural violation of the APA, arguing that the Final Rule did not meet the requirements for notice and comment. 75 F.4th at 583. The APA "requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (citing 5 U.S.C. § 553(b)(3)). The Fifth Circuit interprets this to mean that the proposed rule must provide "fair notice" of what will become the final rule. *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021). In other words, "the ultimate changes in the proposed rule [must be] in character with the original scheme or a logical

outgrowth of the notice." *Mock*, 75 F.4th at 586 (citing *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1107 (4th Cir. 1985)). In *Mock II*, the Fifth Circuit held that the plaintiff was likely to succeed on the merits of his procedural APA claim that the Final Rule promulgated was not a logical outgrowth of the proposed rule and the error was prejudicial. *Id.*

Here, Plaintiff brought no such procedural challenge under the APA. Plaintiff indeed admits as such in his Notice of Supplemental Authority when he says, "In *Mock* [*II*], the Fifth Circuit concluded that the *Mock* plaintiffs were likely to succeed on their claim that the [Final] Rule violates the procedural and substantive requirements of the Administrative Procedure Act. [] Watterson did not assert that same claim . . ." (Dkt. #40 at p. 3). Plaintiff then reiterates this assertion in his Supplemental Reply Brief when he says "[t]he *Mock* plaintiffs showed the [Final] Rule is procedurally flawed whereas Watterson has shown it is substantively flawed" (Dkt. #48 at p. 5). The Court analyzes the merits of each of Plaintiff's claims below.

## II.    Plaintiff has not demonstrated a substantial likelihood of success on the merits of any of his claims.

A plaintiff seeking a preliminary injunction must present a prima facie case of his substantial likelihood to succeed on the merits. *See Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)). Plaintiff brought claims against Defendants arguing that the Final Rule is: 1) an unconstitutional delegation in violation of Article I and separation of powers; 2) a violation of the APA and the Congressional Review Act ("CRA"); and 3) a violation of the Second Amendment. At this preliminary stage, Plaintiff has not demonstrated a substantial likelihood of success on the merits of any of his claims.

A.   **Plaintiff has not shown a substantial likelihood that the Final Rule is an unconstitutional delegation in violation of Article I and Separation of Powers principles.**

Plaintiff contends that the Final Rule violates Article I and constitutional Separation of Powers principles because it is an unconstitutional exercise of core legislative power (Dkt. #7 at p. 13). In support, Plaintiff asserts that the Final Rule has significant policy decisions and severe criminal consequences that cannot be delegated to unelected officials (Dkt. #7 at p. 14). The ATF responds that it enacted the Final Rule pursuant to the Attorney General's lawful delegation (Dkt. #23 at p. 44–50). Though the Court does understand Plaintiff's concern, Plaintiff has not shown a substantial likelihood of success on this claim.

Pursuant to the Constitution, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § I. "Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989). "But the Constitution does not deny to the Congress the necessary resources of flexibility and practicality that enable it to perform its functions." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (cleaned up). "Congress may obtain the assistance of its coordinate Branches—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Id.* (cleaned up). Therefore, "a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Id.* (cleaned up).

In *Mock II*, the Fifth Circuit conceded that "[t]hough [it has] never reasoned that those delegations to the ATF violate the nondelegation doctrine, there are perhaps serious concerns about the constitutionality of the ATF's interpreting criminal statutes." 75 F.4th at 578 n.34. Even

so, the *Mock II* court declined to address the delegation claim. *Id.* at 578. Similarly, in *Cargill v. Garland*, the Fifth Circuit acknowledged the concern that Tenth Circuit Chief Judge Tymkovich expressed in *Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir. 2021) (Tymkovich, C.J., dissenting). *See* 57 F.4th 447, 471 (5th Cir. 2023), *cert. granted*, No. 22-976, 2023 WL 7266996 (U.S. Nov. 3, 2023)). In *Aposhian*, Chief Judge Tymkovich admonished:

> [W]e should feel deep discomfort at allowing an agency to define the very criminal rules it will enforce by implicit delegation. Such a delegation "turn[s] the normal construction of criminal statutes upside down, replacing the doctrine of lenity with a doctrine of severity." *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring). The delegation raises serious constitutional concerns by making ATF the expositor, executor, and interpreter of criminal laws.

*Id.* (quoting *Aposhian*, 989 F.3d at 900 (Tymkovich, C.J., dissenting)). Despite acknowledging its concern, the *Cargill* court ultimately did not decide the question. *Id.*

This Court, too, has concerns regarding the ATF's ability to interpret criminal statutes. Nevertheless, the law remains clear—the ATF holds the delegated authority to administer and enforce the GCA and the NFA. Congress granted the Attorney General authority to administer and enforce the GCA and the NFA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). To that end, the Attorney General "shall prescribe all needful rules and regulations" *Id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). The Attorney General then delegated the responsibility for administering and enforcing both statutes to the Director of the ATF. *See* 28 C.F.R. § 0.130(a). Specifically, the "Director of [the ATF] shall: (a) Investigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson . . . including exercising the functions and powers of the Attorney General under [provisions including the NFA and GCA]." *Mock*, 75 F.4th at 577 (citing

23

28 C.F.R. § 0.130(a)).

Considering the evolution of stabilizing braces since 2012, the Final Rule appears to be "needful" and "necessary" to enforce the definitional phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder." *See* 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 18 U.S.C. § 926(a); 28 C.F.R. § 0.130; *see also Second Amend. Found., Inc.*, 2023 WL 7490149, at \*7. Some stabilizing braces are used to brace against a shooter's forearm while others closely resemble common shoulder stocks. The Final Rule establishes clear criteria that the ATF shall consider when determining whether a stabilizing brace converts the weapon into one to be fired from the shoulder, thereby constituting an SBR. Thus, because the Final Rule is needful and necessary to carry out the NFA and GCA's provisions, the ATF has the constitutional authority to promulgate it.

**B.**   **Plaintiff has not shown a substantial likelihood of success on his administrative law claims.**

Plaintiff makes two administrative law arguments that the Final Rule is invalid. First, he claims that the Final Rule violates Section 706(2)(C) of the APA because the ATF rewrote the statutory definition of "rifle" and the Final Rule runs afoul of the Major Questions Doctrine (Dkt. #7 at pp. 8–9). Second, Plaintiff argues that the Final Rule violates the CRA and APA because the Final Rule's effective date was January 31, 2023—the same day the ATF published the Final Rule in the Federal Register (Dkt. #7 at pp. 21–22).

**1.**   **Plaintiff has not shown a substantial likelihood that the Final Rule violates Section 706(2)(C) of the APA or the Major Questions Doctrine.**

Plaintiff argues that the ATF lacked the statutory authority to promulgate the Final Rule, asserting that the Final Rule "rewrites" rather than interprets the statutory definition of "rifle"

and runs afoul of the Major Questions Doctrine (Dkt. #7 at pp. 15–16). Under the circumstances presented, the Court is not convinced that Plaintiff is likely to succeed on the merits of these claims.

The Court first addresses Plaintiff's argument that the ATF has exceeded its statutory authority to promulgate the Final Rule. Plaintiff contends that the ATF improperly rewrites or expands the statutory definition of "rifle" (Dkt. #7 at p. 16). A grant of authority from the legislature to an executive agency is generally policed by the APA. *VanDerStok v. Garland*, 86 F.4th 179, 187–88 (5th Cir. 2023). Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *VanDerStok*, 86 F.4th at 188 (citing *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019)). A regulation will withstand judicial scrutiny if the statutory text shows that the ATF has "clear congressional authorization to enact such regulation." *Id.* (citing *West Virginia v. EPA*, 142 S. Ct. 2587, 2614 (2022)).

In *VanDerStok*, the ATF promulgated a rule that did in fact constitute "unlawful agency action in direct contravention of the legislature's will." 86 F.4th at 182. The GCA defines a "firearm" as: "(A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3)(C). In 1978, the GCA defined "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its

forward portion to receive the barrel." *VanDerStok*, 86 F.4th at 184 (quoting Title and Definition Changes, 43 Fed. Reg. 13531, 13537 (Mar. 31, 1978)). In 2022, the ATF promulgated the rule at issue, which gave the terms "frame or receiver," among other terms, an updated definition. *Id.* at 183. The new rule provided that "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun." *Id.* at 185 (quoting Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24739 (Apr. 26, 2022)).

A comparison of the rules revealed that the new definition now included "partially complete, disassembled, or nonfunctional" frames and receivers, including a "frame or receiver parts kit." *Id.* The problem with this inclusion was that, historically, at-home gun making was never permitted to be regulated by the ATF. *Id.* at 185 (citing Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 66 (2023)). Indeed, "Congress made it exceedingly clear when enacting the GCA that 'this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.'" *Id.* (quoting Pub. L. No. 90-618, Title I, § 101, 82 Stat. 1213, 1213 (Oct. 22, 1968)). The ATF attempted to expand the terms "frame" and "receiver" to include changes in firearms in modern times, but the Fifth Circuit explained that meanings of statutes do not change with the times. *Id.* at 189. Rather, a statute is interpreted "in accord with the ordinary public meaning of its terms *at the time of its enactment.*" *Id.* (quoting *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020)) (emphasis in

original). Because the ATF's rule materially deviated from past definitions to encompass items that were not originally understood to fall within the ambit of the GCA, the rule was deemed an impermissible extension of the statutory text. *Id.* at 190.

Here, unlike in *VanDerStok*, Plaintiff has not shown that the Final Rule does any more than establish criteria by which to classify a weapon as a rifle. Both the NFA and the GCA define the term "rifle" to include all weapons that are, among other things, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Final Rule does not "rewrite" the definition of "rifle" to encompass additional weapons not previously understood to fall within the ambit of the GCA, but rather provides a framework to determine whether a particular weapon equipped with a stabilizing brace is designed, made, and intended to be fired from the shoulder. *See* 88 Fed. Reg. at 6,478. And it is well established, as discussed *supra*, that the ATF has the congressional authorization to prescribe all needful and necessary rules and regulations for the administration and enforcement of the NFA and the GCA. To be sure, "previous ATF regulations using this authority to classify certain weapons and devices as subject to or exempt from federal regulation have been recognized consistently in courts nationwide." *Mock*, 75 F.4th at 578.

Plaintiff also argues that, pursuant to the Major Questions Doctrine, Congress did not speak clearly—as required—to give the ATF the authority to adopt the Final Rule (Dkt. #7 at p. 15). It is fundamental that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia*, 597 U.S. at 721. "Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to

confer the power the agency has asserted." *Id.* (cleaned up). The Major Questions Doctrine applies in extraordinary cases in which the "history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *Id.* In those extraordinary cases, an agency must show "clear congressional authorization" for the authority it claims. *Id.* at 723.

Plaintiff provides little support for his argument that the Final Rule runs afoul of the Major Questions Doctrine (*See* Dkt. #7 at pp. 15–16; Dkt. #25 at pp. 6–7). And it is unclear to the Court how the Final Rule raises any reason to hesitate before concluding that Congress meant to confer such authority to the ATF. As discussed *supra*, the ATF holds clearly delegated authority to regulate and classify firearms. Thus, the Major Questions Doctrine does not appear to be applicable, and Plaintiff has not shown a substantial likelihood of success on the merits of these claims.

> **2.** **Plaintiff has not shown a substantial likelihood that the Final Rule violates the CRA nor has Plaintiff shown harm resulting from the APA violation.**

Plaintiff argues that the Final Rule violates the CRA and APA because the Final Rule took effect on the same day it was published in the Federal Register (Dkt. #7 at pp. 21–22). However, Plaintiff notes that "[i]t is unclear . . . whether [an agency's] failure to comply with the [CRA] is reviewable" (Dkt. #7 at p. 21 n.1). Regarding the alleged CRA violation, Defendants claim the CRA's requirements do not impact a major rule's effective date, instead creating a 60-day waiting period before it may enforce the rule (Dkt. #23 at p. 60). Regarding the alleged APA violation, Defendants respond that no APA violation occurred because it is too late for Plaintiff to request postponement of an "effective date that has already come and gone" and an exception for

interpretive rules and statements of policy applies (Dkt. #23 at pp. 59–60).  The Court first addresses the alleged CRA violation and then the alleged APA violation.

The CRA requires that:

A major rule . . . shall take effect on the latest of the later of the date occurring 60 days after the date on which . . . Congress receives the report . . . ; or (ii) the rule is published in the Federal Register, if so published.

5 U.S.C. § 801(a)(3). The plain language of the CRA precludes the Court from reviewing whether the ATF complied with the CRA in this context. According to Section 805 of the CRA, "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." *Id.* § 805. "When interpreting statutory language, words are given their ordinary, plain meanings, and language must be enforced unless ambiguous." *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)). The statute's plain language indicates that the Court cannot review whether the ATF's decision to make the Final Rule's effective date the same as its date of publication violates the CRA. *See* 5 U.S.C. § 801(a)(3); 88 Fed. Reg. at 6,478.

Even if the Court could review this issue under the CRA, the ATF did not violate the CRA.[3] No court within the Fifth Circuit has interpreted the meaning of 5 U.S.C. § 801(a)(3). Nevertheless, the CRA states that the regulation "shall take effect," not "the effective date is." *See id.* "When the statute does not define a term, as it is the case here, the agency and the reviewing court must give the undefined term its ordinary meaning." *Liesegang v. Sec'y of Veterans Affs.*, 312 F.3d 1368, 1374 (Fed. Cir. 2002). The ordinary meaning of "take effect" is "[t]o be in force; to go into operation." *Take Effect*, BLACK'S LAW DICTIONARY (11th ed. 2019). "As shown by the term's

---

[3] The Court assumes that the Final Rule is a major rule under the CRA. *See* 5 U.S.C. § 804(2).

denotation, the CRA does not change the date on which the regulation becomes effective." *Liesegang*, 312 F.3d at 1375. "It only affects the date when the rule becomes operative." *Id.* "In other words, the CRA merely provides for a 60–day waiting period before the agency may enforce the major rule so that Congress has the opportunity to review the regulation." *Id.* Therefore, the Final Rule does not violate the CRA because the ATF delayed initiating enforcement actions for at least 60 days following the Final Rule's publication in the Federal Register. *See* 88 Fed. Reg. at 6,481 ("For purposes of the Congressional Review Act, however, the Department will wait to actually initiate such enforcement actions for at least 60 days from publication of the rule in the Federal Register.").

Next, the Court finds that the Final Rule's violation of the APA through its effective date is harmless. Under the APA, "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date." 5 U.S.C. § 553(d). "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *City of Arlington*, 668 F.3d at 245. However, exceptions to this rule exist where 1) "a substantive rule [] grants or recognizes an exemption or relieves a restriction;" 2) with "interpretative rules and statements of policy;" or 3) "as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C. § 533(d)(1)–(3).

No exception to the 30-day waiting period applies to the Final Rule. "The burden of establishing good cause is on the agency, and the exception is applicable in emergency situations, or where delay could result in serious harm." *Coal. For Workforce Innovation v. Walsh*, No. 1:21-CV-130, 2022 WL 1073346, at *5 (E.D. Tex. March 14, 2022) (cleaned up). Neither party's briefing addresses how the first or third exceptions apply to the Final Rule. Further, the Fifth

Circuit has established that the Final Rule is a legislative rule, rather than an interpretive rule, *Mock II*, 75 F.4th at 579, so the second exception is not applicable.

Although the Final Rule violates the APA, the violation is harmless. "[T]he harmless error rule requires the party asserting error to demonstrate prejudice from the error." *City of Arlington*, 668 F.3d at 243. Plaintiff does not explain how the ATF's actions impacted him during the 30-day period following the Final Rule's publication. Although the Final Rule was "immediately effective" at its date of publication, the ATF established a 60-day waiting period before it would initiate any enforcement actions pursuant to the Final Rule. 88 Fed. Reg. at 6,481. Therefore, the January 31, 2023, publication date and effective date of the Final Rule did not affect Plaintiff. *See* 88 Fed. Reg. at 6,478. Additionally, Plaintiff's claimed harm of wanting to possess a firearm equipped with a stabilizing brace does not stem from the effective date but rather from his choice not to register his firearm pursuant to the Final Rule. *See Second Amend. Found., Inc.*, 2023 WL 7490149, at *9 (noting the plaintiffs' "alleged harm of wanting to purchase new brace-quipped firearms without agency interference does not flow from the immediate effective date but rather from choosing to purchase but not register a qualifying device under the Final Rule"). For these reasons, Plaintiff has not shown a substantial likelihood of success on his CRA and APA claims.

### C.   Plaintiff has not shown a substantial likelihood that the Final Rule violates the Second Amendment.

Plaintiff contends that the Final Rule is a violation of his Second Amendment right to keep and bear arms (Dkt. #7 at pp. 10–12). In response, Defendants argue: 1) a stabilizing brace, as an attachment, is not protected by the Second Amendment; 2) a pistol equipped with a stabilizing brace subject to the Final Rule is substantially similar to that of a short-barreled rifle, which is a dangerous and unusual weapon not protected by the Second Amendment; and 3) the registration

and taxation requirements of the Final Rule are not protected by the Second Amendment (Dkt. #23 at p. 23–33). The Court concludes that Plaintiff has not shown a substantial likelihood that the Final Rule violates the Second Amendment.

The Supreme Court in *Heller*, as clarified in *Bruen*, set out a two-part framework to evaluate modern firearms regulations: it requires "courts to assess whether modern firearms regulations are consistent with the Second Amendment's *text* and *historical understanding*." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26 (2022) (emphasis added). First, if the "Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Once the court finds the Second Amendment protects the conduct, the government must then "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

Importantly, courts look at history at both steps. First, courts look at history to assess whether textual understandings of the Second Amendment are "confirmed by the historical background of the Second Amendment." *Bruen*, 597 U.S. at 20. Second, courts look at history to "demark the limits on the exercise of that right." *Id.* at 21. It is at this demarcation step that the "government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

For example, the Supreme Court in *Heller*, while recognizing the individual right to keep and bear arms, recognized that the "right was not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Court noted that the Second Amendment does not "protect the right

of citizens to carry arms for *any sort* of confrontation." *Id.* (emphasis in original). The Court also noted that the "sorts of weapons protected [by the Second Amendment] were those 'in common use at the time.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Then the Court highlighted this country's "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* Accordingly, the Court in *Heller*, when interpreting its decision in *Miller*, found that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.

> **1.    Determining whether a firearm accessory or attachment is protected under the Second Amendment is not necessary or relevant.**

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In other words, the Second Amendment "conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595.

Even so, "the right secured by the Second Amendment is not unlimited." *Id.* There is no right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Rather, the Second Amendment extends only to those "instruments that constitute bearable arms." *Id.* at 582. An "arm" is a "[w]eapon[] of offence or armour of defence" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller,* 554 U.S. at 581.

Firearm accessories or attachments have generally not been held to constitute bearable arms. *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment."); *United States v. Peterson*, No. CR 22-231,

2023 WL 5383664, at *2 (E.D. La. Aug. 21, 2023) ("[S]ilencers are not bearable arms within the scope of the Second Amendment even in light of *Bruen* or its progeny."). Indeed, a silencer does not fall within the purview of the Second Amendment because "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm[,]" and "a firearm remains an effective weapon without a silencer of any type attached." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022).

Following the same reasoning in *Hasson*, Defendants argue that a stabilizing brace cannot cause any harm on its own, nor is it useful independent of its attachment to a pistol (Dkt. #23 at pp. 34–40). Moreover, a pistol remains an effective weapon without a stabilizing brace attached (Dkt. #23 at p. 39). Defendants conclude then that a stabilizing brace is a firearm accessory or attachment, not a bearable arm falling within the purview of the Second Amendment (Dkt. #23 at p. 40).

However, the Final Rule does not regulate a stabilizing brace on its own. Stabilizing braces only come within the Final Rule's purview when attached to a firearm. This is initially clear from the title of the Final Rule—"Factoring Criteria for Firearms with *Attached* Stabilizing Braces." *See* 88 Fed. Reg. 6,478 (Jan. 31, 2023) (emphasis added). And it is further evident from the various requirements of the Final Rule, including requiring individuals to destroy, dispose of, modify, or register existing braced pistols. *Id.* at 6,570. Moreover, the ATF makes clear on the FAQ page of its website that "a 'stabilizing brace' is an accessory and ATF does not regulate accessories." *"Stabilizing Brace" Devices*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/qa-category/stabilizing-brace-devices (last visited Feb. 7, 2024); *see also Coleman v. Dretke*, 409 F.3d 665 (5th Cir. 2005) (taking judicial notice of information published on

a state agency's website). Further, a person registers their firearm equipped with the stabilizing brace as one item, rather than either component separately. BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, OMB NO. 1140-0011, APPLICATION TO MAKE AND REGISTER A FIREARM (2024). It is evident that Defendant's argument is flawed—the Final Rule does not regulate stabilizing braces on their own, so it is irrelevant whether stabilizing braces are protected under the Second Amendment.

2. **Dangerous and unusual weapons are not protected by the Second Amendment.**

Plaintiff argues that a pistol equipped with a stabilizing brace is, as a whole, a weapon protected by the Second Amendment (Dkt. #7 at p. 18). However, those pistols subject to the Final Rule are most akin to that of a short-barreled rifle, which are considered dangerous and unusual weapons not protected by the Second Amendment.

The sort of weapons protected by the Second Amendment are those "in common use at the time" of founding. *Heller*, 554 U.S. at 625 (citing *Miller*, 307 U.S. at 179). That limitation is "supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. Stated differently, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

A short-barreled shotgun is a dangerous and unusual weapon that would fall outside the protection of the Second Amendment. *Heller*, 554 U.S. at 625. Though the Supreme Court has not explicitly extended that classification to a short-barreled rifle, it has indicated that a short-barreled rifle is likely to be used for criminal purposes rather than lawful purposes. *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) ("[T]he NFA's object was to regulate certain

weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used."); *cf. Mock*, 75 F.4th at 596 (Higginson, J. dissenting) ("I am persuaded that uniquely dangerous weapons, including short-barreled rifles, are not covered by the Second Amendment."). And at least one court within the neighboring Northern District of Texas has concluded that short-barreled rifles are "dangerous and unusual." *United States v. Miller*, No. 3:23-CR-0041-S, 2023 WL 6300581, at *3 (N.D. Tex. Sept. 27, 2023) (Scholer, J.). Because a pistol equipped with a stabilizing brace subject to the Final Rule effectively becomes a short-barreled rifle, it too likely becomes a dangerous and unusual weapon not protected by the Second Amendment.

The Court is not persuaded by Plaintiff's argument that pistols equipped with a stabilizing brace are in common use today for lawful purposes and thus fall within the Second Amendment's protection (Dkt. #7 at p. 11). The law is clear that "[i]f a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). Accordingly, Plaintiff has not established a likelihood of success on the merits of this claim.

### 3.   The Final Rule's registration requirements do not violate the Second Amendment.

Plaintiff argues that no historical analogue exists to justify the Final Rule's registration requirement that "compel[s] law-abiding citizens to wait months to a year to possess a pistol with a stabilizing brace or that justifies a tax designed to discourage the exercise of Second Amendment rights" (Dkt. #7 at p. 12). In response, Defendants argue that the Final Rule's registration requirements do not implicate the Second Amendment (Dkt. #23 at p. 40).

The Supreme Court contemplated specific licensing regimes in *Bruen* and explained that

36

the licensing requirements at issue, which often required applicants to undergo a background check or pass a firearms safety course, did not necessarily prevent citizens from exercising their Second Amendment right. *Bruen*, 597 U.S. at 38 n.9. Instead, those licensing requirements appeared to ensure that those bearing arms in the jurisdiction were "law-abiding, responsible citizens." *Id.* That said, the Supreme Court further explained it does not rule out constitutional challenges to specific licensing regimes where "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their [Second Amendment right]." *Id.*

Here, Plaintiff cannot show that the Final Rule's registration process constitutes a lengthy wait time such that it denies him the right to bear arms. Plaintiff claims that he would need to wait several months to a year for approval, but Defendants point to the Current Processing Times page on the ATF's website that shows otherwise. Current[4] processing times are 91 days for paper forms and 40 days for eForms. *Current Processing Times*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/resource-center/current-processing-times (last visited Feb. 7, 2024). These estimated times are substantially less than the year wait time complained of by Plaintiff and are not lengthy enough such that Plaintiff's Second Amendment right is denied. Moreover, if Plaintiff submitted his application pursuant to the Final Rule on or before May 31, 2023, he could properly retain possession of the firearm pending a decision from the ATF on his application. *See* 88 Fed. Reg. at 6,559.

Additionally, Plaintiff cannot show that a $200 tax is so exorbitant that he is effectively denied his Second Amendment right to bear arms. The $200 tax has remained the same since the NFA was enacted in 1934. *See* National Firearm Act, Pub. L. No. 474, § 3(a), 48 Stat. 1236, 1237

---

[4] Defendants indicate in their Response that current wait times at the time of drafting were 45 days for a paper submission and 30 days for an electronic submission (Dkt. #23 at p. 41).

(1934). Plaintiff cites to *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 U.S. Dist. LEXIS 135684, at *34–37, *79–83 (D. N. Mar. I. Sept. 28, 2016) in support of his assertion that the $200 tax is exorbitant. In *Murphy*, the registration requirement of $1000 was struck down because it came too "close to destroying the Second Amendment right to acquire the quintessential self-defense weapon." 2016 U.S. Dist. LEXIS 135684, at *83. But a $200 tax can hardly be compared to a $1000 tax. Consequently, Plaintiff cannot show a likelihood of success on the merits of his Second Amendment claim.

### III.    Plaintiff has not demonstrated a substantial threat that he will suffer irreparable harm if the injunction is not granted.

For a preliminary injunction, Plaintiff must demonstrate he is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Id.* at 22. Plaintiff contends that, even though the Final Rule is stayed pursuant to 5 U.S.C § 705, "he still faces prosecution risks if he attaches his brace to his pistol," which "chills the exercise of his Second Amendment rights and perpetuates the continued deprivation of constitutional rights" (Dkt. #57 at p. 5–7). However, in light of the *Britto* Stay, the Court finds that Plaintiff cannot demonstrate he is likely to suffer irreparable harm.

The APA authorizes a court to stay the Final Rule in its entirety. *See* 5 U.S.C § 705 (authorizing courts "to postpone the effective date of an agency action"). "[W]hen a court stays agency action pursuant to Section 705, it stays all (or at least the challenged part) of the agency regulation as applied to all parties and not just to the parties before the Court." *Rural & Migrant Ministry v. EPA*, 565 F. Supp. 3d 578, 605–06 (S.D.N.Y. 2020) (citing *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019)); *see also All. for Hippocratic Med.*, 78 F.4th at 254 (A § 705 stay "removes

the source of the defendant's authority" and "effectively rescinds the unlawful agency action.").

As discussed previously, the court in *Britto* stayed the "[Final] Rule in its entirety" pursuant to § 705. *Britto*, 2023 WL 7418291, at *5. Consequently, the Final Rule is stayed nationwide, and the ATF no longer has the authority to enforce it. Indeed, the ATF recognizes as such and confirms it is not currently enforcing the Final Rule (Dkt. #52 at p. 2). Plaintiff cannot show irreparable harm stemming from a rule that an agency is no longer authorized to enforce. Therefore, Plaintiff has not demonstrated that he is likely to suffer irreparable harm.

## IV.   The remaining preliminary injunction elements need not be considered.

Plaintiff has not shown he is entitled to the extraordinary remedy of preliminary injunctive relief. At this early stage, Plaintiff has failed to demonstrate a substantial likelihood of success on the merits of at least one of his claims.[5] Failure to satisfy this element bars injunctive relief. Plaintiff has also failed to demonstrate irreparable harm. The remaining preliminary injunction elements need not be considered.

## V.   Plaintiff's request for a stay under 5 U.S.C. § 705 should be denied.

Also pending before the Court is Plaintiff's request to stay the Final Rule under 5 U.S.C. § 705 (*see* Dkt. #42). For the same reasons asserted above, the Court declines to enter a § 705 stay.

An analysis of whether a stay is appropriate under § 705 considers the same elements required for injunctive relief. *See R.J. Reynolds Tobacco Co. v. FDA*, No. 6:20-CV-00176, 2022 WL 17489170, at *10 n.93 (E.D. Tex. Dec. 7, 2022) ("A stay 'appropriate' under § 705 requires satisfaction of the well-known test that considers the [likelihood] of success on the merits, injury

---

[5] Had Plaintiff made a logical-outgrowth claim under the APA, the Court would have adhered to the Fifth Circuit's ruling in *Mock*, which held that the plaintiffs established a substantial likelihood of success on the merits of their logical-outgrowth claim. The Court then would have considered the remaining preliminary injunction factors.

to the plaintiff, injury to the defendant, and the public interest."); *Texas v. Biden*, 646 F. Supp. 3d 753, 771 (N.D. Tex. 2022) ("Motions to stay agency action pursuant to [Section 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief.") (quoting *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010)).

Because Plaintiff failed to satisfy all elements required for a preliminary injunction, the Court declines to grant a stay under § 705.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Reconsider and Modify the Court's June 7, 2023 Order (Dkt. #42) is **DENIED**.

**IT IS SO ORDERED.**
 **SIGNED this 1st day of March, 2024.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE